HOLLAND & KNIGHT LLP
David A. Robinson, Esq. (SBN 107613)
*david.robinson@hklaw.com*
Marne S. Sussman, Esq. (SBN 273712)
*marne.sussman@hklaw.com*
Emily M. Lieban, Esq. (SBN 303079)
*emily.lieban@hklaw.com*
Nicholas A. Dellefave, Esq. (SBN 323814)
*nicholas.dellefave@hklaw.com*
Three Park Plaza, Suite 1400
Irvine, CA  92614-8537
Telephone:  949.833.8550
Facsimile:  949.833.8540

Attorneys for Plaintiff CALIFORNIA
TRUCKING ASSOCIATION

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT; The GOVERNING BOARD OF THE SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.: 2:21-cv-6341<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

*Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540*

**INTRODUCTION**

1.      "*The problem is the trucks*." — South Coast Air Quality Management District ("District") Governing Board Member Rex Richardson at the May 7, 2021 hearing on Proposed Rule 2305 – Warehouse Indirect Source Rule – Warehouse Actions and Investments to Reduce Emissions Program, and Proposed Rule 316 – Fees for Rule 2305 (collectively, "Rule 2305").

2.      "*We all acknowledge trucks are the issue.  The type of building the trucks go to or from, the trucks are indifferent. They pollute no matter where they go.*" — District Governing Board Member Janice Rutherford at the May 7, 2021 hearing on Rule 2305.

3.      To avoid the balkanization of emissions and regulatory standards across every local jurisdiction, the United States Congress has enacted two sweeping preemptions of local rules that could impact the control of emissions from trucks or that could impact the price, routes, or services those trucks provide.  But faced with diminishing returns on its regulation of traditional polluters, looming federal deadlines, and nearing the edge of its regulatory authority, the District has flouted this prohibition by adopting a regional warehouse regulation that, from its inception, has been designed to do only one thing: change the trucks on the road.

4.      Dissatisfied with the pace of fleet turnover already mandated by the California Air Resources Board ("CARB"), the District has seized for itself powers reserved to the United States Environmental Protection Agency ("EPA") and CARB under what the United States Supreme Court has already declared to be "Congress's carefully calibrated regulatory scheme."  *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004).  The District now seeks to go where no local air district has sought to go before, to implement a rule forcing the marketplace's accelerated acquisition and use of zero emission ("ZE") or near zero emission ("NZE") heavy-duty trucks.

5.      In so doing, the District has issued "[a] command, accompanied by

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

sanctions, that certain purchasers *may* buy only vehicles with particular emission characteristics" previously determined by the United States Supreme Court to be "as much a [preempted] 'attempt to enforce' a 'standard' as a command, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume *must* consist of such vehicles." *Engine Mfrs. Ass'n.*, 541 U.S. at 255 (italics added).  As explained by our High Court:  "The aggregate effect of allowing every state or political subdivision to enact seemingly harmless rules would create an end result [that] would undo Congress's carefully calibrated regulatory scheme." *Ibid*.

6.     Plaintiff California Trucking Association et al. ("CTA") thus brings this suit to declare void and to permanently enjoin enforcement of Rule 2305.

7.     The District has long-struggled to achieve state and federal air quality standards by exercising only those powers lawfully granted to it.  The District has also long-recognized that the majority of its remaining emissions result from tailpipes, not smokestacks.  But the District has no lawful authority over tailpipes.  Nonetheless, in an effort to reach those sources, the District has stretched the letter of the law to reach far beyond its jurisdiction in order to obtain emission reductions.

8.     Rule 2305 is nominally styled as a lawful indirect source review ("ISR") rule, but is instead concerned with none of the emissions sources such a review normally addresses.  While the Clean Air Act ("CAA"), 42 U.S.C. § 7401, *et seq.,* allows EPA to review and approve certain ISR rules promulgated by California's 35 legislatively created air districts and duly incorporated into California's State Implementation Plan ("SIP") by CARB (*see* 42 U.S.C. § 7410(a)(5), hereinafter "CAA § 110"), Rule 2305 is not truly concerned with indirect sources.  It does not address vehicle trips from workers coming to or leaving the site, the construction equipment used in developing new warehouses, the length of trips to and from the warehouse, or any direct emissions from the warehouse itself.  Rule 2305, by necessity and design, is entirely about the trucks.

9.     Congress has expressly preempted state and local rules that "relate to"

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

the control of emissions from new motor vehicles and state and local rules that "relate to" a price, route, or service of any motor carrier.  42 U.S.C. § 7543(a) ("CAA § 209"); Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501(c)(1).

10.     The CAA sets up a comprehensive federal regime via which EPA regulates emissions.  Section 202(a)(1) of the CAA directs EPA to "prescribe . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines."  "Because the regulation of mobile source emissions is a federal responsibility, Congress has expressly preempted states from setting emissions standards for mobile sources…." *Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 939 (9th Cir. 2011) (citing CAA § 209(a)).  According to the United States Supreme Court, "[t]he language of [the CAA] is categorical." *Engine Mfrs. Ass'n,* 541 U.S. at 256.  There is no exception for the indirect regulation the District purports to undertake.

11.     Like the CAA, the FAAAA is a comprehensive law with strong preemptive power.  The FAAAA's purpose is to "'prevent States from undermining federal regulation of interstate trucking' through a 'patchwork' of state regulations." *Am. Trucking Ass'ns v. City of Los Angeles*, 660 F.3d 384, 395-96 (9th Cir. 2011), *rev'd on other grounds*, 569 U.S. 641 (2013).  The FAAAA's express-preemption provision prohibits the State of California or any subdivision thereof from making, applying, or enforcing laws "related to a price, route, or service of any motor carrier … or any private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).  Rule 2305 creates precisely the type of patchwork the FAAAA was designed to avoid as motor carriers must modify their services and routes to support ZE/NZE vehicles or even entirely relocate.  If every local jurisdiction enacted its own version of Rule 2305, the impact on the nation's logistics industry would be nothing short of disastrous.

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

12.     Because Rule 2305 has the purpose and effect of interfering with interstate freight operations, facilities and equipment on an intra-state, sub-regional basis, it is both expressly and impliedly preempted by the CAA, 42 U.S.C. § 7401, *et seq.,* and the FAAAA, 49 U.S.C. § 14501; as explained below, it exceeds the District's limited authority to adopt ISR rules under the California Health and Safety Code, § 40000, *et seq.*; and it constitutes an unlawful tax adopted in contravention of the California Constitution Art. XIII C, § 1(e).

## THE PARTIES

13.     Plaintiff California Trucking Association ("CTA") is an association devoted to advancing the interests of its motor-carrier members, which include warehouse owners and operators, who provide transportation services in California. CTA promotes advocacy, safety and compliance with all applicable state and federal laws on behalf of its members, including motor-carrier members operating in California.

14.     CTA members are licensed motor-carrier companies and warehouse owners or operators that manage, coordinate, and schedule the movement of property throughout California in interstate commerce.  Many of CTA's members are based in this judicial district, and many other CTA members are based elsewhere but provide transportation services in this judicial district.  Many of CTA's motor-carrier members contract with warehouse owner-operators to provide interstate trucking services to their customers in and between several states, including California.  Other CTA members are themselves owners or operators of warehouses directly regulated by Rule 2305.  CTA also expends significant resources to ensure that its members, and the governmental agencies that regulate them, understand and faithfully implement the goals and requirements of all applicable laws and regulations, including Rule 2305.  The activities of CTA's members are subject to regulation under Rule 2305, and the injuries they have suffered and will suffer under Rule 2305 can only be redressed by this Court's order setting aside this illegal rule and enjoining

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

its enforcement.

15.     Defendant District is a political subdivision of California responsible for air pollution control in counties that include the Los Angeles metropolitan area.  Its authority is defined, and circumscribed, by enabling legislation found at California Health & Safety Code § 40400, *et seq.*, aka the "Lewis-Presley Air Quality Management Act."  Under California law, the District has the authority to sue and be sued in the name of the District in all actions and proceedings in all courts and tribunals of competent jurisdiction.  Cal. Health & Safety Code § 40701.  Agents of the District are responsible for administering Rule 2305.

16.     Defendant members of the District Governing Board are all residents of the State of California.

### JURISDICTION AND VENUE

17.     The claims asserted herein arise under, *inter alia*, the CAA, 42 U.S.C. § 7401, *et seq.,* the FAAAA, 49 U.S.C. § 14501, and Article VI of the United States Constitution. Thus, this Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

18.     Pursuant to 28 U.S.C. § 167, this Court may exercise supplemental jurisdiction over CTA's claims that the District's adoption of the regulations at issue was not an authorized exercise of its regulatory power under the California Health & Safety Code and imposes an unauthorized tax.

19.     The Court may issue declaratory judgment and appropriate relief in this matter pursuant to 28 U.S.C. §§ 2201-2202.

20.     Venue in this district is appropriate pursuant to 29 U.S.C. § 1391(b), as the South Coast District's headquarters are located in the Western Division of the Central District of California and the South Coast District's contested Rule 2305, the subject of this action, pertains to warehouses and commercial truck fleets operating, and the movement of goods for sale transported by those trucks, in the Western Division of the Central District of California.

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

## STATEMENT OF FACTS

### I.   The Clean Air Act

21.   Enacted in 1970, the CAA is a comprehensive federal law which regulates air quality.  Section 202(a)(1) of the CAA directs EPA to "prescribe . . . standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines."  The EPA is also responsible for certifying that new motor vehicle engines comply with applicable standards and regulations under the CAA.  *Ibid.*

22.   The CAA makes "the States and the Federal Government partners in the struggle against air pollution."  *General Motors Corp. v. United States*, 496 U.S. 530, 532 (1990).  The direct regulation of emissions from stationary sources is primarily left to the states (42 U.S.C. § 7416, hereinafter "CAA § 116"; *see also Engine Mfrs. Ass'n, ex rel. Certain of its Members v. United States EPA*, 88 F.3d 1075, 1079 (1996) (describing a "history of detailed state regulation of stationary sources")), while the federal government sets nationwide emissions standards for mobile sources. The category of "mobile sources" includes both motor vehicles ("onroad") and "nonroad" sources.  *See* CAA § 202 (giving the EPA Administrator authority to set emission standards for new motor vehicles); 42 U.S.C. § 7547 ("CAA § 213") (same for nonroad sources).

23.   The CAA regulates mobile sources through both direct emissions standards for motor vehicles and engines, and fuel composition requirements for the fuels combusted in these engines.  42 U.S.C. §§ 7521-7544 ("CAA §§ 202-210") (engine standards), §§ 7545-7549 ("CAA §§ 211-215") (fuels standards).  Mobile sources are not, however, regulated under the stationary source programs, even when used in a stationary manner (*e.g.,* stationary internal combustion engines).  42 U.S.C. §§ 7411(a)(3), 7602(z) ("CAA §§ 111(a)(3), 302(z)").

24.   Because the regulation of mobile source emissions is a federal responsibility, Congress has expressly preempted states from setting emissions

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

"standards" for mobile sources.  CAA § 209(a) (preempting state regulation of new motor vehicle emissions).

25.     According to the United States Supreme Court, the term "standard" broadly includes that which was "established by authority, custom, or general consent, as a model or example; criterion; test."  *Engine Mfrs. Ass'n.*, 541 U.S. at 252-53 (opn. by J. Thomas striking down as preempted an earlier District rule that, as here, used fees or economic sanctions to effectively coerce the purchase of lower emission vehicles); *see also Metropolitan Taxicab Bd. of Trade v. City of New York*, 633 F. Supp. 2d 83, 100 (S.D.N.Y., 2009) ("*Metropolitan Taxicab*") (holding that a New York City rule increasing the maximum allowable taxi lease rate in order to coerce taxi owners to purchase hybrid vehicles by rendering conventional fleets substantially less profitable than hybrid fleets was, in fact, a preempted state or local "mandate to switch to hybrid vehicles").

26.     Under CAA § 209(b), California can seek EPA approval for a waiver of preemption to adopt its own mobile source emissions standards, provided they are at least as protective of health and welfare as federal standards.  The CARB, as the state agency designated "the air pollution control agency for all purposes set forth in federal law" (Cal. Health & Safety Code § 39602), is the agency responsible for applying for such a waiver.

27.     Section 110(a)(1) of the CAA, entitled "State implementation plans for national primary and secondary ambient air quality standards" mandates, and prescribes a procedure for, each states' submission of "a [SIP] which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State" within 3 years or less after "the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 109."  It also establishes a procedure for the EPA Administrator's review and approval of such SIPs.  These SIPs explain how each state, and within California how each air district, intends to comply with the national

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

ambient air quality standards.

## II.    Air Quality Regulation in California

28.    The CARB, or "the state board," is the agency that California law designates as "the air pollution control agency for all purposes set forth in federal law."  Cal. Health & Safety Code § 39602.  The CARB's statutory mandate includes "preparation of the [SIP] required by the [CAA] …" and coordination "of the activities of all districts necessary to comply" with the CAA and SIP.  *Ibid.*

29.    The "districts" with whom CARB is required to coordinate are those "created or continued in existence pursuant to … [Health & Safety Code s]ection 40000."  Cal. Health & Safety Code § 39025.  The District is one of 35 such districts throughout the state.  The District is responsible for developing and implementing a "comprehensive basinwide air quality management plan" to reduce emission levels and thereby achieve and maintain "state and federal ambient air quality standards."  Cal. Health & Safety Code § 40402(e).  The District is authorized to "adopt rules and regulations that carry out the [P]lan and *are not in conflict with state law and federal laws and rules and regulations*."  Cal. Health & Safety Code § 40440 (italics added).  Any rules and regulations promulgated by the District must "conform to the [SIP]."  *Ibid.*

30.    The California Legislature has found and declared that "local and regional authorities have the primary responsibility for control of air pollution from all sources, other than emissions from motor vehicles.  *The control of emissions from motor vehicles, except as otherwise provided in this division, shall be the responsibility of the state board*."  Cal. Health & Safety Code § 40000 (italics added); *see also* Health & Safety Code §§ 39002, 43000.5, 43013, 43018(b) and (d).  Under state law, CARB and the air districts are each charged with regulating particular sources of air pollution.

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

### III.    Indirect Source Review Authority

31.    "Indirect sources" are neither stationary sources nor mobile sources, but are facilities which, by their nature "attract[], or may attract, mobile sources of pollution." CAA § 110(a)(5)(C).  Typical indirect sources include shopping centers, stadiums, and other places of public assembly.  The CAA provides that states may, but are not required to, adopt an ISR program as part of their SIPs.  *Id.* at (a)(5)(A).  The CAA defines ISR programs to mean "the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that *a new or modified indirect source* will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations exceeding any national primary ambient air quality standard…." *Id.* at (a)(5)(D) (italics added).

32.    An ISR is "an environmental review process encompassing air pollution, land use decisions and individual usage of the automobile .... ISR can serve as a tool for evaluating a land development project's effects on automobile usage and the resulting air quality effects of such increased vehicle usage."[1]

33.    Echoing the provisions of CAA § 110(a)(5), California's Health & Safety Code § 40716 gives California air districts generally the authority to adopt and implement regulations to "[r]educe or mitigate emissions from indirect and areawide sources of air pollution" and "[e]ncourage or require the use of measures which reduce the number or length of vehicle trips."  However, subsection (b) expressly stipulates *"[n]othing in this section constitutes an infringement on the existing authority of counties and cities to plan or control land use, and nothing in this section provides or transfers new authority over such land use to a district"* (italics added).

34.    Similarly, Health & Safety Code § 40440 gives the District specifically

---

[1] Phillip E. Rothschild, *The Clean Air Act and Indirect Source Review: 1970-1991*, 10 UCLA J. Envtl. L. & Pol'y 337 (1992), https://escholarship.org/uc/item/71q986z0.

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

authority to "provide for indirect source controls in those areas of the south coast district in which there are high-level, localized concentrations of pollutants or with respect to any new source that will have a significant effect on air quality in the South Coast Air Basin," but only to the extent such indirect source controls or ISR regulations are "consistent" with the mandates of Health & Safety Code § 40414. Health & Safety Code § 40414, in turn, provides *indirect source controls shall not "constitute an infringement on the existing authority of counties and cities to plan or control land use, and no provision of this chapter shall be interpreted as providing or transferring new authority over such land use to either the south coast district, the Southern California Association of Governments, or the state board*" (italics added).

35.    These provisions were not enacted in a vacuum.  In authorizing the air districts to implement ISR rules, the Legislature "was aware of the congressional objections to indirect source review when it provided specific authorization in section 40716" and designed the provision to be "reflective of Congress' aversion to placing an undue regulatory burden on indirect source."  75 Op. Cal. Att'y Gen. 256 (1993). The authorization to the District was provided against the backdrop of federal law, which had created a vernacular describing categories of indirect sources, how and when they could be reviewed, and the bounds of the controls that could be imposed on them.

36.    Accordingly, both as a matter of state and superseding federal law, the District's purported authority to promulgate and enforce indirect source controls or ISR regulations is expressly limited in the following respects:

Under California law,

- The District has authority to regulate only "new" sources or to regulate in areas of the District with demonstrated high-level localized concentrations of pollutants,

- No ISR may "infringe" on land use or control, assess the equivalent of an operational permit, nor confer upon the District or CARB "new

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

authority" with respect to land use or control, and

- No ISR can be contrary to federal law, *e.g.*, violate either the "categorical" preemption of CAA § 209(a) or the broad preemption of the FAAAA.

Under the CAA,

- No ISR can have as its principal purpose or effect (aka "domain," *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996)) the attempted adoption or enforcement of any standard—*e.g.,* here ZE or NZE—relating to the control of emissions from new motor vehicles.

37. Yet, as explained below, Rule 2305 transgresses all of these prohibitions.

## IV. Control of Mobile Source Emissions in California

38. The CARB has exercised its exclusive authority over mobile sources zealously. On June 25, 2020, CARB passed the Advanced Clean Trucks rule ("ACT"). The ACT requires medium and heavy-duty vehicle manufacturers to sell ZE vehicles as a certain percentage of sales, beginning with the 2024 vehicle model year. The ACT phases in over a period of 10 years, culminating in 2035 with a requirement that ZE trucks and tractors comprise 55% of all Class 2b-3, 75% of all Class 4-8, and 40% of all Class 7-8 trucks and tractors sold each year.

39. To address emissions associated with the remaining conventional medium and heavy-duty diesel trucks, CARB adopted the Heavy Duty Engine and Vehicle Omnibus Regulation, often referred to as the "Low NOx Omnibus." This complex regulation requires, among other things, further reductions of oxides of nitrogen ("NOx") emissions from heavy-duty on-road engines, to be phased-in beginning in 2024, overhauls engine testing procedures, and extends engine useful life and warranty periods in order to secure durable emissions reductions.

40. Having mandated that manufacturers provide cleaner vehicles, CARB more recently has turned its attention to the "buy side," with the introduction of its

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

proposed Advanced Clean Fleet rule ("ACF").  The ACF, slated for an initial public hearing in December 2021, proposes to require that a certain percentage of vehicles acquired by fleets be ZE.  For example, the ACF proposes that 50% of public fleet vehicle purchases for model years 2024 to 2026 must be ZE, ramping up to 100% in 2027.  If adopted, the ACF will become effective for certain fleets in 2024 and phase in over time with the goal of a zero-emission truck and bus fleet by 2045 everywhere feasible, and significantly earlier for certain market segments such as last mile delivery and drayage applications.

41.    Despite these diligent efforts, the District has made no secret of its dissatisfaction with the perceived slow pace of CARB's rulemaking and decision to gradually mandate the conversion of billions of dollars-worth of existing medium and heavy-duty trucks transporting goods.  In its comment letter on the Draft Mobile Source Strategy ("MSS"), the District called on CARB to "go even further" since it felt that CARB's efforts to regulate mobile sources were insufficient to meet upcoming 2023 and 2031 federal deadlines for ozone reduction.[2]  In commenting on the ACT, the District explained the 15% ZEV sales requirement in 2030 "will be insufficient and must be increased to generate the needed NOx reductions."[3]

42.    But CARB has persisted in taking a measured approach to the regulation of mobile sources, declining to require a higher sales percentage "due to concerns about the feasibility of manufacturers to comply with even higher sales requirements especially for Class 2b-3 vehicles and tractors."[4]  In other words, CARB, in accordance with its statutory mandate, has responsibly weighed competing public

[2] South Coast Air Quality Management District, Final Staff Report—Proposed Rule 2305 and Proposed Rule 316 (May 2021), at 52, www.aqmd.gov/docs/default-source/Agendas/Governing-Board/2021/2021-May7-027.pdf?sfvrsn=10.

[3] South Coast Air Quality Management District Letter to CARB, Comment Letter on Proposed Advanced Clean Trucks Regulation (Dec. 6, 2019), https://www.arb.ca.gov/lists/com-attach/60-act2019-VzYHYlciWVUBZFM8.pdf.

[4] Advanced Clean Trucks Regulation, Final Statement of Reasons (January 2021), at 99, https://ww3.arb.ca.gov/regact/2019/act2019/fsor.pdf.

- 13 -

policy interests and made a decision with which the District disagrees.  Local officials do not, however, have the right to "undo Congress's carefully calibrated regulatory scheme" simply because they disagree.

**V.     The Origin of the District's Unlawful ISR**

43.     The District is responsible for air quality in the South Coast Basin, an area of approximately 10,743 square miles including all of Orange County and the non-desert portions of Los Angeles, Riverside and San Bernardino Counties.  The Basin is home to the "megaports" of Los Angeles and Long Beach (San Pedro), the origin points for 40 percent of all container cargo traffic in the United States, and a well-developed logistics system designed to disseminate those goods across the region, state, and nation.

44.     There are over 2,600 warehouses located within the District comprising over 662 million square feet of rentable building area.  The District's own consultant estimates that of all of the goods passing through these warehouses, barely a quarter both originate in and are destined for use within the District.[5]  The remainder is transported to or from areas beyond the District's reach, *e.g.,* to Northern California, other states, and nations.  More specifically, the District's own staff have asserted that 41 percent of goods warehoused in the District are intended for national distribution.[6]

45.     The warehouses and distribution centers located in the District are not simply participants in, but essential components of, interstate and international commerce.

46.     Air quality in the South Coast Basin has dramatically improved from the hazy days of the 1970s and 1980s, due in no small part to the combined and ongoing

---

[5] INDUS. ECON., INC., ET AL., ASSESSMENT OF WAREHOUSE RELOCATIONS ASSOCIATED WITH THE SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT WAREHOUSE INDIRECT SOURCE RULE (2020), http://www.aqmd.gov/docs/default-source/planning/fbmsm-docs/iec_pr-2305-warehouse-relocation-report-(12-23-20).pdf?sfvrsn=8.

[6] South Coast Air Quality Management District Mobile Source Committee Meeting Agenda (February 19, 2021), at 10, http://www.aqmd.gov/docs/default-source/Agendas/Mobile-Source/msc021921.pdf?sfvrsn=22.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

1    regulatory efforts of EPA, CARB, the District, and California's other legislatively

2    created air districts.

3        47.    In 2017, in an effort to further progress air quality, the South Coast

4    District adopted its 2016 Air Quality Management Plan ("AQMP").  Included therein

5    was provision "MOB-03 - Emission Reductions at Warehouse Distribution Centers,"

6    the goal of which was to assess and identify potential actions to further reduce

7    emissions associated with emission sources operating in and out of warehouse

8    distribution centers."  The approved language in MOB-03 contains no reference to an

9    ISR.[7]  Indeed, during the hearing on its adoption, the District's Governing Board

10   specifically rejected an amendment that would have required the drafting and

11   consideration of an ISR for warehouses.[8]

12       48.    Nevertheless, in 2018, District staff returned to the Governing Board

13   with a proposal for facility-based mobile source controls, including the development

14   of an ISR for warehouses.  There were no illusions regarding the objectives of this

15   new staff proposal.  As District staff member Ian MacMillan explained during the

16   _____

17   [7] MOB-03 – EMISSION REDUCTIONS AT WAREHOUSE DISTRIBUTION
     CENTERS: The goal of this measure is to assess and identify potential actions to

18   further reduce emissions associated with emission sources operating in and out of
     warehouse distribution centers.  The South Coast District is currently working with

19   industry stakeholders on conducting in-use truck trip studies and obtaining emissions
     information from various warehouse distribution types.  This information along with

20   emissions occurring in and around individual warehouse distribution centers will
     serve as the basis for seeking opportunities to reduce emissions beyond existing

21   requirements.  A stakeholder working group will be convened to discuss warehouse
     emissions related issues and provide input and comments on identifying actions that

22   will result in further emission reductions.  To the extent that these actions are
     voluntary in nature and are sustained over a long-term basis and the emission

23   reduction levels are maintained, the emission reductions may be credited as surplus
     reductions (as defined by the U.S. EPA) into the SIP.  If emission reductions are to be

24   included in the SIP, enforceable commitments to ensure that the emissions are
     permanent will need to be made and may be in the form of a regulation adopted by

25   the South Coast District within its legal authority or by other enforceable
     mechanisms.

26
     [8] Minutes of the South Coast Air Quality Management District Governing Board

27   (March 3, 2017), at 16, http://www.aqmd.gov/docs/default-
     source/Agendas/Governing-Board/2017/2017-apr7-001.pdf?sfvrsn=4.

28

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

- 15 -

staff presentation before the Governing Board on March 2, 2018, "[r]eally the focus will be on trucks."[9]

49.     The Governing Board members likewise understood the intent of this proposed foray in rulemaking.  As Governing Board member Supervisor Shawn Nelson explained, "[i]f there is anyone in this room who doesn't know what this is about, diesel truck emissions are the issue.  It's not the hours of operation of warehouses, it's not how everybody got to work, what car they drove and, you know, forklifts and those things are all natural gas or electric anyway.  There is not a bunch of diesel forklifts driving around.  So this is all about diesel trucks."[10]

50.     Nonetheless, Governing Board member Mayor Pro Tem Larry McCallon presciently warned, "[u]sing the indirect source rule to solve a problem that the federal government isn't willing to step up to do, which is to regulate trucks, is not a good idea."[11]

51.     Despite this and other expressed reservations about employing a purported warehouse ISR to control mobile source emissions, on May 4, 2018, the Governing Board directed staff to develop reduction strategies for warehouses through "voluntary and regulatory measures."[12]

52.     District staff then began a series of working group meetings with stakeholders and provided regular updates to the District's Mobile Source Committee.  Throughout these meetings the District's intent was unequivocal.  As District staff member Dr. Philip Fine explained during the January 24, 2020 meeting of the Mobile Source Committee, "[w]e [the District] have not raised the amount of money we need

---

[9] SCAQMD Governing Board Meeting - March 2, 2018, at 1:47:20 (Ian MacMillan), YOUTUBE, https://www.youtube.com/watch?v=5Ob94qyM24Y.

[10] SCAQMD Governing Board Meeting - May 4, 2018, at 1:49:55 (Shawn Nelson), YOUTUBE, https://youtu.be/nAy8bR0N09w.

[11] *Id.* at 27:36 (Mayor McCallon), https://youtu.be/nAy8bR0N09w?t=1655.

[12] Minutes of the South Coast Air Quality Management District Governing Board (May 4, 2018), at 9, http://www.aqmd.gov/docs/default-source/Agendas/Governing-Board/2018/2018-jun1-001.pdf?sfvrsn=8.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

to turn over the entire fleet. . . . You could look at this [ISR] as providing additional incentives, additional options in the form of points to comply with the rule in case we have not raised [the funds] to completely turn over the truck fleet through incentives."[13]  Dr. Fine further concluded, "[a]ny way we can get people to take those actions—to purchase that cleaner truck in the absence of funding to do so—I think it's a good policy."[14]

53.    To advance this expressly stated goal of forcing the acquisition of ZE and NZE trucks, the so-called ISR had to begin and end with the trucks.  The compliance obligation "would be based on the number of truck trips to those particular facilities and that's because with warehouses, you look at the bulk of the emissions, it's really all about truck emissions."[15]

54.    On March 3, 2021, the District made its draft staff report in support of Rule 2305 publicly available.  Explaining the need for the new regulation, the report stated "[t]rucks are the largest source of NOx emissions in the air basin" and Rule 2305 is "expected to increase industry's interest in incentive programs" that provide "incentive funding to clean up vehicle and engine fleets."[16]  Per the report, Rule 2305 would "support statewide efforts to increase the number of ZE vehicles" by "provid[ing] a mechanism to require warehouse operators to encourage ZE vehicle use at their facilities."[17]  That is, Rule 2305 would "place requirements on warehouse operators in [the District] that will encourage them to ensure that potential benefits

[13]  South Coast AQMD Mobile Source Committee Meeting - January 24, 2020, at 76:59-77:18, YOUTUBE, https://www.youtube.com/watch?v=AXN_eeFcJco.
[14] *Id.* at 77:30-77:39 (italics added).
[15] South Coast AQMD Mobile Source Committee Meeting - September 20, 2019, at 15:07-20 (Sarah Rees), YOUTUBE, https://www.youtube.com/watch?v=8E1koiMg0VE.
[16] South Coast Air Quality Management District, Draft Staff Report on Proposed Rule 2305 and Proposed Rule 316 (March 3, 2021), at 14, http://www.aqmd.gov/docs/default-source/planning/fbmsm-docs/pr2305_draft-staff-report_03032021.pdf?sfvrsn=8.
[17] *Id.* at 15.

from statewide regulations would occur here."[18]  The staff report posited that Rule 2305 would correct the perceived gap in CARB's regulations by forcing the acquisition and use of ZE and NZE vehicles within the South Coast Basin.

55.    The District has also noted that complying with Rule 2305 could require warehouses, goods owners, and motor carriers to modify their contractual relationships: "Under PR 2305, some warehouse operators may choose to include contract provisions either with motor carriers or with goods owners who contract with motor carriers, that take into account the requirements of the rule.  This could include requiring or incentivizing near zero emission (NZE) or ZE truck visits, or increasing the price charged for warehousing operations so that the operator can comply with PR 2305 in other ways."[19]

56.    In response to comments on Rule 2305, the District also noted that contracting for ZE or NZE trucks is not current industry practice, "warehouse operators can contract with trucking companies to, at least to the extent that they already do this, to [sic] have NZE or ZE trucks visit their warehouse.  While the action to have third-party NZE and ZE trucks visit a warehouse may not be standard industry practice today, this does not mean it is infeasible."[20]

57.    The objectives of Rule 2305 were further confirmed in the District's environmental analysis of its proposal which acknowledged, "*[t]he proposed project is intended to accelerate the use of ZE trucks and yard trucks that operate at warehouses in the South Coast AQMD region*."[21]

58.    Despite objections from a wide range of stakeholders and the

---

[18] *Ibid*.

[19] *Id.* at 43-44.

[20] *Id.* at 125.

[21] South Coast Air Quality Management District, Final Environmental Assessment for Proposed Rule 2305, Appendix C: NOP/IS Comments and Responses (April 2021), at C-26, C-32, C-34, C-46, http://www.aqmd.gov/docs/default-source/ceqa/documents/aqmd-projects/2021/attachment_j_pr2305_finalea.pdf?sfvrsn=6 (italics added).

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

reservations of multiple Governing Board Members, Rule 2305 and its companion Rule 316 were adopted on May 7, 2021. The provisions of Rule 2305 began altering the operations at warehouses throughout the District beginning July 1, 2021.

## VI.    Rule 2305 Mechanics

59.    The District has long acknowledged and been frustrated by the limits of its authority over mobile sources. To alleviate this frustration, the District conceived Rule 2305 as a "wolf in sheep's clothing." Nominally styled as an ISR, its true purpose and effect is to control mobile source emissions by imposing preempted ZE/NZE emissions standards on medium to heavy-duty trucks used at warehouses, backed by the threat of economic sanctions styled as a mitigation fee. The novel use of a sanction-backed ISR for this purpose has been described as a "hammer" to be employed when the so-called "carrots" of earlier incentive programs failed to produce desired results.[22]

60.    Rule 2305 applies to both new and existing warehouses, whether or not those warehouses have been modified. It creates a regulatory scheme in which qualifying warehouses accrue a compliance obligation *based solely on the number, type, and emission characteristics of trucks that visit their facilities*. Rule 2305 is unconcerned with vehicle trips from workers coming to or leaving warehouses, with the construction equipment used in developing new warehouses, with the length of trips to and from the warehouse, or with any direct emissions from the warehouse itself, such as forklifts, yard hostlers, or back-up generators; rather, as explained by Governing Board member Supervisor Shawn Nelson, Rule 2305 "is entirely about the trucks."

61.    Warehouses with 100,000 or more square feet of indoor floor space are required to monitor the number and type of trucks that visit their facilities. This data creates the "WATT," the weighted-annual truck trips in which the heaviest class of

---

[22] SCAQMD Governing Board Meeting - March 3, 2017, at 2:00:05 (Governing Board Member Judith Mitchell), YOUTUBE, https://www.youtube.com/watch?v=e2wBwNM1LKY.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

1  truck is considered the equivalent of 2.5 trips in lighter duty vehicles.

2  62.  The WATT is then multiplied by a stringency factor—an arbitrary
3  number selected by the District—and by an annual variable designed to phase the
4  stringency factor in over time.  The resulting number is the "WPCO," or WAIRE
5  Points Compliance Obligation.  Each year, regulated warehouses must earn "WAIRE
6  Points" greater or equal to their WPCO in order to comply with the Rule.

7  63.  As part of Rule 2305, the District developed a menu of so-called
8  "options" whereby warehouse operators can earn WAIRE points ("WAIRE Menu").
9  In theory, these options are tied to emissions reductions and relative cost.

10  64.  The WAIRE Menu options can be broadly classified into three groups:
11  (1) those requiring warehouse operators to directly purchase and use ZE/NZE
12  vehicles ("direct acquisition"), (2) those requiring warehouse operators to rely on the
13  purchase and use of ZE/NZE vehicles by others ("indirect acquisition"), and (3) non-
14  acquisition pathways.  During the rulemaking process, the District analyzed 18
15  different compliance pathways, styled as scenarios, using these options.  Eight are
16  direct acquisition pathways; five rely on indirect acquisition; and the remaining five
17  are independent of ZE/NZE acquisition and use.

18  65.  Direct acquisition pathways are those that require a warehouse operator
19  itself to acquire and use ZE/NZE vehicles.  The average projected cost of compliance
20  as modeled by the District for direct acquisition is **$0.19** per year per square foot.

21  66.  Indirect acquisition pathways are those that require visits to the
22  warehouse of ZE/NZE vehicles from non-warehouse owned fleets.  Under these
23  pathways, warehouses rely on their fleet contractors purchasing ZE/NZE vehicles and
24  then using those vehicles to serve their warehouse to satisfy their WPCO.  The
25  average projected cost of compliance as modeled by the District for indirect
26  acquisition is **$0.42** per year per square foot.

27  67.  Non-acquisition pathways are methods of accumulating points which are
28  neither directly nor indirectly related to the purchase of ZE/NZE trucks.  There are

essentially three non-acquisition options: (1) pay an assessed fee, (2) install and use solar panels, (3) purchase filter systems for nearby sensitive receptors.  The average projected cost of compliance as modeled by the District for these non-acquisition pathways is **$0.85** per year per square foot, approximately four and one-half times greater than the cost of directly acquiring new ZE or NZE trucks, and more than twice the cost of indirectly acquiring new fleets.

68.     Using the District's own modeling, the average annual cost of using a direct acquisition pathway for compliance for a 200,000 square foot warehouse is $38,000, the average annual cost of using an indirect acquisition pathways for compliance is $84,000, while the average annual cost of using the non-acquisition pathways for compliance is $170,000.

69.     This dramatic cost differential can have but one effect—assuming rational behavior, it will compel the purchase and use of ZE and NZE vehicles.  This has been the District's unambiguously stated goal since Rule 2305 was first proposed.

70.     The District claims that its menu of options saves Rule 2305 from preemption, but the cost differential belies the claim.  Further, the mitigation fee proposed by the District imposes burdens in excess of any benefit conferred upon the warehouses and is designed to generate revenue to fund a variety of projects that are neither directly nor indirectly related to the specific emissions from warehouses.  The mitigation fee funds the WAIRE Mitigation Program which would provide incentives toward the purchase of NZE and ZE trucks.[23]  But the WAIRE Mitigation Program goes far beyond the trucks themselves, it is also intended to fund the purchase and installation of ZE charging or hydrogen fueling infrastructure, neither of which reduce emissions of NOx or particulate matter.[24]  Even further, the District acknowledges that the Program may fund grid upgrades on the utility side, an activity

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

---

[23] South Coast Air Quality Management District, Final Staff Report—Proposed Rule 2305 and Proposed Rule 316 (May 2021), at 40-41, www.aqmd.gov/docs/default-source/Agendas/Governing-Board/2021/2021-May7-027.pdf?sfvrsn=10.

[24] *Ibid.*

wholly divorced from the emissions produced by the regulated warehouses.[25]

71.    Rule 2305 phases in over time.  Warehouses 250,000 square feet or larger must begin accruing WAIRE points in 2022.  The "annual variable" to calculate the compliance obligation will increase over a period of three years until the rule reaches full stringency.  In 2023, warehouses between 150,000 and 249,999 square feet will begin accruing a compliance obligation.  Finally in 2024, all warehouses over 100,000 square feet in the District will be required to comply.  Rule 2305 also has no sunset period, not even in the event that the District attains the national ambient air quality standards.

72.    The District has internally acknowledged that implementation of Rule 2305 will lead several warehouses to relocate.  The remainder captured by circumstances—*e.g.,* proximity to the "megaports," available industrial land access to the interstate freeway system, or needed for the fulfillment of local needs—will experience a fundamental shift in the manner in which they provide and charge for their services.  As with all well intended regulatory measures, ultimately the consumers will pay.

## VII.    Federal Regulation of the Trucking Industry

73.    Prior to 1980, both federal and state governments regulated the trucking industry.  These regulations dictated, both directly and indirectly, how transportation services could be provided and the prices that could be charged for those services.

74.    In 1980, Congress passed the Motor Carrier Act, which deregulated interstate trucking so that the rates and services offered by licensed motor carriers and related entities would be set by the market rather than by government regulation.  49 U.S.C. §11503a.

75.    Fourteen years later, in 1994, to bolster deregulation, Congress included a provision within the FAAAA expressly preempting state regulation of the trucking industry:

---

[25] *Ibid.*

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

[A] State… may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of any motor carrier* (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.  49 U.S.C. § 14501(c)(1) (italics added).

76.    In enacting the FAAAA, Congress' "overarching goal" was "helping ensure transportation rates, routes, and services that reflect maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008) (internal quotations omitted).  The FAAAA's express-preemption provision furthers this purpose by "'prevent[ing] States from undermining federal regulation of interstate trucking' through a 'patchwork' of state regulations." *Am. Trucking Ass'ns*, 660 F.3d at 395-96, *rev'd on other grounds*, 569 U.S. 641 (2013).

77.    The United States Supreme Court has explained that the "ban on enacting or enforcing any law 'relating to rates, routes, or services is most sensibly read … to mean States may not seek to impose their own public policies or theories of competition or regulation on the operations of [a motor] carrier." *Am. Airlines, Inc. v. Wolens,* 513 U.S. 219, 229 n.5 (1995) ("*Wolens*").  Deregulation requires not only that states not interfere with the ability of private parties to contract, but also that they not interfere with the enforcement of those contracts.  "Market efficiency requires effective means to enforce private agreements." *Wolens*, 513 U.S. at 230 (quotation marks omitted).  Moreover, "[t]he stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on the needs perceived by the contracting parties at the time." *Ibid*.

78.    The EPA and CARB are cooperatively advancing cleaner fleet vehicles through their respective regulatory activities.  But the market itself is advancing implementation.  As ZE and NZE vehicles become more commercially available, contractors have responded.  Goods purveyors seeking to elevate their corporate sustainability have begun to contract for ZE and NZE carriers in their distribution networks.  While EPA and CARB continue to evaluate regulatory steps for cleaner

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

1   vehicles, market participants are already making choices based on their needs and ZE

2   availability.

3        79.    Rule 2305 will fundamentally redefine the economics of warehouse

4   operation in the South Coast Basin.  As previously explained, the District understood

5   that Rule 2305 would impact contractual relationships between motor carriers and

6   good owners/warehouses and would directly affect the services motor carriers offer to

7   their customers in the District.  A law which "requires carriers to offer a system of

8   services that the market does not now provide (and which the carriers would prefer

9   not to offer)" is preempted by the FAAA as it produces "the very effect that the

10  [FAAA] sought to avoid, *i.e.,* a State's direct substitution of its own governmental

11  commands for "competitive market forces"  in determining (to a significant degree)

12  the services that motor carriers will provide."  *Rowe,* 552 U.S. at 374.

13       80.    By the District's own internal assessment, the added cost of accelerated

14  ZE or NZE fleet acquisition, or alternatively payment of monetary sanctions in the

15  form of the "mitigation fee," will also drive many warehouses to shut down or move.

16  For those that move, it will interfere with existing contracted routes, distribution

17  channels, and pricing, cost hundreds if not thousands of local jobs, and drive the

18  problem "next door."  For those who stay, the additional operational costs will be

19  borne by truck owner/operators, who in turn will need to increase freight charges, the

20  cost of which contractual realignment ultimately will be borne by commercial and

21  retail consumers in and outside of the District's territory.

22       81.    The District expressly acknowledged that operators may be forced to

23  engage in "rerouting so that the usage points are accumulated at multiple warehouses,

24  since each operator must report annual truck trips that serve the warehouse."[26]

25       82.    The marked increase in warehouse operational costs undoubtedly will

26

27  ───────────────
    [26] South Coast Air Quality Management District, Final Environmental Assessment for
28  Proposed Rule 2305 (April 2021), at 4.1-17, http://www.aqmd.gov/docs/default-
    source/ceqa/documents/aqmd-
    projects/2021/attachment_j_pr2305_finalea.pdf?sfvrsn=6.

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

also affect contracted traffic in and out of the Los Angeles Airport and the mega ports of Los Angeles and Long Beach thereby resulting in (1) the loss of further jobs and (2) a marked increase in the cost of moving freight and goods regionally, nationally and internationally.  Finally, the secondary impact of this contractual realignment on manufacturers and others dependent on the flow and warehousing of goods in and through the South Coast Basin could cause good purveyors to reassess the economics of their ties to, or continued operations within, the South Coast Basin.

## COUNT I

### (Declaratory/Injunctive Relief — Violation of the Clean Air Act)

83.     The CTA realleges and incorporates all of the foregoing paragraphs.

84.     Through the formation of EPA in 1970, and the passage of major amendments to the CAA in 1970, 1977, and 1990, Congress provided EPA with the responsibility for establishing national emissions standards and other requirements for mobile sources of air pollution.

85.     Section 209(a) of the CAA provides in pertinent part:
"Prohibition. No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."

86.     Rule 2305 is a "standard relating to the control of emissions from new motor vehicles."  While the Rule is drafted as a regulation that both rewards and punishes warehouse operators based on the type of trucks they or those with whom they contract operate, in reality it provides warehouse operators one, and only one, economically viable option: to acquire, directly or indirectly, new fleets of ZE or NZE trucks.  As District staff and Governing Board members have repeatedly stated, the purpose and effect of Rule 2305 is to regulate emissions of new motor vehicles. Rule 2305 is thus preempted.

87.     The United States Constitution makes federal law and regulations "the supreme Law of the Land."  U.S. Const., art. VI, cl. 2.  The CTA and its members have legally protected interests under the Constitution, the CAA, and other federal

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

laws in the full enforcement of the federal laws against the District's implementation of Rule 2305. The CTA and its members will be actually and irreparably injured with respect to their federally protected interests if Rule 2305 is not declared unlawful and its implementation is not enjoined.

88.     A clear and judicially cognizable controversy exists between the CTA and its members, on the one hand, and the District, on the other, over whether Rule 2305 is preempted by the CAA. The CTA and its members contend that the regulation is preempted by the CAA and cannot be enforced. The District has rejected the CTA's and other interested parties' arguments (as well as the observations of some of its own Governing Board members) to this effect.

89.     To redress the violations of federal law and the interference with such rights, and pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and other provisions of law, including the Supremacy Clause, the CTA requests a declaration that Rule 2305 is preempted and unenforceable.

90.     The District is now implementing and will continue to implement Rule 2305 in violation of federal law unless enjoined by this Court from doing so. The CTA is therefore also entitled to injunctive relief restraining and redressing these violations of federal law, and the Supremacy Clause, and other provisions of law.

## COUNT II

### (Declaratory/Injunctive Relief — Violation of the FAAAA)

91.     The CTA realleges and incorporates all the foregoing paragraphs.

92.     The Supremacy Clause, which makes the federal constitution and laws "the supreme Law of the Land," U.S. Const. art. VI, § 3, together with the express preemption provision of the FAAAA, prohibit the State of California from making, applying, or enforcing laws "related to a price, route, or service of any motor carrier … or any private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

93.     At all relevant times, the CTA and its members, and all others similarly

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

situated, had, have, and will have the right under the Supremacy Clause not to be subjected to or punished under state laws that interfere with, are contrary to, or are otherwise preempted by federal law.

94.     An actual controversy exists among the parties because warehouse owners, operators, freight forwarder and/or brokers, some of whom are CTA members, and truck owner/operators, the primary constituency that the CTA represents, will be required to change their prices, routes, and services in order to comply with Rule 2305 and will be required to offer services which the market does not compel.  Thus, these parties cannot freely contract for the provisions of freight services.

95.     Rule 2305 is directly aimed at the carriage of goods and is not broadly applicable across industries.  The application of Rule 2305 directly impacts the services, routes and prices that CTA's members and other similarly situated motor carriers, warehouse owners, operators, freight forwarders, and/or brokers offer their customers for the transportation of goods in local and interstate commerce.  Before Rule 2305's adoption, motor carriers and warehouses were free to contract with an extensive network of contractors to provide virtually any type and number of trucks, trailers, drivers, and equipment needed for a particular job on little or no notice. Following Rule 2305's adoption, motor carriers, warehouse owners, operators, freight forwarders and/or brokers who continue to use, or continue to contract with others who use, conventional freight vehicles to provide commercial transportation services face triggering significant sanctions for violating Rule 2305's *de facto* accelerated fleet conversion mandate.

96.     Rule 2305 also indirectly impacts rates, services, and pricing by imposing service requirements on motor carriers, in contravention of the United States Supreme Court's determination that regulations cannot require carriers to offer services that differ significantly from those that the market would dictate in the absence of regulation.  *Rowe,* 552 U.S. at 374.  While some motor carrier contractors

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

have begun to request ZE or NZE trucks, these contractors are the exception, not the rule.  There is nothing to suggest that the market currently dictates that motor carriers provide ZE or NZE vehicles as part of their services.

97.     The only economically viable way to avoid triggering Rule 2305 sanctions is to acquire, and/or mandate that others acquire, ZE or NZE trucks on an accelerated basis.  Members of CTA and other similarly situated motor carriers, warehouse owners, operators, freight forwarders and/or brokers must simultaneously cease using, and/or allowing others to use, conventional trucks regardless of whether ZE and/or NZE trucks are commercially available on the open market.

98.     At present, ZE and NZE freight vehicles remain in the experimental/demonstration phase, are not commercially available through all classes, and represent a significant acquisition cost increase above conventional vehicles.  A motor carrier/operator that chooses to invest in these specialized trucks will have to charge its customers higher prices than before for those specialized services.

99.     Under Rule 2305, motor carriers, warehouse owners, operators, freight forwarders, brokers and their contractors, must acquire expensive and rare vehicles long before the end of the current fleet's useful life, must charge higher prices for services due to the purchase of those vehicles, and must offer services which the market does not currently dictate, or trigger sanctions via the "mitigation fee" and incur the risk of enforcement and civil actions and significant civil and criminal liability.

100.     Once ZE/NZE vehicles are acquired, motor carriers, warehouse owners, operators, freight forwarders, brokers and their contractors must then modify their routes and services, not only in the South Coast Basin but nationally, based on charging infrastructure availability.

101.     Rule 2305 compels operators to change their business in ways that will directly impact the types of services the motor carriers provide to their customers, the

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

routes the drivers must take, and the prices that the motor carriers charge their customers for services.  Unless Defendants are restrained and enjoined from enforcing Rule 2305, CTA members and other similarly situated motor carriers will suffer irreparable harm.

102.   The CTA has no plain, speedy, and adequate remedy at law, making injunctive relief necessary.

## COUNT III

### (Declaratory/Injunctive Relief — Violation of State Law — Authority)

103.   The CTA realleges and incorporates all the foregoing paragraphs.

104.   Subject to and only to the limited extent allowed by federal law, CARB has exclusive authority in California over mobile source emissions.  Health & Safety Code §§ 39002, 40000, 43000.5, 43013, 43018(b) and (d).

105.   CAA § 209(a) prohibits state or local regulations imposing "standard[s] relating to the control of emissions from new motor vehicles or new motor vehicle engines" without an EPA approved waiver.  In California, only CARB has the right to apply for such a waiver.  The CARB has not sought a waiver with respect to Rule 2305.  To the contrary, in previously enacting the ACT, Low NOx Omnibus and ACF, CARB rejected the District's call for the accelerated pace of fleet conversion in the South Coast Basin now de facto mandated by Rule 2305.  Because Rule 2305 is designed to target air contaminants emitted by mobile sources, the District's enactment and threatened enforcement of Rule 2305 per se is a violation of state law.

106.   Under California law, local air districts have limited ability to regulate emissions from mobile sources through indirect source controls.  As explained above, federal law allows, but does not require, states to adopt an "indirect source review program" as part of the SIP to review "new or modified indirect source[s]."  CAA § 110(a)(5)(A)(i); (a)(5)(D).

107.   California law gives the air districts authority to "adopt and implement regulations" to "[r]educe or mitigate emissions from indirect and areawide sources of

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

1

2

3

4

5

pollution." Cal. Health & Safety Code § 40716(a).  The District also has authority to adopt "indirect source controls," but these ISR rules are limited to "areas of the south coast district in which there are high-level, localized concentrations or pollutants or with respect to any *new* source that will have a significant effect on air quality in the South Coast Air Basin." Cal. Health & Safety Code § 40440 (italics added).

6

7

8

9

108.   Such regulations cannot "infringe[] on the existing authority of counties and cities to plan or control land use" and do not "provide[] or transfer[] new authority over such land use to" the District or CARB.  Cal. Health & Safety Code §§ 40716(b), 40414.

10

11

12

109.   Indirect source control program is not defined in California law, but the CAA defines "indirect source review programs" as limited to new or modified sources.

13

14

15

16

17

18

110.   The District is a local agency created by the Legislature.  As such, it possess only the authority specifically granted to it by state law.  It has no inherent police power nor any other authority beyond that explicitly conferred on it by statute. *PaintCare v. Mortensen,* 233 Cal. App. 4th 1292, 1305 (2015) ("an administrative agency 'has only as much rulemaking power as is invested in it by statute'"); *Friends of the Kings River v. County of Fresno*, 232 Cal. App. 4th 105, 117 (2014) (similar).

19

20

21

22

23

24

111.   On its face, Rule 2305 applies to all warehouses operating within the South Coast Basin meeting the minimum 100,000 square foot indoor floor space requirement; in other words, it applies to all existing, as opposed to simply "new," sources of emissions.  As such, its enactment was and remains in excess of the "power conferred [to the District] by statute" and its adoption infringes on the existing authority of counties and cities to plan and control land use.

25

## COUNT IV

26

### (Declaratory/Injunctive Relief — Violation of State Law — Unlawful Tax)

27

112.   The CTA realleges and incorporates all the foregoing paragraphs.

28

113.   An actual controversy presently exists between the CTA and its

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

members, on the one hand, and the District, on the other, with regard to the legality of the District's imposition, or threatened imposition, of purported new "mitigation fees" as unlawful, invalid and in violation of controlling state law.

114.    The Rule 2305 ISR "fees" are an unlawful tax under Proposition 26, Cal. Const. Art. XIII C, § 1(e), which states that "any levy, charge, or exaction of any kind imposed by a local government" is a tax except for certain enumerated exemptions.  The District is a "local government" and "special district" as defined by Article XIII C 1(b)(c).  The ISR fee does not fall within any of the exemptions in Proposition 26, including:

> A charge imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and that does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege.  Cal. Const., Art. XIII C, § 1(e)(1).

115.    The District has established charges or "fees" ostensibly to be dedicated to the specific purpose of funding District programs relating to air quality management, however the revenue to be generated by the new ISR "fees" greatly exceeds the reasonable or estimated costs of the District's programs or services, and actually constitute new "special tax" revenues for the District.  The District failed to seek or obtain the requisite voter approval for such "special taxes" as required by the California Constitution Article XIII C 2(d), and Cal. Gov. Code § 53722.

116.    A levy only qualifies as a regulatory fee if (1) the amount of the fee does not exceed the reasonable costs of providing the services for which it is charged, (2) the fee is not levied for unrelated revenue purposes, and (3) the amount of the fee bears a reasonable relationship to the burdens created by the feepayers' activities or operations.  If those conditions are not met, the levy is a tax. *California Bldg. Indus. Ass'n v. State Water Res. Control Bd*., 4 Cal. 5th 1032, 1046 (2018).  The District has not and cannot prove that Rule 2305's fee option meets these requirements.

117.    The District calibrated the ISR fee to the Carl Moyer program cost-effectiveness threshold, but did not analyze whether this threshold adequately

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

represents the cost to implement emission reduction projects in the South Coast Basin specifically or to implement the projects necessary to offset emissions from the specific warehouses regulated by the Rule.

118.   The District failed to demonstrate, and cannot demonstrate, that the new ISR fees are not established or imposed for general revenue purposes, in excess of any reasonable regulatory program costs.  "What a fee cannot do is exceed the reasonable cost of regulation with the generated surplus used for general revenue collection.  An excessive fee that is used to generate general revenue becomes a tax." *California Farm Bureau Fed'n v. State Water Res. Control Bd.*, 51 Cal. 4th 421, 438 (2011).

119.   The fee does not seek to regulate the specific fee-payors' indirect source emissions, but instead aims to raise money for the control of emissions in the South Coast Basin generally.  The District's stated purpose is to "reduce local and regional emissions of NOx and PM associated with warehouses in order to assist in meeting state and federal air quality standards."  The District also stated that proceeds from this new tax will be used to provide financial incentives for truck owners to purchase NZE or ZE trucks, for the installation of fueling and charging infrastructure, with priority given for projects in the communities near warehouses that paid the fee, and to fund grid upgrades.

120.   Some of these projects, such as charging infrastructure and utility projects, will not even achieve emission reductions, let alone reductions from the warehouses that will pay the "fee".  The uses to which the money will be put thus do not have any nexus to the specific fee-payors' generation of indirect emissions, and the exaction therefore constitutes a tax.   *Morning Star Co. v. Board of Equalization,* 201 Cal. App. 4th 737, 755 (2011) (charge to company that did not seek to regulate the Company's use, generation, or storage of hazardous material but to raise money for the control of hazardous material generally was a tax).

121.   The District failed to demonstrate by substantial evidence in the record,

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

and cannot demonstrate under any factual construct or as a matter of law, that the amount of the new ISR fees bear a reasonable relationship to the social or economic burdens that may fairly be attributed to warehouses and fleet operators or to demonstrate a causal connection or "nexus" between warehouses and the amount of the fee, as required by *Sinclair Paint Co. v. Board of Equalization*, 15 Cal. 4th 866 (1997).

122.   The District bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity. *California Ass'n of Prof. Scientists v. Dept. of Fish and Game,* 79 Cal. App. 4th 935, 935, 945 (2000).

123.   The District failed to demonstrate, and cannot demonstrate, the basis for determining, if any, the manner in which the costs of the new ISR programs are apportioned, or to assure that the charges allocated to a fee payer bear a fair and reasonable relationship to the fee payer's burdens on or benefits from the regulatory activity.

## COUNT V
### (Declaratory Relief)

124.   The CTA realleges and incorporates the foregoing paragraphs.

125.   This case presents a justiciable issue in that warehouses and fleet operators operating in the Basin must already comply with Rule 2305 or face significant penalties.

126.   A declaratory judgment in this matter would terminate and afford relief from the uncertainty, cost, disruption, conflict, and controversy giving rise to this proceeding and prevent a similar situation from arising in the future.

127.   This matter is most properly resolved through a declaratory judgment

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

- 33 -

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

issued by this Court.  The matter involves important federal and state law questions, and a ruling in this case will have significant impact on the national system of freight transportation.  It is, therefore, of critical importance to the trucking industry and the public at large.

### COUNT VI

### (Preliminary and Permanent Injunctive Relief)

128.    The CTA realleges and incorporates the foregoing paragraphs.

129.    The CTA and its members will suffer irreparable harm if the District's implementation and enforcement of Rule 2305 is not enjoined.  The impact of Rule 2305 on the efficiency of the nation's logistics system is significant, and the economic loss attributable to delays, equipment shortages, and interference with dispatching and the efficient allocation of freight vehicles is not capable of clear calculation.  The threat of facing substantial, and perpetually on-going economic sanctions for non-compliance also threatens to cause the CTA's members and other local and interstate commercial transportation and logistics operators doing business in the South Coast Basin—together with their customers and the public-at-large—irreparable harm.

130.    If the novel Rule 2305 is not enjoined and other jurisdictions were emboldened to likewise assume the authority of EPA and adopt similar regional or state regulations, the irreparable harm to the trucking and logistics industry and to the public interest would be compounded.

131.    The CTA and its members have no adequate remedy at law for the injuries alleged herein.  Even if the monetary value of the perpetually on-going injuries to the CTA and its members could be ascertained, there is no action at law available to the CTA and its members to recover such losses from the District.  Only this Court's exercise of its equitable powers can protect the CTA, its members, and other similarly situated operators from the threatened irreparable harm.

132.    Whereas injunctive relief would prevent irreparable injury to the CTA, its members, other similarly situated operators, and the public-at-large, on balance,

the injury to the District, if any, would only amount to a judicial declaration of the prescribed constitutional and statutory limits on its authority.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs CTA and its members pray:

A.    For a declaration that (1) Rules 2305 and 316 are invalid and (2) it is contrary to law for Defendants to enforce Rules 2305 and 316 against warehouses and fleet owners operating in the South Coast Basin;

B.    For a preliminary and permanent injunction requiring Defendants to conform their conduct to such judicial declaration and barring them from implementing or enforcing in any way Rules 2305 and 316;

C.    For such costs and attorneys' fees to which Plaintiffs may be entitled by law; and

D.    For such other, further or different relief as this Court may deem just and proper.


Dated:      August 5, 2021              HOLLAND & KNIGHT LLP


                                        By: _____
                                            David A. Robinson
                                            Marne S. Sussman

                                        Attorneys for Plaintiff CALIFORNIA
                                        TRUCKING ASSOCIATION

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF