HOLLAND & KNIGHT LLP
David A. Robinson, Esq. (SBN 107613)
*david.robinson@hklaw.com*
Marne S. Sussman, Esq. (SBN 273712)
*marne.sussman@hklaw.com*
Emily M. Lieban, Esq. (SBN 303079)
*emily.lieban@hklaw.com*
Nicholas A. Dellefave, Esq. (SBN 323814)
*nicholas.dellefave@hklaw.com*
Three Park Plaza, Suite 1400
Irvine, CA 92614-8537
Telephone: 949.833.8550
Facsimile: 949.833.8540

Attorneys for Plaintiff CALIFORNIA TRUCKING ASSOCIATION

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT; The GOVERNING BOARD OF THE SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.: 2:21-cv-6341-JAK-MRW<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: Jan. 23, 2023<br>Time: 8:30 a.m.<br>Ctrm: 10B<br>Judge: Hon. John A. Kronstadt |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION .................................................................................................- 1 -

II. BACKGROUND ..................................................................................................- 3 -

III. STANDARD OF REVIEW ..................................................................................- 6 -

IV. THE UNDISPUTED FACTS ...............................................................................- 7 -

    A. The Parties ..................................................................................................- 7 -

    B. The Rule's Enactment and Current Implementation................................- 8 -

    C. Rule Mechanics..........................................................................................- 9 -

    D. The District's Avowed Intent Is to Change the Trucks on the Road.....................- 14 -

V. ARGUMENT........................................................................................................- 15 -

    A. Absent an EPA Waiver, the Clean Air Act Preempts State and Local Motor Vehicle Emission Standards ................................................................- 16 -

    B. The Rule Is a Standard Relating to Motor Vehicle Emissions ..............................- 16 -

        1. The Rule De Facto Mandates the Purchase of ZE/NZE Vehicles ...................- 18 -

            a. The Intent and Purpose of the Rule Is To Incentivize the Purchase of ZE/NZE Vehicles to Reduce Emissions......................................................- 18 -

            b. The Effect of the Rule Is To Mandate the Purchase of ZE/NZE Vehicles - 19 -

        2. Because the Rule Is A Purchase Mandate, It Is Preempted ..............................- 22 -

    C. Congress Did Not Authorize States to Adopt Standards Relating to Emissions From Mobile Sources Under The Guise of An ISR ......................................- 22 -

    D. The District Admittedly Adopted the Rule Because the EPA and CARB Have Not Seen Fit to Act So Aggressively ........................................................- 24 -

VI. CONCLUSION......................................................................................................- 25 -

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).............................................................................................. 7

*Ass'n of Int'l Auto. Mfrs. v. Commissioner*,
208 F.3d 1 (1st Cir. 2000) ................................................................................... 22

*Clicks Billiards Inc. v. Sixshooters Inc.*,
251 F.3d 1252 (9th Cir. 2001)............................................................................... 7

*Colony Insurance Company v. United Specialty Insurance Company*,
No. CV218903DMGAFMX, 2022 WL 4597422 (C.D. Cal. July 14, 2022)......................... 7

*Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*,
447 U.S. 102 (1980)............................................................................................ 16

*CSX Trans., Inc. v. Easterwood*,
507 U.S. 658 (1993)............................................................................................ 16

*Egelhoff v. Egelhoff*,
532 U.S. 141 (2001)........................................................................................ 4, 21

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004)..................................................................................... passim

*Engine Mfrs. Ass'n v. U.S. E.P.A*,
88 F.3d 1075 (D.C. Cir. 1996) .............................................................................. 4

*Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*,
644 F.3d 934 (9th Cir. 2011)................................................................................. 3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).............................................................................................. 7

*Metropolitan Taxicab Bd. of Trade v. City of New York*,
633 F. Supp. 2d 83 (S.D.N.Y. 2009) .............................................................. passim

*Mitchell v. United States* (*In re Mitchell*),
977 F.2d 1318 (9th Cir. 1992)............................................................................... 7

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992).............................................................................................. 4

*Motor & Equip. Mfrs. Ass'n, Inc. v. E.P.A.*,
627 F.2d 1095 (D.C. Cir. 1979)............................................................................. 3

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

iii

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*,
627 F.3d 730 (9th Cir. 2010) ..................................................................... *passim*

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) ...............................................................................18, 20

*Oxygenated Fuels Ass'n Inc. v. Davis*,
331 F.3d 665 (9th Cir. 2003) ......................................................................... 16

*Pacific Merchants Shipping Ass'n v. Goldstene*,
517 F.3d 1108 (2008) ................................................................................ 4, 6

*Retail Indus. Leaders Ass'n v. Fielder*,
475 F.3d 180 (4th Cir. 2007) ...................................................... 18, 19, 20, 21

*S. Dakota v. Wayfair, Inc.*,
138 S. Ct. 2080 (2018) .................................................................................. 25

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983) .......................................................................................... 4

*Universal Health Servs., Inc. v. Thompson*,
363 F.3d 1013 (9th Cir. 2004) ......................................................................... 7

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ........................................................................9, 24, 25

**Statutes**

42 U.S.C. § 7408 ................................................................................................ 3

42 U.S.C. § 7409 ................................................................................................ 3

42 U.S.C. § 7410 ........................................................................................3, 5, 23

42 U.S.C. § 7413 ................................................................................................ 3

42 U.S.C. § 7521 ................................................................................................ 3

42 U.S.C. § 7543 ................................................................................................ 3

Cal. Health & Safety Code § 39602 ................................................................. 4

Cal. Health & Safety Code §§ 39602, 40000 .................................................. 4

Cal. Health & Safety Code § 40400, et seq. ................................................... 8

**Other Authorities**

76 Fed. Reg. 26609-26611 ..........................................................................18, 23

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

iv

Federal Rule of Civil Procedure Rule 56(a) .................................................................................. 6

U.S. Const. art. VI, cl. 2.................................................................................................................. 16

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

## I.    INTRODUCTION

"If there is anyone in this room who doesn't know what this is about, *diesel truck emissions are the issue*. It's not the hours of operation of warehouses, it's not how everybody got to work, what car they drove and, you know, forklifts and those things are all natural gas or electric anyway. There is not a bunch of diesel forklifts driving around. So *this is all about diesel trucks*."[1]

Plaintiff California Trucking Association et al. ("CTA") challenges two rules adopted by Defendant South Coast Air Quality Management District ("SCAQMD") and its Governing Board (collectively, the "District"): Rule 2305 and Rule 316 (collectively, the "Rule").  The Rule targets emissions from a specific mobile source—conventional commercial trucks—in violation of the "categorical" preemption codified in Section 209(a) of the federal Clean Air Act, 42 U.S.C. § 7543 ("Section 209(a)"), by imposing penalties on warehouse owners and operators who continue to allow conventional, federally-compliant trucks[2] to serve their facilities.

The Rule regulates CTA's members by creating a *de facto* mandate that fleet owners purchase near-zero emission ("NZE") or zero emission ("ZE") vehicles to accrue points needed to satisfy a newly invented "compliance obligation."  To conceal that the Rule is in fact an impermissible mandate, it is crafted to offer the appearance of choice for compliance, but with severe economic sanctions to ensure warehouse operators in reality have no choice.  This is because warehouse operators who do not convert their fleets, or if they contract for trucks do not force their contractors to do so, will on average face operating costs *three times higher* than operators who directly acquire NZE or ZE trucks and *nine times higher* than operators who force their contractors to acquire such trucks.  Thus, no rational actor

[1] Undisputed Fact ("UF") #1.

[2] For purposes of this Memorandum of Points and Authorities, "federally-compliant" is intended to mean trucks that meet the emissions and other standards set by the United States Environmental Protection Agency ("EPA").

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

- 1 -

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

would choose what the District purports to offer by way of "non-acquisition pathways" rather than purchase, or force the purchase of, NZE or ZE vehicles.

While nominally styled as an indirect source review ("ISR") rule, the Rule fails to provide a "facility-by-facility" review of all "attracted" emission sources. In fact, it entirely ignores emission sources other than trucks, including employee vehicle trips, loading equipment, auxiliary power generation equipment, construction equipment, and other non-road sources, and instead bases its compliance obligation solely on the number and type of trucks that visit regulated warehouses. Nor can cloaking a mobile source emissions standard as an ISR avoid federal preemption in any event. Because the Rule "target[s a specific] direct source[] apart from its regulation of the [warehouses] as a whole," it is the inverse of the situation addressed in *Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 737 (9th Cir. 2010) ("*NAHB*"), discussed below.

The Rule is merely the latest attempt by the District to establish and enforce its own localized vehicle emissions standards and, in doing so, circumvent the judgment and authority of the EPA and the California Air Resources Board ("CARB"). The District's prior attempt was struck down by the U.S. Supreme Court in *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 256 (2004) ("*EMA*"). As the Supreme Court made clear in *EMA*, the District cannot circumvent Section 209(a)'s categorical prohibition against state and local government regulation of vehicle emission standards by imposing a purchase mandate on buyers to acquire District-compliant vehicles. This prohibition has been held to apply to both express and *de facto* mandates, including those that rely on economic sanctions to create "offer[s] which can not [*sic*], in practical effect, be refused." *Metropolitan Taxicab Bd. of Trade v. City of New York*, 633 F. Supp. 2d 83, 99 (S.D.N.Y. 2009) ("*Metro Taxi*"). Because the District's purpose, and the Rule's effect, are to create an offer which cannot be refused, the Rule is a *de facto* mandate foreclosed by Section 209(a) and the U.S. Constitution's Supremacy Clause. CTA respectfully requests this Court

- 2 -

to declare the Rule invalid and preempted, and grant summary judgment.

## II.      BACKGROUND

Under the Clean Air Act's division of authority over air pollution control, the EPA bears responsibility for identifying pollutants to regulate and for establishing National Ambient Air Quality Standards ("NAAQS").  42 U.S.C. §§ 7408, 7409.  The states are responsible for developing State Implementation Plans ("SIPs") to attain, maintain, and enforce the NAAQS.  42 U.S.C. § 7410.  In California, the 35 local air districts prepare their own Air Quality Management Plans ("AQMPs") which, when approved by CARB, become part of California's SIP.  If and when approved by the EPA, California's SIP becomes enforceable by the EPA and the State.  42 U.S.C. §§ 7410, 7413.

The Clean Air Act delegates to the states, and California delegates to its 35 local air districts, the authority to regulate stationary sources of air pollution within their boundaries, such as refineries and power plants, but reserves to the federal government the power to control emissions from "mobile sources," including motor vehicles.  *NAHB*, 627 F.3d at 733; 42 U.S.C. §§ 7521, 7543.  This bifurcation of regulatory authority is crucial to our system of federalism and free interstate commerce as mobile sources can, and frequently do, cross state lines.  Allowing states and their subdivisions to separately and independently regulate mobile sources would "raise[] the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which [would] threaten[]to create nightmares for the manufacturers" and operators.  *Motor & Equip. Mfrs. Ass'n, Inc. v. E.P.A.*, 627 F.2d 1095, 1109 (D.C. Cir. 1979).  This is precisely why Section 209(a) prohibits states and their subdivisions—such as the District—from adopting *any* "standard relating to the control of emissions from new motor vehicles."  42 U.S.C. § 7543(a); *Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 938-39 (9th Cir. 2011) (explaining that the regulation of mobile source emissions is a federal responsibility and Congress has expressly preempted states

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

- 3 -

from setting emissions standards for mobile sources).

According to our Supreme Court in *EMA*, this prohibition against state-level regulation of emissions from new motor vehicle is both "categorical" and expansive. *EMA*, 541 U.S. at 252-57. Once a regulation is found to "relate to" emissions from new motor vehicles, Section 209(a) admits no exception. *EMA,* 541 U.S. at 256. And whether a regulation "relates to" preempted subject matter is interpreted broadly; preemption reaches to state or local standards that have "a connection with or reference to" the federal statute's predicate. See *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001) ("state law relates to an ERISA plan 'if it has a connection with or reference to such a plan'") (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983)); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("Since the relevant language of the ADA is identical, we think it appropriate to adopt the same standard here.").

This is not to say California is always prohibited from promulgating regulations related to motor vehicle emissions. Under Section 209(b), California may seek a waiver from the EPA to adopt its own statewide vehicle emissions standards provided they are at least as protective of health and welfare as the federal standards.[3] CARB, as the California agency designated "the air pollution control agency for all purposes set forth in federal law," is the only California regulatory body vested with authority to seek such a waiver. Cal. Health & Safety Code § 39602. Individual air districts, like the District, may not. See Cal. Health & Safety Code §§ 39602, 40000. Courts have also recognized that states may promulgate "in-use" requirements, such as "carpool lanes, restrictions on car use in downtown areas, and programs to control extended idling of vehicles." *Pacific Merchants Shipping Ass'n v. Goldstene*, 517 F.3d 1108, 1115 (2008) (quoting *Engine Mfrs. Ass'n v. U.S. E.P.A*, 88 F.3d 1075, 1094 (D.C. Cir. 1996). But states cannot restrict or remove the ability of

___

[3] CARB has already acted under this authority in adopting the Advanced Clean Trucks Rule, the Heavy-Duty Engine and Vehicle Omnibus Rule, the Advanced Clean Cars II Rule, and soon the Advanced Clean Fleets Rule, all since 2020.

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

manufacturers to produce, or purchasers to acquire and operate, federally-compliant new motor vehicles.  *EMA*, 541 U.S. at 255-56; *Metro Taxi*, 633 F. Supp. 2d at 105.

The District previously tested the bounds of Section 209(a) by indirectly doing what it is prohibited from doing directly.  While the District acknowledged federal law prohibits it from imposing tighter emissions standards on vehicle manufacturers, it tried to achieve the same result by prohibiting the sale or lease of vehicles within its boundaries that did not meet tighter standards.  The Supreme Court readily saw through the District's efforts and found such a regulation was preempted—reasoning it is "impossible to find in [Section 209] an exception for standards imposed through purchase restrictions rather than directly upon manufacturers." *EMA,* 541 U.S. at 256.  "A command, accompanied by sanctions, that certain purchasers may buy only vehicles with particular emission characteristics is as much an 'attempt to enforce' a 'standard' as a command, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume must consist of such vehicles." *Id.* at 255.  A rule with a so-called "purchase mandate" is thus preempted by Section 209(a) because a "manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Ibid*.

The District's new effort to circumvent Section 209(a) has the same purpose and effect, but this time the District characterizes its *de facto* purchase mandate as an ISR program.  This is a false characterization.  42 U.S.C § 7410(a)(5)(D) defines an ISR as a "*facility-by-facility* review of indirect *sources* of air pollution, including such measures as are necessary to assure, or assist in assuring, that a *new* or *modified indirect source* will not *attract* mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations …." (emphasis added).  Section 7410(a)(5)(C), in turn, defines an "indirect source" as "a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution ...."  Thus, indirect sources are neither stationary sources nor mobile sources, but facilities which draw mobile sources to them.  The

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

purpose of a permitted indirect source facility-wide "review" therefore is to determine what mobile sources (plural) of pollution such "new or modified" facilities might "attract," as opposed to "targeting" specific mobile sources (such as trucks) at existing facilities, in violation of Section 209(a).

In sum, an ISR is "an environmental review process encompassing air pollution, land use decisions and individual usage of the automobile .... [and] can serve as a tool for evaluating a land development project's effects on automobile usage and the resulting air quality effects of such increased vehicle usage."[4]  Here, however, this tool is being employed as a hammer  "to solve a problem that the federal government isn't willing to step up to do, *which is to regulate trucks*"[5] (emphasis added).  The Rule does not call for "facility-by-facility" reviews of the regulated warehouses; rather, it penalizes all existing warehouses if they allow the continued use of conventional (non-NZE/ZE) trucks.  If this mutated use of an ISR were permitted, the "categorical" preemption of Section 209(a) that "admits no exception" would have no meaning.

## III.    STANDARD OF REVIEW

This motion is brought pursuant to Rule 56(a) of the Federal Rule of Civil Procedure ("FRCP").  Summary judgment is appropriate because CTA's facial challenge to the validity of the Rule presents a question of law.  *Pacific Merchant Shipping Ass'n,* 517 F.3d at 1115 (affirming district court's grant of summary judgment invalidating nonroad engine rule as preempted by Clean Air Act section 209(e)(2)).  That is to say, summary judgment "is proper [because here] the record, viewed in the light most favorable to the non-moving party, discloses 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Pacific Merchant Shipping Ass'n*, 517 F.3d at 1113 (citation

---

[4] Philip E. Rothschild, <u>The Clean Air Act and Indirect Source Review: 1970-1991</u>, 10 UCLA J. Envtl. L. and Pol'y 337, 337 (1992), https://escholarship.org/uc/item/71q986z0.

[5] UF #51.

omitted); see also *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004).  This is so even if the evidence is viewed in the light most favorable to the non-movants and the Court draws all reasonable inferences in their favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).  Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge …," the "mere existence of a scintilla of evidence in support of the [non-movant's] position [would be] insufficient" to avoid summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (citation and quotation marks omitted).

Here, simply put, the question is did Congress, in enacting the Clean Air Act and Section 209(a), intend to allow local air districts to use economic sanctions cloaked as an ISR to mandate the accelerated conversion of combustion powered commercial truck fleets to ZE/NZE fleets?  As this is a pure question of law, this case is well-suited to summary disposition.  *Mitchell v. United States* (*In re Mitchell*), 977 F.2d 1318, 1320 (9th Cir. 1992); *Colony Insurance Company v. United Specialty Insurance Company*, No. CV218903DMGAFMX, 2022 WL 4597422, at *2 (C.D. Cal. July 14, 2022).

## IV.    THE UNDISPUTED FACTS

### A.    The Parties

The CTA is an association devoted to advancing the interests of its motor-carrier members who provide transportation services in California.  UF #2.  CTA promotes advocacy, safety and compliance with all applicable state and federal laws on behalf of its members, including motor-carrier members in California. UF #3.

CTA members are licensed motor-carrier companies that manage, coordinate and schedule the movement of property throughout California and in interstate

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

- 7 -

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

commerce. UF #4. The Rule will directly and indirectly impact many of CTA's members who operate in the District's boundaries. UF #5. Many of CTA's motor-carrier members contract with warehouse owners or operators to provide trucking services to their customers in the District. UF #6. Other CTA members are themselves owners or operators of warehouses directly regulated by the Rule. For example, Ability Tri-Modal is a CTA member. Ability Tri-Modal Operates two warehouse facilities within the jurisdiction of the South Coast Air Quality Management District that are over 100,000 square feet, and which are therefore subject to the Rule. UF #7. Over the life of the Rule, CTA's members will expend substantial resources in direct response to the Rule by purchasing and using District-approved trucks in place of their federally-compliant combustion vehicles. UF #8. Thus, the activities of CTA's members are subject to regulation under the Rule. UF #9. CTA also expends significant resources to ensure that its members, and the governmental agencies that regulate them, understand and faithfully implement the goals and requirements of all applicable laws and regulations, including the Rule.

The District is a political subdivision of California responsible for air pollution control in counties that include the Los Angeles metropolitan area. UF #10. Its authority is defined, and circumscribed, by enabling legislation found at California Health & Safety Code § 40400, et seq., also referred to as the "Lewis-Presley Air Quality Management Act." Agents of the District are responsible for administering the Rule. UF #11.

Defendant members of the District's Governing Board are all residents of the State of California. UF #12.

**B.      The Rule's Enactment and Current Implementation**

On May 7, 2021, the District adopted Rule 2305 (UF #13) and Rule 316, establishing administrative fees for the program, collectively the WAIRE Program ("Warehouse Actions and Investments to Reduce Emissions"). Both rules became effective when adopted. UF #14. CTA submitted substantial comments on the Rule

- 8 -

when it was proposed and actively participated in the administrative proceedings before the Rule was adopted.  UF #15.  The Rule does not apply statewide; it purports to apply only within the geographic limits of the District.  UF #16.  However, the Rule's penalties are accrued based on truck visits regardless of where the trucks originated or are thereafter destined.  UF #17.  The State of California, through CARB, has not obtained a waiver from the EPA pursuant to Section 209(b) for the Rule.  UF #18.[6]

**C.      Rule Mechanics**

The Rule applies to *any building* that stores cargo, goods, or products for later distribution so long as the warehouse meets the Rule's size thresholds.  Under the Rule, warehouses with 100,000 or more square feet of indoor floor space are required to monitor the number and type of trucks that visit their facilities.  UF #19.  This data creates the "WATT", or measurement of weighted-annual truck trips in which the heaviest class of truck is considered the equivalent of 2.5 trips in lighter duty vehicles.  UF #20.  The WATT is then multiplied by a stringency factor—an arbitrary number selected by the District—and an annual variable designed to phase the stringency factor in over time. UF #21.  The resulting number is the WPCO or WAIRE Points Compliance Obligation.  *Id.*  Each year, regulated warehouses must earn "WAIRE Points" equal or greater than their accumulated WPCO to comply with the Rule.  If they do not, they face punitive civil and criminal sanctions.  UF #22.

The District developed 18 different "Scenarios" through which warehouse operators could earn WAIRE points and titled these the "WAIRE Menu."[7]  UF #23.  These 18 Scenarios can be categorized into three general pathways for Rule

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

---

[6] In the wake of our Supreme Court's recent "major questions doctrine" decision in *West Virginia v. EPA*, 142 S. Ct. 2587, 2614 (2022), it is questionable whether the EPA could grant such a waiver without clear Congressional authority vesting the EPA with authority to allow unelected local bodies to effect such "a generation shifting" change to our Nation's interstate commerce infrastructure.

[7] The District later added a 19th scenario, a modification of the mitigation fee scenario in which warehouses accrue points for ZE and NZE vehicles that spontaneously visit their warehouses, on the assumption that the District's use of mitigation funds will subsidize the deployment of such vehicles.  UF #23.

compliance: (1) direct NZE/ZE truck acquisition, (2) indirect NZE/ZE truck acquisition, and (3) options that do not require the acquisition of NZE/ZE trucks. A warehouse operator that owns a fleet may replace her existing conventionally fueled trucks with ZE or NZE trucks (Scenarios 1, 2, 3, 6, 8, 12, 13, and 18—direct acquisition).[8] UF #24. A warehouse operator that does not own a fleet may compel her contractor(s) to replace their trucks (Scenarios 4, 5, 9, 10, and 14—indirect acquisition). UF #25. Finally, a warehouse operator may (1) pay a mitigation fee, (2) install rooftop solar equipment, (3) install filter systems for nearby sensitive receptors, (4) purchase filter systems for nearby sensitive receptors or (5) install transport refrigeration unit ("TRU") plugs (Scenarios 7, 11, 15, 16, and 17—non-acquisition). UF #26.

Using the District's own data and projections, the cost differential between these three pathways is stark. The average annual cost per square foot for compliance via one of the direct acquisition Scenarios is $0.27. UF #27. If a warehouse operator instead contracts for trucks, and manages to compel her contractor(s) to acquire NZE/ZE trucks, the average annual cost per square foot is $0.09. UF #28. The average annual cost per square foot under the remaining five non-acquisition Scenarios is $0.86. UF #29. Thus, a warehouse operator seeking to comply by the non-acquisition pathway will on average face costs ***three times higher*** than her competitors who directly acquire compliant trucks and ***nine times higher*** than her competitors that contract for trucks and are able to force their contractors to provide compliant trucks. Compare UF #29 to UF #27 and UF #28. The District acknowledged that the non-acquisition options "are expected to be chosen rarely as a compliance option to earn WAIRE Points due to their higher cost relative to other compliance options." UF #30. This table illustrates the stark cost differential:

---

[8] Even scenarios which appear to be independent of truck purchase, such as Scenarios 6 and 12 (installation of charging or fueling stations), in fact require the purchase and subsequent charging of trucks in order to acquire the points necessary to make the Scenario feasible for compliance.

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

| Compliance Type | Scenario # | Description | Annual Cost Per Square Foot | Average Annual Cost Per Square Foot |
|---|---|---|---|---|
| Direct Acquisition | 1 | NZE Class 8 truck acquisitions and subsequent visits from those trucks | $0.16 | $0.27[9] |
| | 2 | NZE Class 8 truck acquisitions and subsequent visits from those trucks (early purchase) | $0.17 | |
| | 3 | NZE Class 8 truck acquisitions (funded by Carl Moyer program) and subsequent visits from those trucks | $0.06 | |
| | 6 | Level 3 charger installations followed by ZE Class 6 & Class 8 truck acquisitions and subsequent visits from those trucks, using installed chargers | $0.23 | |
| | 8 | NZE Class 6 truck acquisitions and subsequent visits from those trucks | $0.23 | |
| | 12 | Hydrogen station installations followed by ZE Class 8 truck acquisitions and subsequent visits from those trucks, using the hydrogen station | $1.04 | |
| | 13 | ZE Class 2b-3 truck acquisitions and subsequent visits from those trucks | $0.10 | |
| | 18 | ZE Hostler Acquisitions and Usage | $0.15 | |
| | 4 | NZE Class 8 truck visits from non-owned fleets | $0.12 | $0.09 |

[9] Direct acquisition is on average a higher cost per square foot than indirect acquisition due to the inclusion of Scenario 12, which contemplates the acquisition of ZE Class 8 trucks that are not presently commercially available. Excluding this scenario results in an average annual cost per square foot for compliance of $0.16 and an even starker cost differential than when Scenario 12 is included. UF #31.

- 11 -

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

| | | | | |
|---|---|---|---|---|
| Indirect Acquisition (Contracts) | 5 | ZE Class 8 truck visits from non-owned fleets | $0.14 | |
| | 9 | NZE Class 6 truck visits from non-owned fleets | $0.07 | |
| | 10 | ZE Class 6 truck visits from non-owned fleets | -$0.02 | |
| | 14 | ZE Class 2b-3 truck visits from non-owned fleet | $0.15 | |
| Non-Acquisition | 7 | Pay Mitigation Fee | $0.83 | $0.86 |
| | 11 | Rooftop solar panel installations and usage | $1.21 | |
| | 15 | Filter System Installations | $0.79 | |
| | 16 | Filter Purchases | $0.77 | |
| | 17 | TRU plug installations and usage in cold storage facilities | $0.70 | |

The District has estimated the nitrogen oxide ("NOx") and diesel particulate matter ("DPM") emission reductions associated with each of the foregoing 18 Scenarios (UF #32) and concluded that two—Scenario 1 (NZE Class 8 truck acquisitions and subsequent visits from those trucks) and Scenario 13 (ZE Class 2b-3 truck acquisitions and subsequent visits from those trucks)—are the most representative of the upper and lower range of reductions that can be anticipated from the Rule's implementation.  UF #33.  Both Scenarios anticipate warehouse operators will earn WAIRE points by choosing to directly acquire and replace federally-complaint trucks with District-compliant ZE/NZE trucks (UF #34), with Scenario 1 replacing 12,733 trucks in the next ten years and Scenario 13 replacing 52,573 trucks in that same period (UF #24).  Both therefore assume rationally acting decision makers will choose direct acquisition..

The District's estimates also demonstrate that even the lower bounds of the projected emission reductions cannot be achieved through three of the five non-acquisition Scenarios—Scenario 15 (installation and use of filter systems), Scenario

- 12 -

16 (purchase and use of filters), and Scenario 17 (installation and use of TRU plugs). UF #35-36. The only non-acquisition options that would meet and exceed the floor of projected emission reductions—Scenarios 7 and 11—assume patently irrational behavior. UF #35, 37-38. Scenario 7 assumes regulated warehouse operators would elect the vastly more expensive option of paying an estimated *$6 billion* in mitigation fees to the District by 2031. UF #39. The District anticipates using half of this fanciful windfall to replace federally-compliant trucks with ZE/NZE alternatives and the other half to install ZE charging infrastructure (UF #40), resulting in the replacement of 11,400 trucks in the first ten years of the Rule (UF #41). The theoretical result would be *six times* the projected emission reductions as compared to Scenario 1. UF #37. Scenario 11 assumes operators would prefer the similarly expensive option of installing rooftop solar. UF #42. This scenario nevertheless would require owner/operators to collectively pay an estimated *$3.1 billion* in mitigation fees by 2031, the end result again being the displacement of federally-compliant trucks with NZE or ZE trucks via District purchase. UF #43. The District projects Scenario 11 would result in *three times* greater emission reductions as compared to Scenario 1. UF #38.

As both Scenarios 7 and 11 assume irrational behavior, unsurprisingly the District does not characterize these emission reduction projections as "likely." Rather, the District relies on the common sense supposition that rational actors, compelled to make such a difficult decision, would choose to pay far less and directly acquire new ZE/NZE trucks.

The Rule phases in over time. UF #44. Starting on January 1, 2022, warehouses 250,000 square feet or larger began accruing WPCO, or WAIRE Points Compliance Obligations. UF #45. In 2023, warehouses between 150,000 and 249,999 square feet will begin accruing WPCO. UF #46. Finally in 2024, all warehouses over 100,000 square feet will accrue WPCO. UF #47. The "annual variable" to calculate the WPCO will increase over a three-year period until the Rule

reaches full stringency.  UF #48.

**D.      The District's Avowed Intent Is to Change the Trucks on the Road**

The District has repeatedly affirmed that the Rule's purpose is to convert the trucks on the road from federally-compliant to District-compliant ZE/NZE vehicles. The expressly stated "goal" is "to reduce emissions from the most significant source—trucks."  UF #49.  The District openly acknowledges the aim of the Rule is to "provide a mechanism to *require* warehouse operators to encourage ZE vehicle use at their facilities."  UF #50 (emphasis added).  In so doing, the District is "[u]sing the indirect source rule to solve a problem that the federal government isn't willing to step up to do, which is to regulate trucks."  UF #51.  As the District acknowledged, the "main difference" between the Rule and statewide fleet mandates "is that they would apply to destinations instead of fleet owners or truck manufacturers."  UF #52. The Rule "is intended to accelerate the use of ZE trucks and yard trucks that visit the warehouses in the South Coast AQMD region" (UF #53) and "encourage and incentivize the purchase and use of NZE and ZE vehicles instead of conventional gasoline and diesel vehicles."  UF #54.  The Rule would "clean up vehicle and engine fleets" (UF #55), "require warehouse operators to encourage ZE vehicle use" (UF #56), and "place requirements on warehouse operators in [the District] that will encourage them" (UF #57) to remedy the perceived failures of CARB's regulations that do not "require any certain number of [ZE/NZE] trucks to be sold or to operate within the South Coast AQMD."  UF #58.

The District has also been clear that the Rule was born from an intent to address emissions from trucks, and only trucks.  See, e.g., District Governing Board Member Rex Richardson at the May 7, 2021 hearing on Rule 2305 ("The problem is the trucks") [UF #59]; District Governing Board Member Janice Rutherford at the May 7, 2021 hearing on Rule 2305 ("We all acknowledge trucks are the issue.  The type of building the trucks go to or from, the trucks are indifferent.  They pollute no matter where they go ….") [UF #60]; District staff member Ian MacMillan

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

explaining to the Governing Board on March 2, 2018 ("[r]eally the focus will be on trucks.") [UF #61].  As District staff member Dr. Philip Fine explained during the January 24, 2020 meeting of the Mobile Source Committee, "[w]e [the District] have not raised the amount of money we need to turn over the entire fleet. . . . You could look at this [ISR] as providing additional incentives, additional options in the form of points to comply with the rule in case we have not raised [the funds] to completely turn over the truck fleet through incentives."  UF #62.  In addressing compliance options District staff stated that "[t]he primary thing that warehouse operators can do is purchase or use low emission technologies" and that if warehouse operators are later revealed to be disproportionately selecting a different compliance option staff "will report back immediately to the Board and recommend any necessary changes [to the Rule]."  UF #63.

## V.  ARGUMENT

Recognizing it could not directly regulate the trucks on the road, the District adopted the Rule to compel warehouse operators to do what the District cannot—change the composition of truck fleets from federally-compliant to District (NZE/ZE) compliant.  As explained above, the Rule creates a *de facto* mandate that warehouse owners/operators, or their contractors, purchase ZE/NZE vehicles.  It does this by imposing far greater economic sanctions on owners/operators who allow conventional trucks to continue to serve their facilities.  Nominally styled an ISR, the Rule does not provide for a holistic review of emissions from individual facilities.  Instead, the Rule's compliance obligation is based solely on the number and type of trucks that visit the warehouses regulated by the Rule because the District's intent and purpose is to accelerate the turnover of trucking fleets.  To avoid the appearance of a preempted purchase mandate, the District designed the Rule to offer the superficial appearance of choice, but with economic costs for "non-acquisition pathways" which ensure rational actors will purchase and use, or force their contractors to purchase and use, NZE and ZE vehicles.

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

**A.      Absent an EPA Waiver, the Clean Air Act Preempts State and Local Motor Vehicle Emission Standards**

Under the U.S. Constitution's Supremacy Clause, laws of the federal government "shall be the supreme Law of the Land; ...any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  "Congress has the authority, when acting pursuant to its enumerated powers, to preempt state and local laws" (*Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665, 667 (9th Cir. 2003)), and this may occur through either express or implied preemption.  Where, as here, the statute contains an express preemption clause, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."  *CSX Trans., Inc. v. Easterwood,* 507 U.S. 658, 664 (1993).  This focus on the statutory text is consistent with "the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980).  Clean Air Act § 209(a) provides in relevant part:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part.

As the Supreme Court explained, "[t]he language of [the Clean Air Act] is categorical" (*EMA*, 541 U.S. at 256), and has been interpreted broadly, including to preempt laws which "effectively mandate" the purchase of motor vehicles. *Metro Taxi*, 633 F. Supp. 2d at 104-105 ("it is a matter of common sense that a rule with the stated purpose of increasing the number of 'cleaner vehicles' and with the effect of requiring the purchase of hybrid taxicabs is a rule 'relating to the control of emissions'").  As explained below, Section 209(a) preempts the Rule as a *de facto* purchase mandate.

**B.      The Rule Is a Standard Relating to Motor Vehicle Emissions**

The Rule is a "standard relating to the control of emissions from new motor

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

vehicles" because it compels a fleet operator to make purchasing decisions with respect to new vehicles based on their emissions characteristics and grants such economic incentives for the purchase of ZE/NZE vehicles as to create a *de facto* purchase mandate.  See *Metro Taxi*, 633 F. Supp. 2d at 83.

In *Metro Taxi*, the court analyzed New York City regulations ("Lease Cap Rules") which incentivized the purchase of hybrid taxicabs by reducing the rates at which a taxicab owner could lease its vehicle to drivers—thus reducing owners' overall profits—if the vehicle was not a hybrid.  *Id.* at 85.  Like the District, the City argued the Lease Cap Rules presented choices to regulated entities to purchase either a hybrid vehicle or a traditional Crown Victoria, while correcting structural disincentives that prevented taxicab owners from switching their fleets to hybrids.  *Id.* at 86.  Based on the City's intent and purpose in adopting the Lease Cap Rules, and the effect of their economic incentives, the court found that the Lease Cap Rules were in effect a purchase mandate preempted by Section 209(a).  *Id.* at 105-106.  The court explained, "[i]t is a matter of common sense that a rule with the stated purpose of increasing the number of 'cleaner vehicles' and with the effect of requiring the purchase of [such vehicles] is a rule 'relating to the control of emissions.'"  *Id.* at 105.

The District's intent and the Rule's effect are no different than those examined in *Metro Taxi*.  Although the Rule nominally provides a "menu" of options, in reality it presents only one "real" option.  A rational actor, after reviewing the District's own data comparing the projected costs of the three compliance pathways and the various Scenarios within each, could reach only one conceivable conclusion … the need to purchase ZE/NZE trucks or force her contractors to do so.  Thus, as was the case in *Metro Taxi*, the Rule incentivizes the purchase of new vehicles based on emissions characteristics by reducing owner/operator profits if such owner/operators, or their contractors, irrationally select another pathway.  As demonstrated by its calculation of anticipated emission reductions, the District realized, *and very much counted on*, this reality when it approved the Rule.  Because the Rule's "incentives [are] so

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

- 17 -

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

onerous as to be in effect a purchase mandate" (76 Fed. Reg. 26609, 26611 (May 9, 2011) and the clear purpose and intent of the Rule is to force the acquisition of cleaner vehicles, as was the case in *Metro Taxi*, the Rule is a preempted standard relating to motor vehicle emissions.

### 1. The Rule *De Facto* Mandates the Purchase of ZE/NZE Vehicles

A rule becomes a *de facto* purchase mandate when it presents only a single "real" option for compliance. *Id.* at 93. When assessing whether options are truly viable, or whether a law in effect mandates a particular outcome, courts look to both the purpose and intent of the rule and its effect. *Id.* at 93-99; *Retail Indus. Leaders Ass'n v. Fielder,* 475 F.3d 180, 194 (4th Cir. 2007) ("*Fielder*") (assessing Maryland legislature's intent in passing Fair Share Act and effect of the Act argued preempted under ERISA). State laws which seemingly present choices to regulated entities, but essentially mandate an outcome, are preempted. *Metro Taxi*, 633 F. Supp. 2d at 103-106; *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995) ("*Travelers*") ("We acknowledge that a state law might produce such acute, albeit indirect, economic benefits, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme … and that such a state law might indeed be pre-empted").[10]

### a. The Intent and Purpose of the Rule Is To Incentivize the Purchase of ZE/NZE Vehicles to Reduce Emissions

In determining whether a regulation is in fact a purchase mandate, the agency's

---

[10] The court in *Metro Taxi* considered multiple ERISA cases that analyzed state laws which seemingly presented choices but essentially mandated an outcome preempted by federal law to determine what constitutes a *de facto* mandate. It should be noted that the courts in the ERISA cases consider that those cases occur in an area of traditional state regulation when determining whether preemption occurs. See *Travelers,* 514 U.S. at 655 ("Indeed, in cases like this one, where federal law is said to bar state action in fields of traditional state regulation [..] we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress'"). Here, in contrast, motor vehicle emission standards are an area of traditional federal regulation, as made clear by Section 209(a), and thus there is no assumption against preemption, but in fact an assumption that Congress was clear as to the preemptive effect of Section 209(a) due to its express language.

"purpose in enacting the [rule] shed[s] light on the issue of preemption" and it is "fair to consider purpose in conjunction with the law's effects." *Metro Taxi*, 633 F. Supp. 2d at 102. In *Metro Taxi*, the City's avowed purpose was "to get fuel efficient taxis on the road using whatever appropriate methods [were] required to achieve [that] goal." *Id.* at 86. Hence, the preempted rule "offer[ed] incentives [to] encourage more taxi fleet owners to purchase hybrids." *Id*. at 85.

It is undisputed that the Rule's purpose is to convert the trucks on the road from conventional federally-compliant trucks to District-compliant ZE/NZE alternatives. See UF #49-63. As was the case in *Metro Taxi,* the District has been clear that the Rule was born from an intent to address emissions from trucks and only trucks by creating economic costs or sanctions so strong as to force warehouse operators to either directly purchase, or require their truck fleet providers to purchase, NZE or ZE vehicles. *Metro Taxi*, 633 F. Supp. 2d at 105. Cases evaluating whether state or local law has imposed a preempted purchase mandate under ERISA are in accord. In *Fielder*, the court assessed the Maryland Fair Share Act, which required employers with 10,000 or more employees to spend at least 8 percent of their total payrolls on employees' health insurances costs or pay the amount their spending falls short to the state. *Fielder*, 475 F. 3d. at 183. The court found, based on the context of enactment of the Act, that only Wal-Mart was subject to the requirements, and the legislative record, that the intent was to create a "fee or a penalty" that would require Wal-Mart to increase its healthcare spending, a requirement that by itself would be preempted under ERISA. *Id.* at 185, 194. Because the state's intent was to pressure the regulated entity to adopt the particular, and preempted, compliance method, the legislative scheme was preempted. Here too, where the District's plain intent is to force the transition to ZE trucks, the regulatory scheme is preempted.

**b.**     **The Effect of the Rule Is To Mandate the Purchase of ZE/NZE Vehicles**

After identifying the purpose and intent of the Lease Cap Rules, the court in

- 19 -

*Metro Taxi* stated that it "must look to the effect of the Lease Cap Rules on Fleet Owners to determine if they are a *de facto* mandate." *Metro Taxi,* 633 F. Supp. 2d at 96; see also *Travelers,* 514 U.S. at 658 (looking at the "purpose and the effects" of New York law to determine preemption under ERISA); *Fielder,* 475 F.3d at 190 (examining the "nature and effect" of Maryland's Fair Share Act to determine preemption under ERISA). The City claimed that fleet owners had a choice because they could still make "a reasonable return on [their] investment, which would be an economic rent greater than zero." *Metro Taxi,* 633 F. Supp. 2d at 98. The court disagreed and found that the incentive of $5,550 to $6,500 per vehicle to switch to hybrids would cause any reasonable businessperson to switch. *Id.* at 99-100. The court was clear that an economically rational actor will choose the least cost pathway in complying with any rule or regulation and that the disincentive in the Lease Cap Rules to purchase a traditional taxicab amounted to a *de facto* mandate.

The Rule at bar similarly punishes operators for the use of trucks essential to their businesses, and only the purchase and use of District-compliant ZE/NZE vehicles can lessen the blow. The purchase and use of ZE/NZE trucks earn warehouse operators compliance points while the acquisition and operation of conventional trucks earn only liabilities. If an operator purchases a ZE Class 4-7 truck, they will earn 68 points. UF #64. If an operator purchases a NZE Class 4-7 truck, they earn 26 points. UF #65. If they purchase a conventional Class 4-7 truck, they earn no points and instead accrue a WPCO obligation the District estimates will cost a 200,000 square foot warehouse upwards of $166,000 per year in mitigation fees. UF #66. The total assessed penalty thus depends entirely on the emissions profile of the trucks the operator acquires or allows to enter and use her facility.

Over the ten-year period from 2022 to 2031, a warehouse operator with a 200,000 square foot facility who attempts to avoid acquiring Rule-compliant trucks, or allows her contractors to continue using federally-compliant trucks will, on average, face $1.7 million in Rule-attributable costs. UF #67. Her similarly situated

competitors would pay on average $540,000 (direct acquisition) or $184,000 (indirect acquisition). UF #68. No rational actor would burden themselves with over $1 million in excess costs. The effect of the Rule is thus to mandate the purchase of District-compliant trucks.

Again cases in the ERISA preemption context are in accord. In *Fielder*, although there were multiple options for Wal-Mart to comply with Maryland's Fair Share Act, including payments to the state, establishing on-site clinics, and Health Savings Account contributions, the court found that these were not meaningful choices. *Id.* at 196-97. Instead, the court held that "[i]n effect, the only rational choice employers have under the Fair Share Act is to structure their ERISA healthcare benefit plans so as to meet the minimum spending threshold." *Id.* at 193. This was because the effect of the law was to create a "fee or a penalty" that gave Wal-Mart "an irresistible incentive" to increase health benefits (*Id.* at 194) as no rational employer would pay money to the state in lieu of spending it on employees. Because "in *most* scenarios, the Act would cause an employer to alter the administration of its healthcare plans," the court held the Act preempted. *Id.* at 197.

The illusion of choice does not overcome practical reality. *Egelhoff*, 532 U.S. at 150 ("[t]he statute is not any less of a regulation of the terms of ERISA plans simply because there are two ways of complying with it"). The economic incentives in the Rule and its effect on regulated parties, combined with the clear intent of the District leave only one "real" option, the purchase of District-compliant ZE/NZE trucks. See *Metro Taxi*, 633 F. Supp. 2d at 99 ("there is one clear conclusion to be drawn from the Lease Cap Rules, the manner in which they were adopted, and the methodology of the new regulatory architecture. The Lease Cap Rules' purpose is to incentivize the purchase of hybrids, while at the same time provide a very meaningful disincentive to the continuing use of conventionally powered vehicles. The combined effect of the lease cap changes, and even the disincentive alone, constitutes an offer which can not [sic], in practical effect, be refused").

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA 92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

### 2. Because the Rule Is A Purchase Mandate, It Is Preempted

It is settled law that a regulation establishing a purchase mandate is a standard regulating the emissions of new motor vehicles and preempted under Section 209(a). As the court in *Metro Taxi* explained, "the Supreme Court in *[EMA]* did not need testimony from scientific experts to explain the connection between 'alternative-fuel vehicles' and emissions regulation. Neither does this Court need further testimony to understand the close relation between hybrid vehicles and emissions." 633 F. Supp. 2d at 105. Congress did not limit Section 209(a) to cabin its preemptive effect to particular types of standards, such as numerical specifications for tailpipe emissions. The Supreme Court has explained a standard is "that which 'is established by authority, custom, or general consent, as a model or example; criterion; test.'" *EMA*, 541 U.S. at 252-53; see *NAHB*, 627 F.3d at 736 (agreeing that rule established standards no matter how much regulatory flexibility it allowed). As the First Circuit pointed out, Section 209(a)'s use of the term "standard" should not be read to exclude state regulation, such as the Rule, whose "very purpose and effect … is to effect a quantitative reduction in emissions." *Ass'n of Int'l Auto. Mfrs. v. Commissioner*, 208 F.3d 1, 7 (1st Cir. 2000). Further, the preemptive language in Section 209(a) is categorical, and does not admit of "an exception for standards imposed" indirectly "rather than directly upon manufacturers." *EMA*, 541 U.S. at 256. If a "manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them" (*ibid.*), then certainly a manufacturer's right to sell federally approved vehicles is also meaningless if buyers are punished for using them.

### C. Congress Did Not Authorize States to Adopt Standards Relating to Emissions From Mobile Sources Under The Guise of An ISR

The District cannot evade the broad preemptive effect of Section 209(a) by disguising its attempt to reach mobile sources as an ISR. While the Clean Air Act and state law afford the District the authority to design an ISR for new or modified

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

indirect sources, neither can shield the District's Rule from the preemptive reach of Section 209(a).  In the first instance, the Rule is not a Clean Air Act-compliant ISR.  The District itself disclaimed any attempt to regulate within the confines of the Act, explaining, "[t]he CAA is irrelevant to the District's authority to adopt the proposed rule."  UF #69.   The District had no choice but to eschew Clean Air Act authorization because, although states are expressly allowed to include ISRs in their SIPs (42 U.S.C. § 7410(a)(5)(A)(i)), programs under this provision are those designed "to assure, or assist in assuring, that a *new or modified* indirect source will not attract mobile sources of air pollution…"  42 U.S.C. § 7410(a)(5)(D) (emphasis added).  As the Rule applies to existing, non-modified warehouses, it is not authorized by any provision of the Clean Air Act.  But even if the District had tried to cloak its ISR in federal authority, the EPA itself has stated that even an ISR facially authorized under Clean Air Act § 7410 may be preempted by Section 209(a) if it creates "incentives so onerous as to be in effect a purchase mandate."  76 Fed. Reg. 26609, 26611 (May 9, 2011).

The District's reliance on state law is also unavailing. While the District claims that "its regulatory authority represents an exercise of the State's police power," on which the Clean Air Act is "not a limit" (UF #70), the broad preemptive effect of Section 209(a) effectuates Congress's intent that the EPA occupy the field of controlling emissions from new motor vehicles, except to the extent Congress has expressly, or through clear implication, authorized state regulation.  Congress has not authorized standards such as the Rule, which purports to control indirect sources but in reality forces the purchase of District-compliant ZE and NZE vehicles.  In light of the broad preemptive effect of Section 209(a), the District's alleged state law authority for the regulation of indirect sources is irrelevant.

In any event, the Rule is an ISR in name only.  The Ninth Circuit has approved of only one ISR, Rule 9510 developed by the San Joaquin Air Pollution Control District.  *NAHB*, 627 F.3d at 731.  Unlike the Rule, Rule 9510 applied only to new

development. See *id.* at 732. Moreover, it evaluated facilities "as a whole" based on a "facility-by-facility" review." *Id.* at 737. Rule 9510 also required each new development to calculate a "baseline" of emissions associated with the construction and operational phases of development and then achieve a 20% or 45% reduction of emissions. *Id.* at 732. Rule 9510 did not specify how those reductions be achieved for construction emissions—whether by using add-on controls, cleaner fuels, more advanced equipment or off-site reductions. *Id.* at 732-33. In *NAHB*, the rule was focused on the development site as a whole, as a true ISR should be. *Id.* at 739.

The contrast with the Rule at issue today could not be more stark. The Rule does not measure emissions from each regulated warehouses "as a whole" nor call for "facility-by-facility" reviews. The emission reductions it requires are unmistakably "engine- or vehicle-based" in that the compliance obligation is determined entirely based on the truck trips to the facility. Thus, as the District has admitted, the Rule "targets" combustion commercial trucks.

**D.      The District Admittedly Adopted the Rule Because the EPA and CARB Have Not Seen Fit to Act So Aggressively**

Governing Director McCallon's candid admission that the District is "[u]sing the indirect source rule to solve a problem that the federal government isn't willing to step up to do, which is to regulate trucks,"[11] along with the District Staff's conclusion that CARB has failed to act quickly enough,[12] illustrates why the Rule amounts to an unauthorized major questions measure by a local administrative body in violation of the U.S. Constitution's Dormant Commerce Clause. Nothing in the Clean Air Act, or within the principles of federalism, allow an unelected regulatory body sitting in Diamond Bar California to presume to "fix" what the federal government or State agency with authority to address has failed or refused to fix.

Relying on the "major questions doctrine," in *West Virginia v. EPA*, our

---

[11] UF #44.

[12] UF #71.

- 24 -

Holland & Knight LLP
3 Park Plaza, Suite 1400
Irvine, CA  92614-8537
Tel: 949.833.8550
Fax: 949.833.8540

Supreme Court recently held that EPA is not permitted to administratively dictate a "generation shifting" change to our Nation's "electricity production from higher-emitting to lower-emitting producers" without "clear congressional authorization." 142 S. Ct. at 2593, 2595.  This being the case, why should the District's Governing Board members be allowed to dictate national policy on the multi-trillion dollar question as to what kind of trucks, without severe penalties, are allowed to load and unload goods in one of the busiest commercial "ports" in the world … thus deciding the fate of untold numbers of workers, consumers, and investors?  Even in the absence of Section 209(a) and the major questions doctrine, surely such local regulation imposes an unreasonable burden on interstate commerce in violation of the Dormant Commerce Clause.  See *S. Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2089 (2018).

## VI.    CONCLUSION

Section 209(a)'s clear preemption plays a vital role in avoiding an "anarchic patchwork" of regulatory programs for mobile sources of air emissions.  This preemption includes *de facto* purchase mandates.  Because the Rule is a purchase mandate foreclosed by the categorical preemption of state standards or other regulations relating to the control of mobile source emissions in Section 209(a) of the Clean Air Act and the U.S. Constitution's Supremacy Clause, the Rule should be declared preempted and invalid, and summary judgment should be granted.

Dated:        October 28, 2022              HOLLAND & KNIGHT LLP


                                            By: */s/ David A. Robinson*
                                                  David A. Robinson

                                            Attorneys for Plaintiff CALIFORNIA TRUCKING ASSOCIATION

*California Trucking Association v. South Coast Air Quality Management District et al*
**United States District Court Case No.: 2:21-cv-06341-JAK-MRW__**

CERTIFICATE OF SERVICE (CM/ECF)

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Three Park Plaza, Suite 1400, Irvine, CA 92614.

On October 28, 2022, I caused the foregoing document described as

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

to be served on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

| | |
|---|---|
| ☒ | BY ELECTRONIC TRANSMISSION.  In accordance with Federal Rules of Civil Procedure 5(d)(3) and Local Rule 5-4, I uploaded the above-listed document to the United States District Court's Case Management and Electronic Case Filing (CM/ECF) system which electronically notifies the parties. |
| ☒ | FEDERAL I declare that I am employed in the offices of a member of the Bar of this Court at whose direction the service was made. |

Executed on October 28, 2022, at Irvine, California.


___/s/ Michelle Woo_____
Michelle Woo

**<u>SERVICE LIST</u>**

*California Trucking Association v. South Coast Air
Quality Management District et al*
**United States District Court Case No.: 2:21-cv-06341-JAK-MRW_**

| | |
|---|---|
| Matthew D. Zinn, Esq.<br>Susannah T. French, Esq.<br>Aaron M. Stanton, Esq.<br>SHUTE, MIHALY &<br>  WEINBERGER LLP<br>396 Hayes Street<br>San Francisco, CA 94102-4421<br>Tel:  (415) 552-7272 | Attorneys for Defendants<br>*South Coast Air Quality<br>Management District  and the<br>Governing Board of the South Coast<br>Air Quality Management District*<br><br>zinn@smwlaw.com<br>French@smwlaw.com<br>Stanton@smwlaw.com |
| Bayron T. Gilchrist, Esq.<br>Barbara Baird, Esq.<br>Mary Reichert, Esq.<br>SOUTH COAST AIR QUALITY<br>MANAGEMENT DISTRICT OFFICE<br>OF THE GENERAL COUNSEL<br>21865 Copley Drive<br>Diamond Bar, California 91765<br>Tel:  (909) 396-3459 | Attorneys for Defendants<br>*South Coast Air Quality<br>Management District  and the<br>Governing Board of the South Coast<br>Air Quality Management District*<br><br>bgilchrist@aqmd.gov<br>bbaird@aqmd.gov<br>mreichert@aqmd.gov |
| Gary J. Smith, Esq.<br>BEVERIDGE & DIAMOND PC<br>456 Montgomery Street, Suite 1800<br>San Francisco, CA 94104-1251<br>Tel:  (415) 262-4000 | Attorneys for Intervenor<br>*Airlines for America*<br><br>GSmith@bdlaw.com |
| Thomas Richichi, Esq.<br>Jennifer J. Leech, Esq.<br>BEVERIDGE & DIAMOND PC<br>1900 N Street NW, Suite 100<br>Washington D.C. 20036<br>Tel: (202) 789-6000 | Attorneys for Intervenor<br>*Airlines for America*<br><br>TRichichi@bdlaw.com<br>JLeech@bdlaw.com |
| Steven J. Elie<br>MUSICK, PEELER & GARRETT LLP<br>624 South Grand Avenue, Suite 2000<br>Los Angeles, CA 90017-3383<br>Tel: (213) 629-7745<br>Fax: (213) 624-1376 | Attorneys for Intervenor<br>*Airlines for America*<br><br>s.elie@musickpeeler.com |

PROOF OF SERVICE

Rob Bonta, Esq.
Attorney General of California
Gary E. Tavetian, Esq.
Supervising Deputy Attorney General
Robert Swanson, Esq.
Deputy Attorney General
Daniel M. Lucas, Esq.
1300 I St., Suite 125
Sacramento, CA 94244-2550
Tel: (916) 210-7808

Attorneys for Intervenors
*State of California and California Air Resources Board*

Robert.Swanson@doj.ca.gov
Gary.Tavetian@doj.ca.gov
Daniel.Lucas@doj.ca.gov

Adriano L. Martinez
Candice L. Youngblood
EARTHJUSTICE
707 Wilshire Street, Suite 4300
Los Angeles, CA 90017
Tel: (415) 217-2000
Fax: (415) 217-2040

Attorneys for Intervenors
*East Yard Communities for Environmental Justice, People's Collective for Environmental Justice, and Sierra Club*

amartinez@earthjustice.org
cyoungblood@earthjustice.org

Regina J. Hsu, Esq.
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2000
Fax: (415) 217-2040

Attorneys for Intervenors
*East Yard Communities for Environmental Justice, People's Collective for Environmental Justice, and Sierra Club*

rhsu@earthjustice.org

Sean H. Donahue, Esq.
DONAHUE GOLDBERG & LITTLETON
1008 Pennsylvania Avenue SE
Washington, D.C. 20003
Tel.: (202) 277-7085
Fax: (202) 315-3582

Attorneys for Intervenors
*Environmental Defense Fund*

sean@donahuegoldberg.com

Alison McLaurin Hahm, Esq.
Communities for a Better Environment
6325 Pacific Boulevard
Huntington Beach, CA 90255
Tel: (323) 826-9771

Attorney for Intervenor
*Communities For A Better Environment*

ahahm@cbecal.org

Timothy J. O'Connor
Environmental Defense Fund, Inc.
123 Mission Street, 28th Floor
San Francisco, CA 94105
Tel: (916) 549-8423

Attorney for Intervenor
*Environmental Defense Fund, Inc.*

toconnor@edf.org

PROOF OF SERVICE

David R. Pettit, Esq.
Natural Resources Defense Council, Inc.
1314 Second Street
Santa Monica, CA 90401
Tel: (310) 434-2300

Attorney for Intervenor
*Natural Resources Defense Council*

dpettit@nrdc.org

PROOF OF SERVICE