TROUTMAN PEPPER HAMILTON SANDERS LLP
Misha Tseytlin, *admitted pro hac vice*
misha.tseytlin@troutman.com
227 West Monroe Street, Suite 3900
Chicago, Illinois 60606-5085
Telephone: 312.759.1920
Facsimile: 312.759.1939

Cindy J. Lee, Bar No. 322133
cindy.lee@troutman.com
350 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: 213.928.9800
Facsimile: 213.928.9850

*Additional Counsel Listed in Signature Block*

*Attorneys for Amici Curiae*
Chamber of Commerce of the United States of America, et al.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION—LOS ANGELES

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION,<br><br>Plaintiff,<br>AIRLINES FOR AMERICA,<br><br>Intervenor-Plaintiff,<br><br>v.<br><br>SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT; GOVERNING BOARD OF THE SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,<br><br>Defendants,<br><br>STATE OF CALIFORNIA; CALIFORNIA AIR RESOURCES BOARD; EAST YARD COMMUNITIES FOR ENVIRONMENTAL JUSTICE; PEOPLE'S COLLECTIVE FOR ENVIRONMENTAL JUSTICE; SIERRA CLUB; COMMUNITIES FOR A BETTER ENVIRONMENT; & ENVIRONMENTAL DEFENSE FUND,<br><br>Intervenor-Defendants. | Case No. 2:21-cv-06341-JAK-MRW<br><br>**BRIEF OF *AMICI CURIAE* CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ET AL., IN SUPPORT OF SUMMARY JUDGMENT MOTIONS OF PLAINTIFF AND INTERVENOR-PLAINTIFF**<br><br>Hearing Date: March 20, 2023<br>Time:      8:30 a.m.<br>Courtroom:  10B<br>Judge:     Hon. John A. Kronstadt |

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

# TABLE OF CONTENTS

**Page**

I.      INTEREST OF *AMICI CURIAE*.................................................................6

II.     INTRODUCTION.............................................................................................8

III.    ARGUMENT ..................................................................................................10

        A.      The CAA And ADA Preempt Rules 2305 And 316 .............................10

        B.      The Rules Would Have Damaging Impacts On Warehouse, Shipping,

                And Logistics Industries Nationwide ...................................................18

IV.     CONCLUSION ..............................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Transp. Ass'n of Am. v. City & Cnty. of S.F.*,
   266 F.3d 1064 (9th Cir. 2001) ....................................................................13, 17

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ...........................................................................................10

*Dan's City Used Cars, Inc. v. Pelkey*,
   569 U.S. 251 (2013) ...........................................................................................10

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
   541 U.S. 246 (2004) .....................................................................................passim

*Fed. Express Corp. v. Cal. Pub. Utilities Comm'n*,
   936 F.2d 1075 (9th Cir. 1991) ....................................................................14, 17

*Gibbons v. Ogden*,
   22 U.S. (9 Wheat.) 1 (1824) ...............................................................................10

*Gobeille v. Liberty Mut. Ins. Co.*,
   577 U.S. 312 (2016) ...........................................................................................11

*Kansas v. Garcia*,
   140 S. Ct. 791 (2020) ..........................................................................................10

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) .....................................................................................passim

*Motor & Equip. Mfrs. Ass'n v. E.P.A.*,
   627 F.2d 1095 (D.C. Cir. 1979) .........................................................................22

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995) ......................................................................11, 12, 15, 16

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified*

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

*Air Pollution Control Dist.*,

   627 F.3d 730 (9th Cir. 2010) ......................................................... 16, 17

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,

   579 U.S. 115 (2016) ............................................................................ 10

*Rowe v. N.H. Motor Transp. Ass'n*,

   552 U.S. 364 (2008) ........................................................................ 9, 18

**Statutes**

U.S. Const. art. VI, cl. 2 .......................................................................... 10

**Other Authorities**

15 U.S.C. § 1681t ..................................................................................... 11

29 U.S.C. § 1144 ...................................................................................... 11

42 U.S.C. § 7543 ................................................................... 11, 12, 15, 17

49 U.S.C. § 13102 .................................................................................... 13

49 U.S.C. § 14501 ................................................................................ 9, 11

49 U.S.C. § 41713 ................................................................ 11, 13, 17

**8**

CA.gov, *Logistics & Infrastructure* ....................................................... 19

Cal. Dep't of Justice, *Warehouse Projects: Best Practices and Mitigation*

   *Measures to Comply with the California Environmental Quality Act* ................ 19

Congressional Research Serv., *Supply Disruptions and the U.S. Economy*

   (May 13, 2022) ................................................................................... 20

Dan Walters, *Southern Cal Ports and Warehouses Face Threats*,

   Cal Matters (July 13, 2022) ........................................................... 18, 19

Jeff Horseman, *Inland Empire is Warehouse Central, But How Did It*

   *Happen?*, The Press-Enterprise (Sept. 29, 2021) ......................... 18, 20

LA: The Port of Los Angeles, *Facts & Figures* (2021) ..................... 19, 22

Mayumi Brewster, *Annual Retail Trade Survey Shows Impact of Online*

   *Shopping on Retail Sales During COVID-19 Pandemic*,

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

Census.gov (Apr. 27, 2022) ................................................................... 19

N.Y.C. Office of the Mayor, *Mayor de Blasio Releases Vision for Sustainable*
*Freight Network* (Dec. 15, 2021) ......................................................... 22

PBS News Hour, *U.S. Inflation at 9.1 Percent, A Record High* (July 13, 2022)..... 20

SCAQMD, *Second Draft Staff Report* (Apr. 2021) .................................... 21

The White House, *FACT SHEET: Lowering Prices and Leveling the Playing*
*Field in Ocean Shipping* (Feb. 28, 2022) ............................................. 21

The White House, *Why the Pandemic has Disrupted Supply Chains*
(June 17, 2021) ................................................................................. 21

U.S. Dep't of Transp., *Supply Chain Assessment of the Transportation*
*Industrial Base: Freight and Logistics* (Feb. 2022) ............................ 21

U.S. Dep't of Transp., *USDOT Supply Chain Tracker Shows Historic Levels*
*of Goods Coming into U.S., Continued Challenges with Congestion*
(May 13, 2022) ................................................................................. 20

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

## I. **INTEREST OF** *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community, including briefs on preemption issues.

American Trucking Associations, Inc. ("ATA"), is the national association of the trucking industry.  Its direct membership includes approximately 1,800 trucking companies, and in conjunction with 50 affiliated state trucking organizations, it represents over 30,000 motor carriers of every size, type, and class of motor carrier operation.  ATA members have an acute interest in this matter, because many of them regularly move freight by commercial truck to and from warehouses within the South Coast Air Quality Management District, or own or operate warehouses within the District that are directly regulated by Rule 2305.  In addition, ATA has regularly been involved (either as a party or an amicus) in cases involving federal preemption concerns relating to transportation.

The California Chamber of Commerce ("CalChamber") is a non-profit business association with over 14,000 members, both individual and corporate, representing 25% of the state's private sector and virtually every economic interest in the state of California.  While CalChamber represents several of the largest corporations in California, seventy-five percent of its members have 100 or fewer

---

[1] No counsel for any party that authored this brief in whole or in part and no entity or person, aside from *amici curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

employees.  CalChamber acts on behalf of the business community to improve the state's economic and jobs climate by representing business on a broad range of legislative, regulatory, and legal issues.

The Retail Litigation Center, Inc. ("RLC") is the only trade organization solely dedicated to representing the retail industry in the courts.  RLC's members include many of the country's largest and most innovative retailers.  Collectively, they employ millions of workers throughout the United States, provide goods and services to tens of millions of consumers, and account for tens of billions of dollars in annual sales.  RLC member retailers strive to be active allies and collaborators on combating climate change and reducing emissions.  RLC provides courts with retail-industry perspectives on important legal issues impacting its members, and highlights industry-wide consequences of significant pending cases.

The Hispanic Chamber of Commerce, Los Angeles Area Chamber of Commerce, Long Beach Area Chamber of Commerce, South Bay Association of Chambers of Commerce, Redondo Beach Chamber of Commerce, San Pedro Chamber of Commerce, Garden Grove Chamber of Commerce, Santa Maria Valley Chamber of Commerce, Southwest California Legislative Council, Murrieta/Wildomar Chamber of Commerce, Carlsbad Chamber of Commerce, Yorba Linda Chamber of Commerce, Tulare Chamber of Commerce, Santa Clarita Valley Chamber of Commerce, Citrus Heights Chamber of Commerce, Oceanside Chamber of Commerce, West Ventura County Business Alliance, Elsinore Valley Chamber of Commerce, Industry Business Council, Harbor Association of Industry and Commerce, Greater High Desert Chamber of Commerce, Danville Area Chamber of Commerce, Laguna Niguel Chamber of Commerce, and Greater Riverside Chambers of Commerce (hereinafter, collectively, "Local Chambers of Commerce"), are non-profit business associations representing both individual and corporate private sector entities in the state of California.  The Local Chambers of

Commerce act on behalf of their local businesses to improve the economic and jobs climate in their respective communities.

Consistent with this extensive interest and history in cases involving federal-preemption principles, the Chamber, ATA, CalChamber, RLC, and Local Chambers of Commerce submit this brief to provide context on the effects of the Rules at issue in this litigation on the U.S. economy, including not only the trucking industry but the broader transportation sector, retail, and all businesses that rely on an efficient, nationally regulated transportation system. *Amici* and their members greatly benefit from federal rules that advance important societal and statutory objectives such as environmental protection, while providing a uniform regulatory regime across the country that supports a consistent, nationwide market for products and services. Local rules of the kind at issue here improperly undermine the federal framework and the value it provides toward achieving these important objectives.

## II. <u>INTRODUCTION</u>

In Section 209(a) of the Clean Air Act ("CAA"), Congress expressly preempted States and their political subdivisions from enacting any law, regulation, or other standard *relating to* the emissions of new motor vehicles or new motor vehicles engines. And in the Airline Deregulation Act ("ADA"), Congress expressly preempted States and their political subdivisions from enacting or enforcing any law, regulation, or other provision having the force of law *related to* a price, route, or service of an air carrier when such carrier is transporting property by motor vehicle. In violation of these express preemption provisions, Defendants South Coast Air Quality Management District and its Governing Board (collectively, the "District") adopted Rule 2305 and Rule 316 ("the Rules"), which effectively require warehouses within the District to purchase, or cause to be purchased zero-emission or near-zero-emission vehicles to be used as the trucks transporting the freight stored at District warehouses. The U.S. Supreme Court

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

1  rejected similar efforts by the District in *Engine Manufacturers Association v.*
2  *South Coast Air Quality Management District*, 541 U.S. 246 (2004).  The Court
3  held that Section 209(a) applied to a command with accompanying sanctions
4  requiring persons to buy vehicles with particular emissions characteristics.  So too
5  here.  For the same reason, these new Rules are similarly preempted by the CAA.
6  The District's characterization of such Rules as "indirect source reviews" in order
7  to escape the CAA's preemptive scope fails.  The Rules are designed to regulate
8  trucks, not whole facilities, thereby rendering the Rules squarely within Section
9  209(a) preemption.  And because the Rules attempt to regulate the terms of service
10  for trucking companies, imposing impermissible economic regulations on trucking
11  operations related to air carriers, they are similarly preempted by the ADA.[2]

12      Allowing these Rules to stand would have grave consequences for the
13  Nation's already over-stressed supply chain.  The District and the related Inland
14  Empire region is a massive, nationally important hub for warehousing and shipping,
15  with particular emphasis on trucking and road-level freight shipping, responsible
16  for about a third of all goods shipped nationwide.  Both increases in consumer
17  demand and the COVID-19 pandemic have led to unprecedented stress on our
18  Nation's supply chain, further underscoring the importance of the warehouses and
19  efficient movement of goods in and out of the District.

20      To ease the stress on our Nation's supply chain and guarantee that supply can
21  meet consumer demand, it is crucial for the transportation and logistics industries to

---

[2] For similar reasons, the Rules are also expressly preempted by the Federal
Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C.
§ 14501(c)(1), which contains identically worded preemption language with respect
to motor carriers.  *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370
(2008).  However, although the plaintiff and the plaintiff-intervenor each assert
claims for relief based on the FAAAA in their complaints, Dkt.1 at 26–29; Dkt.32
at 31–32, their summary judgment motions are limited to their CAA and ADA
claims, and so *Amici* also limit this brief to analyzing those issues.

retain and recruit additional drivers and trucks.  Yet the District's Rules seek to impose massive regulatory demands and compliance costs on one of the busiest shipping and warehouse regions in the country, without regard for the inevitable disruptions this will cause to the supply chain and national economy.  These increased costs will likely result in further delays and shortages in consumer goods, causing price hikes for consumers across the country and contributing to already historic levels of inflation.  Allowing the Rules to stand would also encourage other local and regional governments to impose similar emissions rules, creating an unworkable, patchwork system of emissions requirements for shipping companies and warehouses across the country, unraveling Congress's carefully calibrated national transportation system, and damaging a crucial element of our national economy.

For these reasons, the Court should grant Plaintiff California Trucking Association ("CTA")'s and Plaintiff-Intervenor Airlines for America ("A4A")'s Motions For Summary Judgment.

## III.     <u>ARGUMENT</u>

### A. The CAA And ADA Preempt Rules 2305 And 316

1.a. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, Congress has the "power to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824).  When Congress explicitly preempts state laws by enacting a preemption provision in a federal statute, *see Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020), all that courts must do to enforce that provision "is to identify the domain expressly pre-empted." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (citation omitted). Courts "do not invoke any presumption against pre-emption"; rather, they "instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent," *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016) (citation omitted)—including the substance and

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

breadth of such preemption, *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992); *see also Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252–53 (2004).

Congress often preempts state laws expressly by enacting preemption provisions that prohibit States from enacting laws "relating to" some topic or field. *See, e.g.*, CAA § 209(a) (42 U.S.C. § 7543(a)); 29 U.S.C. § 1144(a) (ERISA preemption); 49 U.S.C. § 41713(b)(1) (ADA preemption); 49 U.S.C. § 14501(c) (FAAAA preemption); 15 U.S.C. § 1681t(b)(1) (FCRA preemption).  When considering such "relating to" preemption clauses, the Supreme Court has explained that such clauses have a "broad scope" and "an expansive sweep"; are "broadly worded" and "deliberately expansive"; and are "conspicuous for [their] breadth." *Morales*, 504 U.S. at 383–84 (citations omitted).  These express "relat[ing] to" preemption clauses are, in short, "comprehensive," *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016), necessarily encompassing all state laws "ha[ving] a connection with, or reference to," the subject of the federal statute, *Morales*, 504 U.S. at 384 (citations omitted).  Their sweep may include, moreover, state laws that only "indirect[ly]" relate to the federally regulated subject matter, if the "effects" of those state laws—"by intent or otherwise"—are sufficiently "acute."  *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995).

b. This case deals with two express preemption provisions—one in Section 209(a) of the CAA and the other in the ADA (as well as the motor-carrier preemption provision of the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), which contains identically worded preemption language).

Section 209(a) of the CAA provides, in relevant part, that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."  42 U.S.C. § 7543(a).  The term "standard" in Section 209(a)

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA  90071-3427

- 11 -

means "that which is established by authority, custom, or general consent, as a model or example; criterion; test"—and "[t]he criteria referred to in § 209 relate to the emission characteristics of a vehicle or engine." *Engine Mfrs. Ass'n*, 541 U.S. at 255 (citations omitted). So, by preempting any law of a state or political subdivision thereof "*relating to* the control of emissions," § 209(a) (emphasis added), Section 209(a) bars those state/political-subdivision laws "ha[ving] a connection with, or reference to," *Morales*, 504 U.S. at 384 (citations omitted), "the emission characteristics of a vehicle or engine," *Engine Mfrs. Ass'n*, 541 U.S. at 253 (citations omitted).

The Supreme Court decision in *Engine Manufacturers Association*— explicitly applying Section 209(a) to prior emissions-based rules issued by the same District Defendant here—is particularly instructive as to the breadth of Section 209(a). *Engine Manufacturers Association* held that Section 209(a) applied to certain "Fleet Rules" that "generally prohibit[ed] the purchase or lease by various public and private fleet operators of vehicles that do not comply with stringent emission requirements." 541 U.S. at 248. Most consequentially, these rules required "the purchase or lease of 'alternative-fuel vehicles'" or "vehicles that meet certain emission specifications established by [a state board]." *Id.* at 249–50. In holding these rules did not escape Section 209(a)'s preemptive scope, the Court rejected the District's argument that only regulation of sellers of vehicles, not of purchasers, falls within Section 209(a), explaining that such a distinction "ha[d] no basis in the text of the statute" and "would make no sense" for "pre-emption purposes." *Id.* at 255. This is because "[a] command, accompanied by sanctions, that certain purchasers may buy only vehicles with particular emission characteristics is as much an 'attempt to enforce' a 'standard' as a command, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume must consist of such vehicles." *Id.*; *accord Travelers*, 514 U.S. at 668 (explaining that a "relating to" preemption clause may preempt a state law that

"indirect[ly]" regulates the subject matter by "produc[ing] such acute . . . economic effects" that force regulated entities "to adopt a certain" course of action).  Finally, that the rules "cover[ed] only certain purchasers and certain federally certified vehicles" did not change the Section 209(a) analysis, because "if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme." *Engine Mfrs. Ass'n*, 541 U.S. at 255.

In addition, this case implicates the express preemption provision of the ADA.  Under the ADA, a State or state agency may not "enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier or carrier affiliated with a direct air carrier through common controlling ownership when such carrier is transporting property by aircraft or by motor vehicle (whether or not such property has had or will have a prior or subsequent air movement)."  49 U.S.C. § 41713(b)(4)(A).  The ADA exempts from this preemptive reach only "the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization," or for the personal moving of household goods.  *Id.* § 41713(b)(4)(B); 49 U.S.C. § 13102(12).  In effect, the ADA prohibits state laws that affect "such things as the frequency and scheduling of transportation," as well as "the selection of markets to or from which transportation is provided," and the like.  *Air Transp. Ass'n of Am. v. City & Cnty. of S.F.*, 266 F.3d 1064, 1071 (9th Cir. 2001).

In *Morales*, the Supreme Court interpreted the ADA's broadly worded preemption provision as preempting any state enforcement of rules "having a connection with or reference to airline 'rates, routes, or services.'"  504 U.S. at 384.

And the Ninth Circuit has further explained that ADA preemption plainly extends to the "trucking operations of . . . an air carrier," which are "part and parcel of the air delivery system," and so "preempts action by the state that regulates the rates and terms of service offered by an air carrier." *Fed. Express Corp. v. Cal. Pub. Utilities Comm'n*, 936 F.2d 1075, 1078 (9th Cir. 1991). That preemptive reach includes state regulation of the rates and terms of the trucking aspects of an air carrier's operations, which "are an essential component of the system," because to do so involves impermissible "economic regulation." *Id.* at 1077–78. Thus, the Ninth Circuit has held that a state agency's "regulation of rates, of discounts and promotional pricing, of claims, of overcharges, of bills of lading and freight bills, and its imposition of fees" are all preempted, as they are either "obviously economic—they bear on price"—or "relate to the terms on which the air carrier offers its services" and so affect cost, all contrary to the ADA. *Id.* at 1078.

2. Here, both Section 209(a) of the CAA and the ADA expressly preempt the District's Rules.

*First*, the CAA preempts the Rules. As CTA's brief more fully explains, the District's Rules require warehouses with 100,000 or more square feet of indoor floor space to offset the emissions of the trucks that visit their facilities, or else face civil or criminal penalties. California Trucking Association's Statement Of Uncontroverted Material Facts ("UF"), Dkt.63–1, at #16–19. A warehouse may offset those emissions through three pathways: (1) directly acquiring zero-emission or near-zero-emission trucks to replace their own fleet; (2) indirectly acquiring zero-emission or near-zero-emission trucks by compelling contractors to replace their fleets with such trucks; and (3) avoiding purchasing zero-emission or near-zero-emission trucks, either directly or indirectly, by paying a mitigation fee, installing rooftop solar equipment, purchasing filter systems, or the like. UF #23–34. According to the District's own data and projections, the bottom-line cost differentials between these three pathways is significant: the average annual cost

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

per square foot for the first pathway is $0.27; the average annual cost per square foot for the second pathway is $0.09; and the average annual cost per square foot for the third pathway is $0.86.  UF #27–29.  Given these substantial differences, the District expects that the third, non-truck-replacement pathway will "be chosen rarely as a compliance option . . . due [to its] higher cost relative to other compliance options."  UF # 30.

Consistent with Supreme Court precedent, the District's Rules requiring warehouses to purchase (either directly or indirectly) zero-emission or near-zero-emission trucks are preempted by Section 209(a) of the CAA as a "standard relating to the control of emissions from new motor vehicles" from a "political subdivision" of a State.  42 U.S.C. § 7543(a).  Just as in *Engine Manufacturers Association*, the District's Rules force certain entities—here, warehouses; there, fleet operators—to acquire vehicles that "meet certain emission specifications,"  541 U.S. at 250, thus qualifying as a law "ha[ving] a connection with, or reference to," *Morales*, 504 U.S. at 384 (citations omitted), "the emission characteristics of a vehicle or engine," *Engine Mfrs. Ass'n*, 541 U.S. at 253 (citations omitted).  Specifically, because the Rules "command, accompanied by sanctions," that warehouses acquire only trucks "with particular emission characteristics"—zero-emission or near-zero-emission— that "is as much an 'attempt to enforce' a 'standard' as a command, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume must consist of such vehicles."  *Id.* at 255.  Thus, Section 209(a) preempts the Rules. And while the Rules' second pathway purports only to require warehouses *indirectly* to acquire zero-emission or near-zero-emission trucks, such "indirect" yet "acute" regulation does not escape Section 209(a)'s preemptive scope.  *See Travelers*, 514 U.S. at 668.

The Rules' recognition of a third pathway that does not require the direct or indirect acquisition of zero-emission or near-zero-emission trucks does not change the Section 209(a) analysis.  The "exorbitant" compliance costs of this pathway

mean that it presents nothing more than "a Hobson's choice" that cannot erase the "mandate[ ]" present in the first two pathways. *Travelers*, 514 U.S. at 664.

Even indulging the implausible hypothesis that some warehouses would choose this third pathway, the Rules' first two pathways would still undoubtedly compel the overwhelming majority of warehouses to acquire zero-emission or near-zero-emission trucks. If "other" political subdivisions followed the District's lead by "enact[ing] such rules," the "end result would undo Congress's carefully calibrated regulatory scheme" under the CAA; thus Section 209(a) preempts the Rules here. *Engine Mfrs. Ass'n*, 541 U.S. at 255.

More broadly, it "would make no sense" to allow the District to enforce the Rules in the face of Section 209(a), given the District's palpable intent and clear regulatory design to impose a standard relating to the control of emissions from new motor vehicles with these Rules. *Engine Mfrs. Ass'n*, 541 U.S. at 255; *accord Travelers*, 514 U.S. at 668. As CTA's brief powerfully shows, the District's stated "goal" with the Rules was "to reduce emissions from the most significant source—trucks." UF #49; *see also* UF #59. Thus, the District has candidly admitted that its purpose with the Rules was to "provide a mechanism to require warehouse operators to encourage [zero-emission] vehicle use at their facilities." UF #56. Indeed, the District believes that, with these Rules, it is trying "to solve a problem that the federal government isn't willing to step up to do, which is to regulate trucks." UF #51; *but see Engine Mfrs. Ass'n*, 541 U.S. at 255 (explaining that "Congress's carefully calibrated regulatory scheme" controls here).

The District's attempts to characterize the Rules as akin to an "indirect source review," relying upon the Ninth Circuit's decision in *National Association of Home Builders v. San Joaquin Valley Unified Air Pollution Control District*, 627 F.3d 730 (9th Cir. 2010) ("*NAHB*"), fail. In *NAHB*, the San Joaquin Valley District promulgated Rule 9510, which "regulate[d] emissions from development projects" and required developers to submit information regarding "the construction

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

equipment [the developers] will use at the site in order to refine the estimate of how much pollutant the site's construction equipment will actually emit." 627 F.3d at 732. The Ninth Circuit concluded that Rule 9510 escaped the CAA's preemption provision because it "target[ed] sites rather than equipment," and evaluated such development facilities "as a whole" based on a "facility-by-facility" review. Because the rule looked at all sources of emissions, the Court explained, it qualified as a true indirect source review properly allowed by the States. *NAHB*, 627 F.3d at 734–39. Here, however, the Rules are unmistakably directed at requiring warehouses to acquire zero-emission or near-zero-emission trucks, UF #19–34, not a whole-site review of emissions. In this regard, the Rules plainly qualify as a "standard relating to the control of emissions from new motor vehicles or new motor vehicle engines" preempted by the CAA, *see* 42 U.S.C. § 7543(a), not an independent source rule. *NAHB* is not apposite.

*Second*, the Rules are similarly void under the ADA's preemption provision. As more fully explained in A4A's brief, the District's Rules impose statutorily prohibited "economic regulation" on warehouse trucking operations, contrary to the ADA. *Fed. Express*, 936 F.2d at 1078. Specifically, the Rules are directly tied to the volume and nature of the trucks that arrive at warehouses in the District, imposing costs and penalties on warehouses based on those trucks, *supra* pp.14–15, thereby having a direct "'connection with' a price, route or service," *Air Transp. Ass'n of Am.*, 266 F.3d at 1071. Thus, the ADA preempts the Rules as impermissibly "related to a price, route, or service of an air carrier or carrier affiliated with a direct air carrier through common controlling ownership when such carrier is transporting property by aircraft or by motor vehicle." 49 U.S.C. § 41713(b)(4)(A).

It does not matter whether the Rules are specifically directed at air carriers, as the ADA's preemptive reach extends further than "only state laws specifically addressed to the airline industry." *Morales*, 504 U.S. at 386. Nor does it matter

whether the Rules specifically seek to prescribe the prices, routes, or services of air carriers, as the ADA's "related to" preemption encompasses even laws that might affect those things, *id.* at 388, more than in a "tenuous, remote, or peripheral . . . manner," *Rowe*, 552 U.S. at 371.  The Rules' extensive regime of costs and penalties for warehouses and transportation companies will necessarily affect the prices, routes, and services of air carriers with trucking divisions, *supra* pp.14–15 (and, for the same reasons, those of motor carriers, who are similarly shielded from state and local regulations relating to their prices, routes, or services under the FAAAA).

> **B.     The Rules Would Have Damaging Impacts On Warehouse, Shipping, And Logistics Industries Nationwide**

If allowed to stand, the District's Rules will significantly harm the shipping and logistics industries nationwide, exacerbating problems already facing an over-burdened supply chain in light of the persistent impacts of COVID-19.

The Ports of Los Angeles and Long Beach, and their supporting warehouses, are a massive hub for trucking and road-level shipping of goods nationwide.  There, "the supply chain doesn't just flow.  It gushes," Jeff Horseman, *Inland Empire is Warehouse Central, But How Did It Happen?*, The Press-Enterprise (Sept. 29, 2021),[3] leading logistics to become "Southern California's all-important . . . industry," Dan Walters, *Southern Cal Ports and Warehouses Face Threats*, Cal Matters (July 13, 2022).[4]  In 2019, the Inland Empire, largely within the District's geographic coverage, was home to 21 of the country's 100 biggest logistics leases, as part of the boom of warehouse development in the region, Cal. Dep't of Justice, *Warehouse Projects: Best Practices and Mitigation Measures to Comply with the*

---

[3] Available at https://www.pressenterprise.com/2021/09/29/inland-empire-is-warehouse-central-but-how-did-it-happen/.

[4] Available at https://calmatters.org/commentary/2022/07/southern-cal-ports-and-warehouses-face-threats/.

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA. 90071-3427

*California Environmental Quality Act* 1,[5] necessary to keep up with the substantial flow of goods coming through the District, stemming from the rise in Asian manufacturing over the past several decades, Walters, *supra*.  Roughly three quarters of all goods shipped on the west coast, and 31 percent of all goods shipped nationwide, pass through the Ports of Los Angeles and Long Beach alone, accounting for approximately $294 billion in cargo value in calendar year 2021. LA: The Port of Los Angeles, *Facts & Figures* (2021);[6] *see also* Walters, *supra*. The shipping and logistics industry maintains almost 1 million jobs just in the five-county region.  Trucking is the predominant shipping method, with approximately 800 trucking companies, responsible for roughly 16,000 trucks, operating at the Ports of Los Angeles and Long Beach to move the massive amount of freight that comes through the port.  CA.gov, *Logistics & Infrastructure*.[7]  Warehouses are essential to store all of this cargo/freight as it enters the country, Walters, *supra*, before moving to its next destination, largely by truck, CA.gov, *Logistics & Infrastructure*, *supra*.

The COVID-19 pandemic increased the need for a stable and productive supply chain, thereby underscoring the necessity for largescale shipping out of the warehouses within the Inland Empire.  The pandemic spiked demand for online shopping and e-commerce, Mayumi Brewster, *Annual Retail Trade Survey Shows Impact of Online Shopping on Retail Sales During COVID-19 Pandemic*, Census.gov (Apr. 27, 2022),[8] and so warehouses faced additional demands to store

---

[5] Available at https://oag.ca.gov/sites/all/files/agweb/pdfs/environment/warehouse-best-practices.pdf.

[6] Available at https://kentico.portoflosangeles.org/getmedia/c39cbb51-d52e-44bd-89c8-41eba408ab12/2021-facts-figures.

[7] Available at https://business.ca.gov/advantages/logistics-and-infrastructure/.

[8] Available at https://www.census.gov/library/stories/2022/04/ecommerce-sales-surged-during-pandemic.html.

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA. 90071-3427

goods bought virtually with one-day delivery, Horseman, *supra*. As a result, the entire country suffered from "stressed supply chains, as historic levels of goods coming into the U.S.," combined with various other factors, "cause[d] bottlenecks, congestion, and challenges in global markets." U.S. Dep't of Transp., *USDOT Supply Chain Tracker Shows Historic Levels of Goods Coming into U.S., Continued Challenges with Congestion* (May 13, 2022).[9] These numbers have largely been maintained even as the country has moved beyond the height of the pandemic, with the Port of Los Angeles still seeing large year-over-year gains in number of containers passing through, with April of 2022 finishing as its second-highest April on record. *Id.*

While the supply chain and trucking in particular have partially recovered from the delays and problems that arose during COVID-19, there remain substantial difficulties with shipping of goods across the country. Consumer demands in our increasingly global economy continue apace, and supply chain pressure remains higher than at any time in recent history. Congressional Research Serv., *Supply Disruptions and the U.S. Economy* 1–2 (May 13, 2022).[10] This contributes to the recent inflation hikes, *id.*, that have come to a four-decade peak this year, imposing a "brutal impact . . . on many families," PBS News Hour, *U.S. Inflation at 9.1 Percent, A Record High* (July 13, 2022).[11] The Department of Transportation has emphasized "recruit[ing] more truck drivers" and "retain[ing] more drivers in the profession" in order to "address disruptions" in both the near and longer term. U.S. Dep't of Transp., *Supply Chain Assessment of the Transportation Industrial Base:*

---

[9] Available at https://www.transportation.gov/briefing-room/usdot-supply-chain-tracker-shows-historic-levels-goods-coming-us-continued-challenges.

[10] Available at https://crsreports.congress.gov/product/pdf/IN/IN11926.

[11] Available at https://www.pbs.org/newshour/economy/u-s-inflation-at-9-1-percent-a-record-high.

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

*Freight and Logistics* xii–xiii (Feb. 2022).[12]

Despite these challenges, the Rules increase the regulatory demands and corresponding costs on warehouses and shipping operations in one of the busiest and most important shipping regions in the entire country, if not the world, and risk further disruptions of the supply chain.  The Rules apply, by the District's own assessment, to approximately 750 million square feet of warehouse space in the District, over 60% of all warehouse space in the region.  SCAQMD, *Second Draft Staff Report* at 76 (Apr. 2021).[13]  As applied to those qualifying warehouses, the Rules impose potential mitigation fees anywhere from $3.1 to $6 billion.  UF #39–43.  Increases in shipping costs, like the inevitable increase in fees paid by warehouses under the Rules, frequently get passed down to the public, "translat[ing] into higher prices for American consumers."  The White House, *FACT SHEET: Lowering Prices and Leveling the Playing Field in Ocean Shipping* (Feb. 28, 2022).[14]

Disruptions caused by the inevitable business effects of these new and exorbitant compliance costs can cause further shortages in consumer goods, resulting in "abrupt price increases" for consumers of all freight.  The White House, *Why the Pandemic has Disrupted Supply Chains* (June 17, 2021).[15]  Given that the Inland Empire is responsible for goods and freight shipped all across the country,

---

[12] Available at https://www.transportation.gov/sites/dot.gov/files/2022-03/EO%2014017%20-%20DOT%20Sectoral%20Supply%20Chain%20Assessment%20-%20Freight%20and%20Logistics_FINAL_508.pdf.

[13] Available at http://www.aqmd.gov/docs/default-source/planning/fbmsm-docs/pr-2305_sr_2nd-draft_4-7-21_clean.pdf.

[14] Available at https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/28/fact-sheet-lowering-prices-and-leveling-the-playing-field-in-ocean-shipping/.

[15] Available at https://www.whitehouse.gov/cea/written-materials/2021/06/17/why-the-pandemic-has-disrupted-supply-chains/.

TROUTMAN PEPPER HAMILTON SANDERS LLP
TWO CALIFORNIA PLAZA
350 SOUTH GRAND AVENUE
SUITE 3400
LOS ANGELES, CA 90071-3427

LA: The Port of Los Angeles, *Facts & Figures*, *supra*, these consumer price increases are likely to have broad-based effects on the nation's economy, imposing significant hardship on the national economy and on consumers' already-stretched wallets. The likelihood of such widespread, national repercussions merely underscores the purpose of federal preemption in the CAA context—to empower the federal government to enact uniform regulation of interstate commerce—even in the context of nationwide regulation of emissions. *See Motor & Equip. Mfrs. Ass'n v. E.P.A.*, 627 F.2d 1095, 1109 (D.C. Cir. 1979).

Finally, even beyond the adverse effects of the Rules at issue here, a decision permitting the District to impose such costs on warehouses could encourage the proliferation of similar requirements in other jurisdictions.[16] If this Court permits the District's Rules to stand, those Rules will likely serve as a blueprint for other local and regional governments to impose extensive requirements and costs upon transportation and warehouse companies serving integral functions in our national economy and interconnected supply chain. The inevitable result would be a patchwork system of differing, and at times incompatible, requirements that would destroy "Congress's carefully calibrated regulatory scheme" intended to create a unified, nationwide system for mobile source emissions. *Engine Mfrs. Ass'n*, 541 U.S. at 255. Disunity and disruption in the nationwide supply chain would follow.

## IV.    **CONCLUSION**

This Court should grant CTA's and A4A's motions for summary judgment, finding the Rules preempted by the CAA and ADA.

---

[16] The District is not the only area in the country where local government officials are concerned with air pollution attributed to the transportation sector. *See* N.Y.C. Office of the Mayor, *Mayor de Blasio Releases Vision for Sustainable Freight Network* (Dec. 15, 2021), *available at* https://www1.nyc.gov/office-of-the-mayor/news/829-21/mayor-de-blasio-releases-vision-sustainable-freight-network.

1    Dated:     December 12, 2022         TROUTMAN PEPPER HAMILTON
2                                         SANDERS LLP

3                                         By:/s/ Cindy J. Lee
4                                             Misha Tseytlin, *admitted pro hac vice*
                                              Elizabeth Holt Andrews
5                                             Cindy J. Lee

6                                             Attorneys for *Amici Curiae*
                                              Chamber of Commerce of the United
7                                             States of America, et al.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28