UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| T. Jackson-Terrell | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:** **(IN CHAMBERS) ORDER RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF (DKT. 65); AND**

**PLAINTIFF-INTERVENOR AIRLINES FOR AMERICA'S MOTION FOR SUMMARY JUDGMENT (DKT. 73)**

I.    <u>Introduction</u>

On August 5, 2021, the California Trucking Association ("CTA" or "Plaintiff") filed this action against the South Coast Air Quality Management District and the Governing Board of the South Coast Air Quality Management District (collectively, the "District" or "Defendants") and Does 1-25. Dkt. 1 (the "Complaint"). The Complaint seeks a declaration that Rule 2305, also known as Warehouse Actions and Investments to Reduce Emissions (the "Rule" or "WAIRE"), which was promulgated by the District, is preempted by the Clean Air Act ("CAA") and Federal Aviation Administration Authorization Act ("FAAAA"). *Id.* ¶¶ 83-102. The basis for the preemption claims is the contention that the Rule compels the purchase of zero-emissions ("ZE") and near-zero-emissions ("NZE") trucks. *Id.* The Complaint also alleges that Rule 2305 exceeds the authority of the District under state law, and that it is an unlawful tax. *Id.* ¶¶ 103-23.

On January 14, 2022, Airlines for America ("A4A" or "Plaintiff-Intervenor") intervened in this action, asserting that Rule 2305 is preempted under the CAA, the FAAAA, and the Airline Deregulation Act ("ADA"). Dkt. 32 ("Intervenor Complaint") ¶¶ 96-121. A4A also contends that Rule 2305 exceeds the District's authority under state law and is an unlawful tax. *Id.* ¶¶ 122-46.

The State of California and the California Air Resources Board (the "State Defendant-Intervenors") were permitted to intervene to defend the constitutionality of Rule 2305. *See* Dkts. 19, 31. East Yard Communities for Environmental Justice, the Peoples' Collective for Environmental Justice, the Sierra Club, the Natural Resources Defense Council, Communities for a Better Environment, and the Environmental Defense Fund (the "NGO Defendant-Intervenors") were also permitted to intervene to defend the constitutionality of the Rule. *See* Dkts. 23, 31. Finally, the Chamber of Commerce of the United States of America and other related entities (the "Amici") were granted leave to file an amicus brief in support of CTA and A4A. *See* Dkt. 84.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|----------|--------------------------|------|-------------------|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

On October 28, 2022, CTA moved for summary judgment on its contention that the CAA preempts the Rule. Dkt. 65 (the "CTA Motion"); *see* Dkt. 63 (the "CTA Motion Memorandum"). On November 14, 2022, A4A moved for summary judgment on its contentions that the CAA and the ADA preempt the Rule. Dkt. 73 (the "A4A Motion," or together with the CTA Motion, the "Motions"); *see* Dkt. 81 (the "A4A Motion Memorandum").

On December 12, 2022, the Amici filed their brief in support of the Motions. Dkt. 86 (the "Amicus Brief"). On December 23, 2022, the District and State Defendant-Intervenors filed a consolidated opposition to both Motions. Dkt. 90 (the "District-State Opposition"). On December 28, 2022, the NGO Defendant-Intervenors filed a consolidated opposition of their own. Dkt. 104 (the "NGO Opposition," or together with the District-State Opposition, the "Oppositions"). On January 13, 2023, the A4A filed a consolidated reply brief to both Oppositions. Dkt. 107 (the "A4A Reply"). Later that day, the CTA filed separate briefs replying to the District-State Opposition and the NGO Opposition. Dkt. 108 (the "CTA District-State Reply"); Dkt. 109 (the "CTA NGO Reply").

On March 21, 2023, the District and State Defendant-Intervenors filed a supplemental brief regarding the compliance data submitted by warehouse operators. Dkt. 122 (the "District-State Supplemental Brief"). On March 28, 2023, the CTA filed a response to the District-State Supplemental Brief, and so did A4A. *See* Dkt. 130 (the "CTA Supplemental Brief"); Dkt. 132 (the "A4A Supplemental Brief").

A hearing on the Motions was held on April 17, 2023, and they were then taken under submission.

On June 14, 2023, the parties stipulated that each of them had received adequate notice and opportunity to respond to the possibility that the Court could grant summary judgment to either Plaintiffs or Defendants on the claims that the Rule is preempted by the CAA, ADA, and/or FAAAA based on the arguments already made and materials already submitted. Dkt. 150. The parties further agreed that the FAAAA preemption claim could be resolved based on the arguments regarding ADA preemption that had already been submitted. *Id.* Thus, although only Plaintiffs have filed motions for summary judgment, the parties have agreed the briefing on those Motions is sufficient for this "Court [to] grant summary judgment for either Plaintiffs or Defendants on the CAA, ADA, and FAAAA preemption claims[.]" *See id.*

For the reasons stated in this Order, the Motions are **DENIED**. Summary judgment is granted to Defendants with respect to the claims brought under the CAA, ADA and FAAAA. Within 14 days of the issuance of this Order, after meeting and conferring, the parties shall file a joint report stating their collective and/or respective positions as to the scheduling of additional proceedings in this action, including their proposed date for the expert discovery cutoff and the last date to file motions. The joint report shall include the parties' collective and/or respective positions as to whether supplemental jurisdiction over Plaintiffs' state-law claims should be retained.

**II.     Factual Background**

     A.     The Parties

The District is a political subdivision of the State of California, which is responsible for air pollution

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

control in the South Coast Air Basin ("Basin"), which comprises the non-desert portions of Los Angeles, Orange, Riverside, and San Bernardino Counties. Dkt. 107-2 ¶ 13; Dkt. 91 ¶ 10; Dkt. 107-3 ¶ 72. Agents of the District are responsible for administering the Rule. Dkt. 91 ¶ 11. The District's activities are overseen by a Governing Board, all of whose members are residents of California. *Id.* ¶ 12. The District is authorized to pursue state and federal air quality standards by exercising the powers lawfully granted to it by statute. Dkt. 107-2 ¶ 15.

CTA is an association devoted to advancing the interests of its motor-carrier members who provide transportation services in California. Dkt. 91 ¶ 2. It promotes advocacy, safety and compliance with all applicable state and federal laws on behalf of its members, including motor-carrier members in California. *Id.* ¶ 3. CTA's members are licensed motor-carrier companies that manage, coordinate and schedule the movement of property throughout California and in interstate commerce. *Id.* ¶ 4. Many of CTA's members operate within the District's boundaries and jurisdiction. *Id.* ¶ 5. Further, many of CTA's motor-carrier members contract with warehouse owners or operators to provide trucking services to their customers within the District's boundaries and jurisdiction. *Id.* ¶ 6. Other CTA members are owners or operators of warehouses directly regulated by the Rule. *Id.* ¶ 7.

A4A is the principal trade association for commercial airlines, and represents the interests of the nation's passenger airlines and cargo carriers operating within air commerce. Dkt. 107-2 ¶ 1. A4A members are commercial air carriers that operate vehicles that transport property moving in interstate commerce. *Id.* ¶ 2. Some of those vehicles operate within the District. *Id.* A4A members provide services that include the transport of property in air commerce nationwide. *Id.* ¶ 3. A4A members also transport time- and temperature- sensitive property including, *inter alia*, commercial and business goods, vaccines, pharmaceuticals, emergency disaster relief resources, perishable goods, blood and organs for transplant. *Id.* ¶ 4. A4A member warehouses and the vehicles that serve them are for the purpose of transporting such property in air commerce. *Id.* ¶ 5. A4A members involved in the transportation of property in air commerce own or operate warehouses in the District, and specifically at the Los Angeles International Airport, whose sizes range from 100,000 – 150,000 and 150,000 – 250,000 square feet. *Id.* ¶ 6.

      B.    Air Pollution in the Basin

Due to a combination of factors including topography, meteorology and human population, the Basin has among the worst air quality of any region in the United States. Dkt. 107-3 ¶ 73. The Basin is in "extreme" nonattainment – the worst possible nonattainment category – for three separate 8-hour National Ambient Air Quality Standards ("NAAQS") for ozone and has the highest ozone levels nationwide. *Id.* ¶ 74. The Basin is one of only two regions in the country that is in extreme nonattainment for the 75 parts per billion (ppb) 8-hour ozone NAAQS. *Id.* Ozone is a colorless gas that forms in the atmosphere as a result of reactions among volatile organic compounds, nitrogen oxides (NOx), and oxygen. *Id.* ¶ 75. It is associated with various human health and environmental harms, including impeded pulmonary function, localized lung injury, increased mortality risk, increased respiratory-related hospital admissions and emergency room visits, and damage to vegetation and property. *Id.*

The Basin is also in "serious" nonattainment for multiple NAAQS for fine particulate matter (also called PM2.5). Dkt. 107-3 ¶ 76. It is one of only three regions in the nation that is in violation of the annual fine

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

particulate matter NAAQS. *Id.* The Basin's air quality is the second worst in the nation with respect to fine particulate matter. *Id.* Fine particulate matter comprises particles less than 2.5 micrometers in diameter and is generated by, among other sources, diesel powered vehicles, e.g., buses and trucks, fuel from automobiles, power plants, industrial processes and the burning of wood. *Id.* ¶ 77. Fine particulate matter contributes to various adverse health effects, including acute and chronic respiratory disease, heart attacks, strokes and premature death. *Id.* Diesel particulate matter – the form of fine particulate matter emitted by diesel engines – has been identified as a toxic air contaminant by the California Air Resources Board ("CARB") since 1998 due to its carcinogenic properties. *Id.* ¶ 78.

In 2012, heavy-duty trucks were the largest single source of NOx emissions within the Basin. Dkt. 107-3 ¶ 82. Those trucks emitted approximately 147 tons of NOx per day – approximately seven times as much as the 20 tons per day emitted by the Basin's 275 largest stationary sources of air pollution. *Id.* Mobile sources of air pollution were responsible for approximately 88 percent of the Basin's total NOx emission in 2012. *Id.* ¶ 83. By 2023, truck emissions are expected to be lower than 2012 levels, but trucks are still projected to emit approximately 43 tons of NOx per day – which is the same as the expected amount of emissions from off-road equipment – making the two largest source of NOx emissions in the Basin. *Id.* ¶ 84.

Warehousing is a growing industry within the Basin. Dkt. 107-3 ¶ 85. Between 2010 and 2019, the total capacity of warehouses within the region increased by approximately 17 million square feet per year, and the District projects that this quantity will continue to increase at a rate of approximately 1.8 percent annually. *Id.* The overall square footage of industrial buildings greater than 100,000 square feet in the region nearly doubled between 2000 and 2020, from approximately 400 million square feet to nearly 800 million square feet; about 90 percent of this total industrial square footage was classified as warehouse or distribution use. *Id.* Each year, at least $217 billion worth of goods flow through warehouses within the District. *Id.* ¶ 86.

The warehouse industry is highly varied. Dkt. 107-3 ¶ 141. Warehouses that are subject to the Rule include facilities near ports that are the first waypoint for ship-delivered cargo, last-mile facilities that sort consumer products and load packages onto delivery vans, intermodal facilities that transfer cargo from truck to rail, lone warehouses that serve smaller businesses in the region, and many other types of facilities. *Id.*

In 2018, District staff estimated that baseline NOx emissions within the District in 2023 and in 2031 – estimated emissions with only the regulations adopted as of 2016 – would be approximately 272 tons per day and 239 tons per day, respectively. Dkt. 107-3 ¶ 87. Of those total amounts, approximately 23 tons per day in 2023 and 19 tons per day in 2031 – or approximately eight percent in both years – would be associated with warehouse operations. *Id.* The estimated baseline emissions for warehouse operations included those emissions associated with Class 4-7 and Class 8 trucks, passenger vehicles, cargo handling equipment, and transportation refrigeration units. *Id.*

Of those NOx emissions associated with warehouse operations, the largest portion is associated with trucks. Dkt. 107-3 ¶ 89. District staff estimated that 20 of the 23 tons per day of NOx emissions from warehouse operations in 2023 – or about 90 percent – would come from trucks, while the remainder would derive from transport refrigeration units, heating, cargo handling and manufacturing equipment, diesel generators, and passenger vehicles. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

The State of California's Office of Environmental Health Hazard Assessment has developed a model called "CalEnviroScreen" that can be used to identify communities with the greatest environmental burdens based on a combination of environmental, public health and socioeconomic data. Dkt. 107-3 ¶ 90. Based on the CalEnviroScreen model, communities within a one-half mile radius of warehouses within the Basin scored in the 85th percentile statewide for total environmental burden, i.e., 85 percent of census tracts in the state have a lower burden. *Id.* ¶ 91. The Basin as a whole scored in the 67th percentile. *Id.* In addition, these warehouse-proximate communities scored in the 77th percentile for exposure to carcinogenic diesel particulate matter (compared to the 65th percentile for the Basin as a whole), and in the 69th percentile for exposure to fine particulate matter (compared to 66th percentile for the Basin as a whole). *Id.* ¶ 92. These warehouse-proximate communities also have a higher prevalence of preexisting health conditions than the region as a whole, a higher minority population rate (62.1 percent Hispanic and 7.6 percent Black, compared to 45.4 percent Hispanic and 6.5 percent Black in the Basin as a whole), and higher poverty rates (46.7 percent low income households, compared to 38.2 percent for the Basin as a whole). *Id.* ¶ 93.

C.      The Rulemaking Process

Under the CAA, states are required to adopt implementation plans that provide for the attainment and enforcement of NAAQS for various pollutants, including ozone and fine particulate matter. Dkt. 107-3 ¶ 79. The most recent plan setting ozone and fine particulate matter requirements for the Basin is the 2016 Air Quality Management Plan ("2016 AQMP" or "2016 Plan"), which the United States Environmental Protection Agency approved for inclusion in California's state implementation plan ("SIP"). *Id.* Under the 2016 Plan, the Basin was required to attain compliance with the 24-hour fine particulate matter NAAQS by 2019, with the 1-hour ozone NAAQS by 2022, with the 80 ppb 8-hour ozone NAAQS by 2023, with the annual fine particulate matter NAAQS by 2025, with the 75 ppb 8-hour ozone NAAQS by 2031, and with the 70 ppb 8-hour ozone NAAQS by 2037. *Id.* ¶ 80.

In order to attain the 2023 8-hour ozone requirement, overall NOx emissions in the Basin would have to be reduced by approximately 45 percent beyond the reductions already scheduled to occur under previously adopted rules. Dkt. 107-3 ¶ 81. NOx emissions would have to be reduced by a further 55 percent beyond already-scheduled reductions to attain the 2031 8-hour ozone requirement. *Id.* NOx emissions from on-road light- and heavy-duty vehicles alone would have to be reduced by 85 percent compared to 2015 levels in order to achieve this 2031 requirement. *Id.*

The 2016 Plan included "facility-based mobile source measures" that sought to reduce "emissions occurring in and around individual warehouse distribution centers," among other facility types. Dkt. 107-3 ¶ 94. That Plan stated that, if after one year from the Plan's adoption, "voluntary actions or [actions] from CARB . . . or U.S. EPA are not identified to any significant extent or identified actions do not result in emission reductions in a timely manner to meet federal air quality standards, [District] staff will recommend that the [District] Governing Board consider regulatory approaches or other enforceable mechanisms to achieve the emissions reductions from the mobile source sectors associated with the various facilities." *Id.* ¶ 95. After the adoption of the 2016 Plan, members of the District staff discussed possible voluntary measures to reduce air pollution with warehouse operators in the Basin. *Id.* ¶ 96. These discussions included 17 working group meetings and several additional individual stakeholder meetings. *Id.* Based on these discussions, potential voluntary strategies were deemed unlikely to result

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

in significant emissions reductions. *Id.* The District considered entering into voluntary agreements with individual warehouse operators, but deemed this approach infeasible. *Id.* No agreements for voluntary measures had been reached by March 2018, and District staff did not anticipate that agreements would be reached in the then immediate future. *Id.*

District staff prepared a March 2018 Update to the 2016 Plan, which was presented to, and considered by the District's Governing Board at its March and May 2018 meetings. Dkt. 107-3 ¶ 97. Among other recommendations, the March 2018 Update recommended that the District begin the rulemaking process for an indirect source rule for warehouses, which would seek to reduce emissions from the mobile sources that travelled to these facilities. *Id.*

On May 4, 2018, the District's Governing Board approved the recommendation of the District staff to initiate the rulemaking process for an indirect source rule for warehouses. Dkt. 107-3 ¶ 98. The rulemaking process included 12 formal working group meetings with interested stakeholders, who included District staff, individuals, and representatives from industry, community groups and government agencies. Dkt. 107-3 ¶ 99. District staff also held two community meetings, presented seven updates to the Governing Board's Mobile Source Committee and three updates to the full Governing Board, conducted dozens of warehouse site visits, presented updates to numerous government and industry entities, and held hundreds of meetings with individual interested parties. *Id.* During the rulemaking process, the District considered several possible iterations of the Rule, including a hard cap on facility emissions, a clean fleet crediting/banking program, a voluntary fleet certification program (under which truck fleet owners could voluntarily certify that their fleets were cleaner than required by CARB regulations, and warehouse operators would be required to ensure that fleets serving their warehouses are cleaner than required), a mitigation fee that would be used to subsidize the purchase of ZE or NZE vehicles and charging infrastructure, and a menu of Best Management Practices. *Id.* 100.

On May 7, 2021, the District adopted Rule 2305. Dkt. 107-2 ¶ 16; Dkt. 91 ¶ 13. Nine members of the District's Board voted in favor of the Rule, and four members voted against it. Dkt. 107-3 ¶ 103.

On June 4, 2021, the District transmitted the Rule to CARB and requested that CARB submit it to the United States Environmental Protection Agency for inclusion within the California SIP. Dkt. 107-3 ¶ 104. CARB approved the Rule and submitted it to the EPA for inclusion in the SIP on August 13, 2021. *Id.*

      D.     The Rule

The Rule applies to owners and operators of warehouses located in the District's jurisdiction with greater than or equal to 100,000 square feet of indoor floor space in a single building. Dkt. 91 ¶ 16.[1]

Rule 2305 requires those who own or operate such warehouses to earn WAIRE Points. Dkt. 91 ¶ 17.

---

[1] The District explains that the Rule included a size cutoff because larger warehouses are generally associated with greater activity that causes larger air emissions, and because it would impose too significant an administrative burden on the District if the Rule applied to all warehouses within the Basin. Dkt. 107-3 ¶ 106. The Basin includes approximately 3000 to 4000 warehouses larger than 100,000 square feet and approximately 30,000 warehouses smaller than 100,000 square feet. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|----------|--------------------------|------|-------------------|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

The number of WAIRE Points that must be earned by the owner and/or operator a given warehouse is proportional to the Weighted Annual Truck Trips (WATTs) at that warehouse. Dkt. 63-5 at 6. This metric "include[s] all actual truck trips that occurred at a warehouse while the warehouse operator was responsible for warehousing activities during the compliance period," with some trips receiving a heavier weight depending on the class of truck or tractor used for the trip. *Id.* Specifically, each trip made by the heaviest class of truck is considered the equivalent of 2.5 trips in lighter duty vehicles. Dkt. 91 ¶ 20.[2] Although the applicable formula considers the number and type of trucks that visit a warehouse, the formula does not take into account the origin or destination of the trucks. *Id.* ¶ 17. The District contends that weighted truck trips are an efficient and accurate proxy for overall warehouse activity and emissions, and argues that counting truck trips is simpler and more efficient than other means of estimating facility-wide emissions. Dkt. 107-3 ¶ 110. The WATT is multiplied by a stringency factor and an annual variable designed to phase the stringency factor in over time and to give smaller warehouses additional time to comply with the Rule, resulting in the number of WAIRE Points that must be earned to comply with the Rule. Dkt. 91 ¶¶ 21, 22; Dkt. 107-3 ¶ 113.[3] This number is called the facility's WAIRE Points Compliance Obligation ("WPCO"). Dkt. 91 ¶¶ 21, 22. When the rule is in full effect, 0.0025 WAIRE Points will be required per weighted annual truck trip. Dkt. 63-5 at 6.

To determine the extent of the compliance obligation of each warehouse, those with 100,000 or more square feet of indoor floor space are required to monitor the number and type of trucks that visit their facilities. Dkt. 91 ¶ 19. For example, warehouse operators must file an Initial Site Information Report on or before July 1 of the operator's first compliance year, which includes truck trip data and explains the operator's plans for meeting the facility's WAIRE points obligation. Dkt. 107-3 ¶ 120. Thereafter, regulated warehouse operators must submit an Annual WAIRE Report, which must include information about truck visits to the facility during the compliance period, the number of WAIRE points earned, and how they were earned. *Id.* ¶ 121.

"WAIRE Points [can] only be earned through completing actions in the WAIRE Menu . . . or by completing actions in an approved Custom WAIRE Plan . . . or by choosing to pay a mitigation fee . . . or using any combination [of the foregoing methods]." Dkt. 63-5 at 7. The "WAIRE Menu" includes 32 different actions from which owners and operators can choose. Dkt. 107-3 ¶ 101. The WAIRE Menu options include the acquisition of ZE or NZE trucks; visits from ZE or NZE trucks; acquisition of ZE yard trucks; use of ZE yard trucks; installation of onsite ZE charging or fueling infrastructure; installation of onsite solar panels; use of onsite solar panels; and installation of air filters in residences, daycares, hospitals, or community centers. Dkt. 107-3 ¶ 115. With the approval of the District, warehouse operators may also choose to earn WAIRE points by developing and implementing a custom WAIRE Plan that involves compliance actions not listed on the WAIRE Menu. *Id.* ¶ 116. Such a custom plan could, for example, involve reducing the vehicle miles traveled ("VMT") associated with the warehouse, acquiring and using NZE yard trucks, installing offsite charging and fueling infrastructure, or installing

---

[2]  The District explains that the Rule weights Class 8 truck trips more heavily because these trucks generally emit more air pollutants than their smaller counterparts and because they can carry a larger quantity of goods, which are associated with a greater amount of other emissions-generating activities at warehouses. Dkt. 107-3 ¶ 108.
[3]  Rule 2305 phases in over a three-year period. Dkt. 91 ¶ 44. On January 1, 2022, warehouses 250,000 square feet or large began accruing WPCO. *Id.* ¶ 45. In 2023, warehouses between 150,000 and 249,999 square feet were to begin accruing WPCO. *Id.* ¶ 46. In 2024, all warehouses over 100,000 square feet will accrue WPCO. *Id.* ¶ 47. The "annual variable" used to calculate the WPCO will increase from 2022 to 2025 until the rule reaches the highest level. *Id.* ¶ 48.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

on-site charging stations with a higher power than listed in the WAIRE Menu. *Id.*

The Rule provides that, "[i]n lieu of earning the required number of WAIRE Points . . . a warehouse facility or land owner, or operator may choose to satisfy all or any remaining part of their WAIRE Points Compliance Obligation through payment of a mitigation fee in the amount of $1,000 for each WAIRE Point." Dkt. 63-5 at 11. The District states that it plans to use the funds generated through the mitigation fee option to reduce NOx and diesel particulate matter emissions in communities near the warehouse that paid the fee. Dkt. 107-3 ¶ 118. According to the District, the fees would be used partially to offset the cost of purchasing ZE or NZE vehicles and installing ZE charging or hydrogen fueling stations. *Id.* Any applicant, including regulated warehouse operators, could apply to use these funds to implement projects to reduce local emissions. *Id.* In addition, warehouse operators can "bank" WAIRE points by completing activities on the WAIRE Menu before they are obligated to comply with the Rule and submitting an early action Annual WAIRE Report. Dkt. 107-3 ¶ 119.

If an operator purchases a zero-emission ("ZE") Class 4-7 truck, that operator will earn 68 points. Dkt. 91 ¶ 64. If an operator purchases a near-zero-emission ("NZE") Class 4-7 truck, that operator will earn 26 points. *Id.* ¶ 65. However, if an operator purchases a conventional Class 4-7 truck, that operator will earn no points. *Id.* ¶ 66. In addition, if that truck visits a warehouse belonging to the operator within the District's jurisdiction, it will increase the WPCO obligation associated with that warehouse. *Id.*

The Rule covers air cargo facilities located at airports in the (1) South Coast Air Basin (including Hollywood Burbank ("BUR"), Los Angeles International ("LAX"), Long Beach ("LGB"), Ontario International ("ONT"), San Bernardino International ("SBD"), and John Wayne ("SNA")) and (2) the South Coast Air Quality Management District (Palm Springs International Airport ("PSP")). Dkt. 107-2 ¶ 7.

The State of California, through the California Air Resources Board ("CARB"), has not obtained a waiver from the EPA pursuant to Section 209(b) with respect to Rule 2305. Dkt. 91 ¶ 18.

      E.     Other Rules Related to ZE and NZE Trucks

The State of California has adopted its own regulations and programs whose purpose is to incentivize the transition of the State's truck fleet to ZE or NZE models. Dkt. 107-3 ¶ 165. CARB enacted the Advanced Clean Trucks regulation in 2020, which requires that ZE trucks constitute certain percentages of overall sales by truck manufacturers of medium- and heavy-duty trucks in certain future years. *Id.* ¶ 166. As a result of this sales requirement, CARB anticipates that there will be 106,000 medium- and heavy-duty ZE trucks in the State by 2030, 570,000 by 2040, and 950,000 by 2050. *Id.* It is expected that approximately 43 percent of the ZE trucks that will be deployed in California as a result of this regulation will operate in the Basin. *Id.* CARB's adopting resolution for the Advanced Clean Trucks regulation also set 100-percent ZE fleet turnover targets for certain priority sectors, which will directly affect the proportion of ZE trucks that visit warehouse facilities going forward. *Id.* ¶ 167. CARB's Medium- and Heavy-Duty GHG Phase 2 regulation sets greenhouse gas emissions standards for medium- and heavy-duty trucks and provides compliance credits for the sale of qualifying ZE vehicles. *Id.* ¶ 168. The Carl Moyer Memorial Air Quality Standards Attainment Program provides an incentive for grant funding for the acquisition of cleaner-emission engines and equipment, including ZE and NZE trucks. *Id.* ¶ 169. CARB's Heavy-Duty Vehicle Investment Program ("HVIP") provides point-of-sale

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

discounts to subsidize the acquisition of lower-emission heavy-duty vehicles. *Id.* ¶ 170. Between 2010 and 2022, HVIP directly contributed to 345 million "cleaner than diesel miles" being traveled in California. *Id.* Since 2010, CARB has invested over $900 million into HVIP and the Clean Off-Road Equipment Voucher Incentive Program ("CORE"), resulting in the purchase of 11,617 vehicles and pieces of equipment. *Id.* Other statewide programs incentivizing the acquisition of ZE trucks through subsidies include, but are not limited to, the Volkswagen Mitigation Trust, the Community Air Protection Program, and the Energy Commission's Clean Transportation Program. *Id.* ¶ 171.

CARB's Heavy-Duty Engine and Vehicle Omnibus Regulation, which was adopted in September 2021, substantially increases the stringency of NOx emissions standards for heavy-duty conventional diesel engines. *Id.* ¶ 172. CARB has developed an Advanced Clean Fleets Regulation, which allows truck fleet operators to comply by ensuring that ZE trucks comprise minimum percentages of their fleets in certain future years. *Id.* ¶ 173.[4] The regulation also sets a 100 percent ZE sales requirement on truck manufacturers in 2036. *Id.*; *see also* Cal. Air Res. Bd., *California Approves Groundbreaking Regulation that Accelerates the Deployment of Heavy-Duty ZEVs to Protect Public Health*, Apr. 28, 2023, https://ww2.arb.ca.gov/news/california-approves-groundbreaking-regulation-accelerates-deployment-heavy-duty-zevs-protect. The proposed regulation is projected to increase the number of medium- and heavy-duty ZE trucks deployed in the State beyond the levels expected under current regulations, i.e., from 320,000 to 510,000 in 2035, from 780,000 to 1,230,000 in 2045, and from 950,000 to 1,590,000 in 2050. Dkt. 107-3 ¶ 173. Under the Advanced Clean Fleets Regulation, drayage trucks, i.e., those that visit ports and intermodal railyards, would fully transition to ZE models between 2024 and 2035. *Id.* ¶ 174.

The California Air Resources Board also approved a regulation to ban the sale of certain new gasoline vehicles, and has applied for a waiver from the EPA to set strict mobile source emission standards. Dkt. 107-2 ¶ 25.

Local and regional entities have also adopted regulations and programs that would incentivize warehouse and truck fleet operators to use ZE/NZE vehicles independent of the Rule. Dkt. 107-3 ¶ 175. For example, the Ports of Los Angeles and Long Beach have implemented a Clean Trucks Fund, which imposes a container fee that the Ports project will raise approximately $90 million in its first year to fund the acquisition of ZE drayage trucks and the installation of ZE infrastructure at the Ports. *Id.* ¶ 176.

F.    Statements Regarding the Purposes and Effects of The Rule

1.    The Administrative Record

The official stated purpose of the Rule is to "reduce local and regional emissions of nitrogen oxides and particulate matter, and to facilitate local and regional emissions reductions associated with warehouses, in order to assist in meeting state and federal air quality standards." Dkt. 107-3 ¶ 102.

According to the Final Environmental Assessment for Proposed Rule 2305 (the "Final EA"), the Rule "is

---

[4] This regulation was under development during the briefing on the Motions, but it has now been adopted. Cal. Air Res. Bd., *California Approves Groundbreaking Regulation that Accelerates the Deployment of Heavy-Duty ZEVs to Protect Public Health*, Apr. 28, 2023, https://ww2.arb.ca.gov/news/california-approves-groundbreaking-regulation-accelerates-deployment-heavy-duty-zevs-protect.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

intended to accelerate the use of ZE trucks and yard trucks that operate at warehouses in the South Coast AQMD region." Dkt. 81-11 at 3. The Final EA also states that the Rule would "encourage and incentivize the purchase and use of NZE and ZE vehicles instead of conventional gasoline and diesel vehicles." Dkt. 91 ¶ 54.

In the Final Socioeconomic Impact Assessment for Proposed Rule 2305, the District's staff prepared 19 estimates of the compliance costs associated with the Rule. Dkt. 81-12. Those estimates of average annual compliance costs ranged from negative $12.6 million to $979.0 million. Id. at 3. Each estimate reflects different assumptions regarding how operators would comply with the Rule. Dkt. 91 ¶ 23; Dkt. 107-3 ¶ 123. The District's staff stated that "[n]o single scenario in this bounding analysis is expected to occur." Dkt. 107-3 ¶ 126. Rather, they expected "a hybrid of all scenarios (or other compliance approaches encompassed within the range of scenarios analyzed)" to occur. Id. They also expected that the compliance options undertaken by any one warehouse operator were likely to change over time. Id. Thus, this "bounding analysis" was conducted to demonstrate the "extreme theoretical costs of the Rule" to the District's Governing Board and the public. Id. ¶ 127. The bounding analysis did not, and was not intended to, consider the full costs and benefits associated with the various means of complying with the Rule. Id. ¶ 128. As one example, the scenario assuming that warehouse operators comply with the Rule by installing and using solar power does not account for the long-term cost savings of using solar power over the life of the solar panel system. Id. Also, the bounding analysis computed the direct costs of the Rule, but did not address any additional factors that might incentivize warehouse operators to choose one compliance method over another, e.g., corporate sustainability goals. Id. ¶ 129.

Eight of these scenarios -- which are numbered 1, 2, 3, 6, 8, 12, 13, and 18 -- assumed that covered operators directly acquire ZE or NZE trucks. Dkt. 91 ¶ 24. In these scenarios, the District anticipated that between 4,076 and 52,573 ZE or NZE trucks would be acquired. Id. Five other scenarios -- those numbered 4, 5, 9, 10, and 14 -- assumed that warehouse operators will use a contractor or contractors who have their own ZE or NZE trucks or assume that ZE or NZE trucks will otherwise visit the affected warehouses. Id. ¶ 25. In the scenarios numbered 7, 11, 15, 16 and 17, warehouse operators can achieve compliance by any of the following actions: (1) paying a mitigation fee; (2) installing rooftop solar equipment; (3) installing filter systems for nearby sensitive receptors; (4) purchasing filter systems for nearby sensitive receptors; or (5) installing transport refrigeration unit ("TRU") plugs. Id. ¶ 26. In the final one, scenario 7a, warehouse operators use a combination of paying a mitigation fee and recording visits from ZE or NZE trucks. Dkt. 81-12 at 3. This scenario was added after the others were stated. Dkt. 91 ¶ 23.

For the eight scenarios that assume warehouse operators will acquire ZE and NZE trucks, the average annual compliance cost per square foot ranges from $0.06 to $1.04 and averages approximately $0.27. Dkt. 91 ¶ 27.[5] For the five scenarios that assume ZE or NZE trucks will visit the warehouses for other reasons, the average annual compliance cost per square foot ranges from negative $0.02 to $0.15 and averages approximately $0.09. Id. ¶ 28. For the five scenarios that do not involve the use of ZE or NZE trucks at all, the average annual compliance cost per square foot ranges from $0.70 to $1.21 and averages approximately $0.86. Id. ¶ 29. However, in scenario 7a, which assumes that some ZE or NZE

---

[5] Scenario 12, one of the eight scenarios in this group, contemplates the acquisition of ZE Class 8 trucks, which were not commercially available when the scenarios were created. Dkt. 91 ¶ 31. Excluding this scenario results in an average compliance cost per square foot of $0.16 for this group. Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

trucks will be used to achieve part of the WPCO and that a mitigation fee will be used for the remaining portion, the average annual compliance cost per square foot is $0.14. Dkt. 81-12 at 3.

Based on these scenarios, the Final Socioeconomic Impact Assessment concluded that compliance costs for a 500,000 square foot facility could range from $70,000 per year for a relatively low-cost compliance option to $415,000 per year for a higher-cost compliance option. Dkt. 107-3 ¶ 134. The Assessment also computed the average total annual operating costs for such a facility at $13 million. *Id.* ¶ 135. Based on these conclusions, the Assessment estimated that the annual costs of the Rule would be 0.5% to 3.2% of the existing annual operating costs of the facilities subject to the Rule. *Id.* Using a similar computation, the Assessment estimated that the annual costs of the Rule would be 0.05% to 0.3% of the value of all goods handled by warehouses within the District during that year. *Id.* ¶ 136.

The District also commissioned Industrial Economics, Inc. ("IEc") to perform an economic study to confirm that the Rule would not cause warehouse operations to relocate outside of the District. Dkt. 107-3 ¶ 133. The study concluded that warehouses would not relocate if the costs of complying with the Rule were less than or equal to approximately $1.50 per square foot per year. *Id.* Plaintiffs dispute the accuracy of the conclusion of this study. *Id.*

The Final Socioeconomic Impact Assessment also attempted to quantify the projected health benefits of the Rule. Dkt. 107-3 ¶ 137. Based on this analysis, District staff concluded that the Rule would result in 150 to 300 fewer premature deaths, 2500 to 5800 fewer asthma attacks, and 9000 to 20,000 fewer work loss days from 2022 to 2031. *Id.* ¶ 138. The Assessment monetized these public health benefits and concluded that, from 2022 to 2031, the expected total discounted public health benefits of the Rule would range from $1.2 billion to $2.7 billion. *Id.* ¶ 139. The Assessment also determined that, because the total expected compliance costs would range from $0.8 billion to $1.1 billion, the monetized public health benefits were about three times greater than the cost of compliance. *Id.*

The District also estimated the nitrogen oxide ("NOx") and diesel particular matter ("DPM") emission reductions associated with each of the scenarios. Dkt. 91 ¶ 32. The District concluded that scenarios 1 and 13 are the most representative of the upper and lower range of reductions that can be anticipated from the implementation of the Rule. *Id.* ¶ 33. Those two scenarios each involved warehouse operators who would acquire and use certain types of NZE and ZE trucks. *Id.* ¶ 34. Scenario 13 is expected to result in approximately 3218 cumulative tons of NOx reductions and 48 tons of DPM reductions over the course of the ten-year compliance period. *Id.* ¶ 35. This is representative of the lower range of reductions that the District's analysis anticipated from the implementation of the Rule. *Id.* However, three of the five scenarios that do not involve the use of ZE or NZE trucks at all – 15, 16, and 17 – would achieve less NOx and DPM reductions than scenario 13. *Id.* ¶ 36. Scenario 1 is expected to result in approximately 8,609 tons of NOx reductions and 64 tons of DPM reductions over the course of the ten-year compliance period. Dkt. 63-10 at 60. This is representative of the upper range of reductions that the District's analysis anticipated from the implementation of the Rule. *Id.* However, scenario 7 is expected to result in a reduction six times greater than scenario 1, and scenario 11 is expected to result in a reduction three-and-a-half times greater than scenario 1. Dkt. 91 ¶¶ 37-38. Scenario 7 also assumes that "collected mitigation fee revenue is spent 50% on electric vehicle chargers and 50% on natural-gas and electric trucks." Dkt. 63-10 at 43. Scenario 11, if it occurs, would cost covered operators $1.21 per square foot, more than any other scenario. Dkt. 91 ¶ 42. Scenario 11,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
| --- | --- | --- | --- |
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

if it occurs, also assumes that operators would collectively pay $3.1 billion in mitigation fees by 2031. *Id.* ¶ 43.

The Final Staff Report for Proposed Rule 2305, states that "[a]ir filters are expected to be chosen rarely as a compliance option to earn WAIRE Points due to their higher cost relative to other compliance options . . . ." Dkt. 91 ¶ 30. That Report also states that the Rule "provide[s] a mechanism to require warehouse operators to encourage ZE vehicle use at their facilities as one of many options of compliance." Dkt. 91 ¶ 56. The Report also states that the Rule is needed "to support statewide efforts to increase the number of ZE vehicles." Dkt. 63-20 at 11. The draft Staff Report said that the Rule was necessary to "place requirements on warehouse operators in [the District's jurisdiction] that will encourage them to ensure that the potential benefits from statewide regulations occur" in the District's jurisdiction. *Id.* at 12. It also found that the Rule would be helpful because it would "reduce emissions and exposures" from both "trucks" and "other emission sources associated with their facilit[ies.]" *Id.* at 14. In the Report, the District also noted a 2016 estimate that "at least $1 billion per year [would be needed] in incentive funding to clean up vehicle and engine fleets would be needed – absent any further regulations – to meet the 2023 and 2031 attainment dates." Dkt. 91 ¶ 55.

The Final Report contends that present levels of incentive funding have "not reached a level sufficient to turn over enough vehicles to meet air quality standards," which is part of the justification for adopting the Rule. Dkt. 63-20 at 11. The Final Report also states that certain other regulations are insufficient to reduce emissions because those other regulations "ensure[] that lower emissions occur only *if* trucks are sold." *Id.* at 12. Thus, those other regulations "do[] not require any certain number of trucks to be sold, or to operate within the [District's jurisdiction]." Dkt. 91 ¶ 58. The Final Report also states that existing regulations "are not sufficient to meet either of the upcoming 2023 or 2031 federal deadlines for ozone reduction" within the District's jurisdiction. Dkt. 63-12 at 12.

The District produced a draft presentation, which included a slide that lists the "Goals of [the] Warehouse ISR." Dkt. 91 ¶ 49. One of those goals is "to reduce emissions from the most significant source—trucks." *Id.* However, the presentation also states other goals, including "provid[ing] the [District] the ability to easily increase/decrease emission reductions from warehouses," "minimiz[ing] [the] impact on [the] business model of [the] industry," "meet[ing] commitments in" the District's Air Quality Management Plan, and "address[ing] localized emissions impacts for AB 617." Dkt. 63-19 at 2.

In responding to A4A's objections to Rule 2305, the District stated that "[t]he CAA is irrelevant to the District's authority to adopt the proposed rule," because "[t]he District's regulatory authority represents an exercise of the State's police power," which was "delegated to [the District] by the state Legislature." Dkt. 81-22 at 3.

2. <u>Statements by the District's Governing Board Members and Staff Members</u>

One member of the District's Governing Board, Rex Richardson, stated during the rulemaking proceedings that "[t]he problem is the trucks." Dkt. 107-2 ¶ 19. Another Board member, Janice Rutherford, stated during those proceedings, "We all acknowledge the trucks are the issue." Dkt. 107-2 ¶ 20. She added that "[t]he type of building the trucks go to or from, the trucks are indifferent" because "[t]hey pollute no matter where they go." Dkt. 91 ¶ 60. However, Rutherford voted against the Rule, Dkt. 101 at 6, which limits an inference that her statements reflect the views of the Board majority that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

enacted the Rule. Larry McCallon, who also voted against the Rule, stated that "[u]sing the indirect
source rule to solve a problem that the federal government isn't willing to step up to do, which is to
regulate trucks, is not a good idea." Dkt. 91 ¶ 51; Dkt. 101 at 6. As Defendants point out, McCallon's
statement was made approximately three years before the Rule was adopted. Dkt. 91 ¶ 51.

At a March 3, 2017 hearing on the Proposed Rule, Shawn Nelson, then a member of the District's
Governing Board, stated that he thought indirect source rules "would circumvent" federal preemption.
Dkt. 81-23 at 3. Defendants object that this statement is an improper legal opinion. This statement is
admissible only for the limited purpose of showing that the District was on notice of Nelson's concerns.
Defendants are also correct that the Rule had not been drafted when Nelson made this statement and
that Nelson was not a member of the Governing Board at the time the Rule was approved. *See* Dkt.
101 at 5. Judith Mitchell, another former member of the Board, stated at the same hearing that indirect
source rules could be used as "a hammer in case our carrots don't work." Dkt. 81-23 at 2. Like Nelson,
Mitchell was not on the Board when the Rule was adopted, nor had the Rule been drafted when she
made these statements. Dkt. 101 at 5.

At this 2017 hearing, Rutherford addressed a "fleet rule" that had been proposed at the time, stated that
there was insufficient infrastructure to support ZE and NZE vehicles and that the "fleet rule" would make
it impossible to transport goods to sparsely populated areas of San Bernardino. Dkt. 81-23 at 3. No
party has presented evidence as to Rutherford's qualifications as an expert, or her basis for making this
statement. In addition, the "fleet rule" proposed in 2017 was different from the "indirect source rule" that
was ultimately adopted, and Rutherford's statements were made a year before the development of the
Rule at issue began. *Id.*; Dkt. 94 ¶ 30. Consequently, this evidence is not material to proving the effects
of the Rule at issue.

At a May 4, 2018 hearing, Nelson stated that, "[i]f there is anyone in this room who doesn't know what
this is about, diesel truck emissions are the issue." Dkt. 91 ¶ 1. Nelson expressed the view that "[i]t's
not the hours of operation of warehouses, it's not how everybody got to work, what car they drove and,
you know, forklifts and those things are all natural gas or electric anyway." *Id.* He then said that "this is
all about diesel trucks" because "[t]here is not a bunch of diesel forklifts driving around." *Id.*

On May 4, 2020, then-Planning and Rules Manager Ian MacMillan sent an e-mail in which he stated
that, compared to the California Air Resources Board's proposed indirect source rule, "[t]he main
difference with [the District's] proposed Indirect Source Rules (ISR's) on warehouses and railyards is
that they would apply to destinations instead of fleet owners or truck[] manufacturers." Dkt. 91 ¶ 52.
Previously, on March 2, 2018, MacMillan was discussing another proposed rulemaking effort and said
"[r]eally the focus will be on trucks." Dkt. 91 ¶ 61. However, no party has presented evidence that the
potential rule MacMillan was discussing is similar to the Rule at issue. Accordingly, this evidence is not
relevant as to the purpose of Rule 2305.

On January 24, 2020, District staff member Dr. Philip Fine stated that the Rule would "provid[e]
additional incentives, additional options in the form of points to comply with the rule in case [the District]
ha[s] not raised [the funds] to completely turn over the truck fleet through incentives." Dkt. 91 ¶ 62.

On April 8, 2021, MacMillan stated that "[t]he primary thing that warehouse operators can do is
purchase or use low emission technologies." Dkt. 91 ¶ 63. He stated that "one option . . . allows

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

operators to install filters in nearby schools, daycares, etc.," but he expressed a belief that this method would "be very rarely used given the difficulty in implementing it." *Id.* He also stated that, "[i]f it turns out that this is a common compliance pathway," he would "report back immediately to the Board and recommend any necessary changes." *Id.* However, MacMillan added that "[t]he rule provides substantial flexibility to comply, which was specifically added at the request of industry," and MacMillan asserted that "it is uncertain what methods each warehouse will choose to comply." Dkt. 63-23 at 2.

        3.   <u>Testimony by the Parties</u>

CTA offered a declaration from Chris Shimoda, its Senior Vice President of Government Affairs, who stated that "[o]ver the life of the Rule, CTA's members will expend substantial resources in direct response to the Rule by purchasing and using District-approved trucks in place of their federally-compliant combustion vehicles." Dkt. 63-2 ¶ 8. However, CTA has not provided any evidence showing that Shimoda had personal knowledge about the plans of CTA's members. To the extent Shimoda learned of any such plans by speaking with CTA's members, this testimony would be inadmissible hearsay.

CTA also contends that a warehouse operator with a 200,000 square foot facility who attempts to avoid acquiring ZE or NZE trucks and allows any contractors to continue using conventional trucks will, on average, face $1.7 million in costs attributable to the Rule over the next 10 years. Dkt. 91 ¶ 67. CTA reaches this conclusion by multiplying the number of square feet in this hypothetical facility, the 10-year projection period associated with the Rule, and the average annual compliance cost per square foot for the five scenarios that do not involve the use of ZE or NZE trucks at all.[6] Applying a similar methodology, CTA estimates compliance costs of $540,000 using the scenarios involving direct acquisition of ZE and NZE trucks and $140,000 using the scenarios involving indirect acquisition of ZE and NZE trucks. *Id.* ¶ 68.

A4A stated in its interrogatory responses that an owner/operator of a District warehouse similar to that operated by United Airlines would be subjected to a WAIRE fee cost of up to $1 million annually, which A4A said was the reason to abandon the use of its current vehicles and deploy ZEVs. Dkt. 107-2 ¶ 11. Although this interrogatory response was verified, the response cited by A4A reflects statements made by United to A4A about its warehouse and business, including how typical its facility may be, rather than the personal knowledge of the individual who verified the responses. *See* Dkt. 81-10 at 13-14. Therefore, this interrogatory response is not admissible to prove the typical compliance costs for a facility within the District.

The District has offered expert testimony that the costs and benefits associated with each option for complying with the Rule will differ substantially from warehouse to warehouse. Dkt. 99 at 33. For example, the District's expert testified that warehouse operators that are affected by local port regulations and publicly traded warehouse operators that face pressure from shareholders to reduce emissions, are more likely to elect to use ZE trucks. *Id.* Similarly, warehouses located close to port terminals tend to have more frequent truck visits and can acquire more WAIRE points with a single ZE truck, so the District's expert opined that the operators of such warehouses are more likely to adopt ZE

---

[6] As discussed above, for the five scenarios that do not involve the use of ZE or NZE trucks at all, the average annual compliance cost per square foot ranges from $0.70 to $1.21 and averages approximately $0.86.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

trucks. *Id.* The District's expert also testified that, for some operators, the mitigation fee would be the most attractive option because of its flexibility and ease of use, even when it is not the least expensive option. *Id.*

       G.      Preliminary Compliance Data

Operators of warehouses larger than 250,000 square feet were required to file an Initial Site Information Report by July 5, 2022. Dkt. 107-3 ¶ 149. These reports explained how warehouse operators intended to comply with the Rule. *Id.*

In the Reports, approximately 31% of warehouse operators anticipated earning at least some points through the acquisition of ZE/NZE trucks (including ZE/NZE yard trucks), which accounted for approximately 11.3% of all points that the operators anticipated earning. Dkt. 107-3 ¶ 151. Other WAIRE Menu items that did not involve the use or acquisition of ZE or NZE trucks, but which were selected by 5 percent of warehouse operators or more, included electric charger use (18% of operators, 0.9% of total points), solar panel usage (17% of operators, 0.3% of total points), beginning construction of a 19.2-350 kW charger project (9% of operators, 0.1% of total points), acquisition of a 51-149 kW electric charging station (6% of operators, 0.4% of total points), and finalizing a 19.2-350 kW charger project (6% of operators, 1.3% of points). *Id.* ¶ 152. Approximately 31% of warehouse operators stated that they would comply with the Rule by paying the mitigation fee, which was the most common compliance option in the Reports. *Id.* ¶ 153. Warehouse operators anticipated earning approximately 3.1% of all WAIRE points by the payment of the fee. *Id.*

In the Reports, no single compliance option was tentatively chosen by a majority of warehouses, nor was any single compliance option a majority of WAIRE points anticipated to be earned. Dkt. 107-3 ¶ 154. 72 of the 156 warehouse operators that filed an Initial Site Information Report anticipated earning WAIRE points through more than one compliance option. *Id.* ¶ 155. 14 operators anticipated earning all of their WAIRE points through ZE/NZE truck visits or acquisitions, but not including yard truck use or acquisitions. *Id.* ¶ 156. 32 operators anticipated earning all of their WAIRE points by the payment of the mitigation fee. *Id.* ¶ 157.

In sum, 17 operators anticipated earning all of their WAIRE points through actions that did not involve either payment of the mitigation fee or the use or acquisition of ZE/NZE trucks or yard trucks. Dkt. 107-3 ¶ 158. In addition, 43 operators anticipated earning enough points to satisfy their full compliance obligations through strategies that did not involve the use or acquisition of ZE/NZE trucks or yard trucks. *Id.* ¶ 159.

Around the same time, some operators chose to file early Annual WAIRE Reports in order to bank points earned from activities completed prior to the first year in which they were obligated to comply with the Rule. Dkt. 107-3 ¶ 150. The early action WAIRE Reports were consistent with the Initial Site Information Reports in that no one compliance option was selected by a majority of warehouse operators or at a majority of individual warehouse facilities. *Id.* ¶ 160. 24 warehouse operators filed early Annual WAIRE Reports. *Id.* ¶ 161. Ten of them earned WAIRE points exclusively from actions that did not involve the use or acquisition of ZE or NZE trucks, and an additional six earned WAIRE points through a combination of actions that do and do not involve ZE/NZE truck visits or acquisitions. *Id.* These Reports were filed for 98 individual warehouse facilities. *Id.* ¶ 162. Of those facilities, 16

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

reported earning WAIRE points exclusively from actions that do not involve the use or acquisition of ZE or NZE trucks, and an additional 34 reported earning WAIRE points through a combination of actions that do and do not involve ZE/NZE truck visits or acquisitions. *Id.*

The District also received 456 Annual WAIRE Reports on or before March 2, 2023, which reflected 453 different warehouse operations overseen by 189 different warehouse operators. Dkt. 126 ¶¶ 5-7. These Reports show that many operators satisfied their WPCO through methods related to ZE and NZE trucks, but many others did not. 26 operators earned enough points to satisfy their entire WPCO through ZE yard truck usage. *Id.* ¶ 13(a). Nine operators earned enough points to satisfy their entire WPCO through ZE yard truck acquisition. *Id.* ¶ 13(b). 22 operators earned enough points to satisfy their entire WPCO through ZE/NZE truck visits. *Id.* ¶ 13(c). Five operators earned enough points to satisfy their entire WPCO through ZE/NZE truck acquisition, not including ZE yard truck acquisition. *Id.* ¶ 13(d). 54 operators earned enough points to satisfy their entire WPCO through a combination of ZE/NZE truck visits/acquisitions and ZE yard truck acquisition/usage. *Id.* ¶ 13(e). 50 warehouse operators earned enough points to satisfy their entire WPCO through mitigation points purchased. *Id.* ¶ 13(f). 29 warehouse operators earned enough points to satisfy their entire WPCO through charger acquisition, installation, and usage; solar acquisition, installation, and usage; filter purchases and installation; or a combination of these options. *Id.* ¶ 13(g). 91 operators earned enough points to satisfy their entire WPCO through compliance options other than ZE/NZE truck visits/acquisitions and ZE yard truck acquisition/usage. *Id.* ¶ 13(h). 110 operators earned enough points to satisfy more than 75% of their WPCO through compliance options other than ZE/NZE truck visits/acquisitions and ZE yard truck acquisition/usage. *Id.* ¶ 13(i). 104 operators earned enough points to satisfy more than 90% of their WPCO through compliance options other than ZE/NZE truck visits/acquisitions and ZE yard truck acquisition/usage. *Id.* ¶ 13(j). 140 operators earned enough points to satisfy their entire WPCO from compliance options other than ZE or NZE truck acquisitions or ZE yard truck acquisitions. *Id.* ¶ 13(k).

The Reports also reflect that many warehouses satisfied their WPCO through methods related to ZE and NZE trucks, but many did not. 39 warehouses earned enough points to satisfy their entire WPCO through ZE yard truck usage. Dkt. 126 ¶ 15(a). 15 warehouses earned enough points to satisfy their entire WPCO through ZE yard truck acquisition. *Id.* ¶ 15(b). 66 warehouses earned enough points to satisfy their entire WPCO through ZE/NZE truck visits, not including ZE yard truck usage. *Id.* ¶ 15(c). 70 warehouses earned enough points to satisfy their entire WPCO through ZE/NZE yard truck acquisition, not including ZE yard truck acquisition. *Id.* ¶ 15(d). 118 warehouses earned enough points to satisfy their entire WPCO through a combination of ZE/NZE truck visits/acquisitions and ZE yard truck acquisition/usage. *Id.* ¶ 15(e). 116 warehouses earned enough points to satisfy their entire WPCO through mitigation points purchased. *Id.* ¶ 15(f). 42 warehouses earned enough points to satisfy their entire WPCO through charger acquisition, installation and usage; solar acquisition, installation and usage; filter purchases and installation; or a combination of these options. *Id.* ¶ 15(g). 174 warehouses earned enough points to satisfy their entire WPCO using compliance options other than ZE/NZE truck visits/acquisitions and ZE yard truck acquisition/usage. *Id.* ¶ 15(h). 194 warehouses earned more than 75% of their WPCO using compliance options other than ZE/NZE truck visits/acquisitions and ZE yard truck acquisition/usage. *Id.* ¶ 15(i). 185 warehouses earned more than 90% of their WPCO using compliance options other than ZE/NZE truck visits/acquisitions and ZE yard truck acquisition/usage. *Id.* ¶ 15(j). 284 warehouses earned enough points to satisfy their entire WPCO using compliance options other than ZE/NZE truck visits/acquisitions and ZE yard truck acquisition/usage. *Id.* ¶ 15(k).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

Overall, 87.11% of the total points were earned by acquiring or using ZE and NZE trucks, 0.50% of points were earned through ZE truck acquisition, and 7.03% were earned through ZE truck use. Dkt. 126 at 6. 5.13% of points were earned through NZE truck acquisition, and 28.14% were earned through NZE truck use. *Id.* 2.32% of points were earned through ZE yard truck acquisition, and 43.99% were earned through ZE yard truck use. *Id.* 3.37% of points were earned by acquiring charging stations for electric vehicles. *Id.* 0.2% of points were earned by beginning construction on electric vehicle chargers. *Id.* at 7. 1.11% of points were earned by finalizing electric vehicle chargers. *Id.* 0.04% of points were earned by using hydrogen stations, and 0.36% of points were earned by using other chargers. *Id.* 3.16% of points were earned by taking actions related to transport refrigeration unit ("TRU") plugs. *Id.* 1.24% of points were earned by installing, acquiring or using solar panels. *Id.* at 7-8. 0.21% of points were earned by purchasing or installing filter systems. *Id.* at 8. Finally, 3.41% of points were earned via payment of a mitigation fee. *Id.*

## III.    Evidentiary Objections

The parties have submitted more than 300 pages of evidentiary objections. Many of them are boilerplate and their basis cannot be determined. Where appropriate, these objections will be addressed in connection with the specific evidence to which they are directed. This Order is based on a review of the objections and reliance only on admissible evidence. To the extent the parties objected to evidence cited in support of the substantive rulings in this Order, those objections have been **OVERRULED**. To the extent the parties objected to evidence that is not cited as a basis for the substantive rulings in this Order, those objections are **MOOT**.

In addition, CTA and A4A have objected that the District filed more than a three-page supplemental brief with respect to the annual WAIRE Reports that were filed in March. *See* Dkts. 131, 134. Defendants had previously been granted leave to file a three-page supplemental brief regarding the compliance reports. Dkt. 70. Although the District's supplemental brief was itself three pages, the District also included two declarations, two amended statements of disputed fact, and an amended statement of additional material facts. *Compare* Dkt. 122 *with* Dkts. 123-27. With respect to the amended statements of disputed fact and amended statement of additional material facts, the amendments merely repeat what is stated in the supplemental brief. Consequently, CTA and A4A have not adequately shown that they were prejudiced by the inclusion of this additional information. On this matter, CTA and A4A's objections are **OVERRULED**.

With respect to the supplemental declaration of Nicole Silva, CTA and A4A have not shown that they were prejudiced by its submission. This declaration merely summarizes the reports that were the subject of the supplemental briefing and provides a factual basis for the statistics cited in the supplemental brief. Indeed, CTA's supplemental brief cites this declaration for the same purposes that it is cited by the District. With respect to this declaration, the objections are **OVERRULED**. However, the supplemental declaration of Philip Davies provided expert testimony regarding the proper interpretation of the reports, and CTA and A4A did not have the opportunity to respond to this testimony with competing expert testimony. Because CTA and A4A have made a sufficient showing of prejudice, their objection is **SUSTAINED**, and the declaration will not be considered for purposes of the instant Motions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

**IV.**   **Analysis**

   A.   Legal Standards

      1.   Motion for Summary Judgment

A motion for summary judgment will be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden to show the basis for its motion and to identify those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* at 324. Where the non-moving party will have the burden of proof on an issue, the movant need only demonstrate that there is an absence of evidence to support such claims. *Id.* If the moving party meets its initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(e).

With certain exceptions, only admissible evidence may be considered in connection with a motion for summary judgment. Fed. R. Civ. P. 56(c). However, in considering such a motion, a court is not to make any credibility determinations or weigh conflicting evidence. *Id.* All inferences are to be drawn in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). This means that "where the facts specifically averred by [the non-moving] party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

A court is not required to assume that "general averments embrace the 'specific facts' needed to sustain the complaint." *Id.* "The object of [summary judgment] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Id.* Thus, conclusory, speculative testimony in declarations or other evidentiary materials is insufficient to raise genuine issues of material fact and defeat summary judgment. *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1136 (9th Cir. 2009); *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp*., 594 F.2d 730, 738 (9th Cir. 1979). "If the factual context makes the non-moving party's claim of a disputed fact implausible, then that party must come forward with more persuasive evidence than otherwise would be necessary to show that there is a genuine issue for trial." *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998).

      2.   Preemption

The United States "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Congress has the authority, when acting pursuant to its enumerated powers, to preempt state and local laws." *Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665, 667 (9th Cir. 2003).

"If [a] statute contains an express pre-emption clause, the task of statutory construction must in the first

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Where a "statute 'contains an express pre-emption clause,' [courts] do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin California Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Commerce of United States of America v. Whiting,* 563 U.S. 582, 594 (2011)). However, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005)).

Even where a statute law does not run afoul of an express pre-emption clause, it may be preempted if "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 66-67 (1941)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . ." *Id.*

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745 (1987). "In cases involving federal preemption of a local statute . . . [this] rule applies with full force." *Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 579 n.3 (9th Cir. 2008); *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (holding that, when a party "challenge[s] [a state] Rule on its face by seeking to enjoin its enforcement altogether," that party cannot "sustain [its] burden even if [it] showed that a possible application of the rule (in concert with another statute or regulation) violated federal law"). There is a "heavy burden of persuasion to sustain a broad attack on the facial validity of a statute in all its applications[.]" *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 861 (9th Cir. 2009), *aff'd sub nom. Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582 (2011) (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008)).[7]

    B.    Application

CTA and A4A argue that the Rule is preempted by the Clean Air Act and the Federal Aviation Administration Authorization Act. The A4A also argues that the Rule is preempted by the Airline Deregulation Act. Each of these arguments is addressed below.

    1.    <u>Clean Air Act</u>

Under the Clean Air Act, "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines

---

[7] In 1999, a plurality of the Supreme Court rejected the application of *Salerno* to certain vagueness challenges. *See City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999). However, the Ninth Circuit has determined that it "will not reject *Salerno* [outside of certain First Amendment and abortion cases] until a majority of the Supreme Court clearly directs [it] to do so." *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 972 (9th Cir. 2003) (quoting *S.D. Myers, Inc. v. City and Cnty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

. . . .” 42 U.S.C. § 7543(a). In addition, “[n]o State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.” *Id.* In this context, the “use of the word ‘new’ [is taken] to mean ‘showroom new,’ that is, never sold.” *Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.* (“*NAHB*”), 627 F.3d 730, 735 (9th Cir. 2010).

CTA and A4A argue that the Rule is preempted because it relates to the control of emissions from vehicles and engines and is a “standard” because its purpose and effect is to mandate the purchase of ZE and NZE trucks. The District argues that the Rule does not relate to vehicle and engine emissions because it is an indirect source rule that applies to warehouses rather than trucks or engines. The District also contends that the Rule is not preempted because it does not mandate the purchase of ZE and NZE trucks.

        a)     Legal Standards

        (1)    <u>“Standard”</u>

In this provision, the word “‘standard’ is defined as that which ‘is established by authority, custom, or general consent, as a model or example; criterion; test.’” *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252-53 (2004) (quoting Webster's Second New International Dictionary 2455 (1945)). Thus, the preemption provision encompasses not “only regulations that compel manufacturers to meet specified emission limits” but also regulations that prohibit people from buying or leasing vehicles that do not meet specified emission limits. *Id.* at 252. The Supreme Court also held that a regulatory action could be a “standard” regardless of which “means of enforcing standards” is adopted. *Id.* at 253. However, the Supreme Court did not resolve whether the Clean Air Act preempted “voluntary incentive programs” or, indeed, any form of regulatory action other than “mandates.” *Id.* at 254-55. Voluntary programs “are significantly different from command-and-control regulation.” *Id.* at 258. Rather, it only determined that “[a] command, accompanied by sanctions, that certain purchasers may buy only vehicles with particular emission characteristics is as much an ‘attempt to enforce’ a ‘standard’ as a command, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume must consist of such vehicles.” *Id.* at 255.

In applying ERISA, the Supreme Court has addressed the question left open in *Engine Mfrs.*: whether a law that encourages, but does not mandate, a preempted action is permissible. The Supreme Court has “acknowledge[d] that a state law might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers, and that such a state law might indeed be pre-empted under § 514.” *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 668 (1995). However, surcharges that “affect only indirectly the relative prices of insurance policies” cause “a result no different from myriad state laws in areas traditionally subject to local regulation, which Congress could not possibly have intended to eliminate.” *Id.*

The Supreme Court made this determination by evaluating both “the purpose and the effects” of the state statute. *Id.* at 658. Ultimately, the state statute at issue only made certain insurance alternatives “more attractive (or less unattractive),” which would have “an indirect economic effect on choices made

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

by insurers." *Id.* at 659. Because such an "indirect economic influence . . . [did] not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan," the statute was upheld. *Id.* It was also material that "cost uniformity was almost certainly not an object of pre-emption, just as laws with only an indirect economic effect on the relative costs of various health insurance packages . . . are a far cry from those 'conflicting directives' from which Congress meant to insulate ERISA plans." *Id.* at 662. The Supreme Court also upheld a California prevailing wage statute that "alter[ed] the incentives, but [did] not dictate the choices, facing ERISA plans" and was not "tantamount to a compulsion upon apprenticeship programs." *California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 333-34 (1997). In addition, the California law was "quite remote from the areas with which ERISA is expressly concerned . . . ." *Id.* at 330.

The Fourth Circuit, following these principles, found a Maryland law preempted when it "require[d] every employer of 10,000 or more Maryland employees to pay to the State an amount that equals the difference between what the employer spends on 'health insurance costs' . . . and 8% of its payroll." *Retail Indus. Leaders Ass' v. Fielder*, 475 F.3d 180, 193 (4th Cir. 2007). The Fourth Circuit noted that "any reasonable employer" "would not pay the State a sum of money that it could instead spend on its employees' healthcare" because "[h]ealthcare benefits are a part of . . . employee compensation" while "an employer would gain nothing in consideration of paying a greater sum of money to the State." *Id.* In addition, the official description of the Maryland law "show[ed] that legislators and interested parties uniformly understood the Act as *requiring* Wal-Mart to increase its healthcare spending." *Id.* at 194. It was also determined that Maryland's "General Assembly knew that it applied, and indeed intended that it apply, to [only] one employer in Maryland – Wal-Mart." *Id.* For this reason, it was immaterial that Wal-Mart could comply with the law by paying the state rather than spending more on its employees' healthcare. The purpose and effect of the law was to mandate that Wal-Mart spend more on its employee benefit plans. The Maryland law directly regulated employers' structuring of their employee health benefit plans. *Id.* at 195. The law was found to be preempted.

"The rule derived from these cases is that a local law is preempted if it directly regulates within a field preempted by Congress, or if it indirectly regulates within a preempted field in such a way that effectively mandates a specific, preempted outcome." *Metro. Taxicab Bd. of Trade v. City of New York*, 633 F. Supp. 2d 83, 95 (S.D.N.Y. 2009), *aff'd*, 615 F.3d 152 (2d Cir. 2010). "Conversely, a local law is not preempted when it only indirectly regulates parties within a preempted field and presents regulated parties with viable, non-preempted options . . . ." *Id.* at 95–96. However, "the purpose of a regulation alone is not enough to create preemption; courts must also examine the effect of a local rule when conducting a preemption analysis." *Id.* at 104.

In *Metro Taxicab*, the Southern District of New York applied the ERISA preemption rule in determining whether the CAA preempted a New York regulatory action. 633 F. Supp. 2d at 104. Specifically, the evidence showed that "using Crown Victorias made approximately $8,500 per year in profits, while those using hybrids earned only $5,100 in profits," a reduction in profits of 40%. *Id.* at 96. It was also material that the rule had "reduced revenues for certain types of vehicles, without regard to cost," with no explanation other than "the City's policy choice: [that] taxi owners should buy hybrids." *Id.* at 97. It was therefore determined that the rule's "purpose [wa]s to incentivize the purchase of hybrids" and "provide a very meaningful disincentive to the continuing use of conventionally powered vehicles." *Id.* at 99. It was also determined that "[t]he combined effect" of the rule was to provide "an offer which can not, in practical effect, be refused." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

The Fifth Circuit has also applied the *Metro Taxicab* test in conducting a CAA preemption analysis. *Ass'n of Taxicab Operators USA v. City of Dallas*, 720 F.3d 534, 540-42 (5th Cir. 2013). In *Taxicab Operators*, "[t]he summary judgment evidence . . . does support the inference that [the local ordinance] has decreased business for traditional cabs servicing Love Field and increased the ranks of [reduced-emissions] cab drivers." *Id.* at 542. In addition, there was evidence to support an inference "that the law alters the 'shopping decisions' for traditional cab drivers in determining where in the City to operate." *Id.* However, the plaintiff did "not offer record evidence to show that the law effectively compels a particular course of action" because there was no evidence that alternative cabs "may displace traditional cabs servicing other parts of the City, or that traditional cab drivers could not compensate for losses at Love Field by soliciting passengers elsewhere." *Id.* It was also relevant that "at most[] seven percent of the Dallas fleet" of cabs serviced the airport and "gasoline cab drivers enjoy[ed] some competitive advantages" over their alternative counterparts. *Id.* It was irrelevant that the local ordinance might "have its intended effect and substitute [alternative] cabs for traditional cabs" at Love Field. *Id.*

*Metro Taxicab* and *Taxicab Operators* present persuasive analyses. ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144. The preemption provisions in the ERISA and the CAA are similar in text and structure: both preempt laws and standards related to a specific area. Both preemption provisions were also adopted for a similar purpose, i.e., to avoid "an anarchic patchwork of federal and state regulatory programs . . . ." *Motor & Equip. Mfrs. Ass'n, Inc. v. E.P.A.*, 627 F.2d 1095, 1109 (D.C. Cir. 1979).

CTA argues that CAA preemption is more stringent than ERISA preemption because control of air pollution is not one of the traditional domains of state regulation. However, the Supreme Court and the Ninth Circuit have already held that the control of air pollution is an activity that is traditionally within the state police power. *See, e.g.*, *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power."); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 959 F.3d 1201, 1215 (9th Cir. 2020) ("In sum, the regulation of air pollution falls within the historic police powers of the states, and the modern CAA maintains a cooperative federalism approach.") (internal citations omitted); *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir. 2011) ("Congress itself contemplated that the states would retain leading roles in regulating air quality when it passed the Clean Air Act."); *Exxon Mobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246, 1255 (9th Cir. 2000) ("Air pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state."); *see also* 42 U.S.C. § 7401(a)(3) (finding "that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments"). Moreover, in the ERISA context, "Congress[] inten[ded] to establish the regulation of employee welfare benefit plans 'as exclusively a federal concern.'" *Travelers*, 514 U.S. at 656 (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981)). The CAA does not present a similar circumstance.

(2)     "Relating to the Control of Emissions From New Motor Vehicles or New Motor Vehicle Engines"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

If a standard requires that a "vehicle or engine must not emit more than a certain amount of a given pollutant, must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions," it necessarily "relate[s] to the emission characteristics of a vehicle or engine." *Engine Mfrs.*, 541 U.S. at 253.

The preemption provision of the CAA must be read together with its indirect-source-review provision. "It would be odd if the [CAA] took away from the states with one hand what it granted with the other." *NAHB*, 627 F.3d at 737.[8] Moreover, "[i]n light of the underlying purpose of section 110(a)(5)—to return power to states and localities—it would be surprising if the Act nevertheless preempted a local rule that qualified as an indirect source review program under section 110(a)(5)." *Id.* at 738. Thus, a rule that regulates indirect sources, but indirectly affects new motor vehicles and new motor vehicle engines, does not relate to the control of emissions from new motor vehicles or new motor vehicle engines.

Generally, "[t]he direct regulation of emissions from stationary sources is primarily left to the states," and "the federal government sets nationwide emissions standards for mobile sources." *Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 938 (9th Cir. 2011). However, the indirect-source-review provision permits a "facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations— (i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or (ii) preventing maintenance of any such standard after such date." 42 U.S.C. § 7410(a)(5)(D).

An "indirect source" is "a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution." *Id.* § 7410(a)(5)(C). Although "[d]irect emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources," *id.*, this "proviso . . . only makes sense if it is read to prohibit an indirect source review program from targeting direct sources . . . *apart from* the program's regulation of an indirect source." *NAHB*, 627 F.3d at 736.

A rule involves a "facility-by-facility" review when it "measur[es] emissions by, and require[es] emission reductions from, [indirect sources] as a whole . . . ." *Id.* at 737. For example, in *NAHB*, the agency that crafted the rule required developers to submit information regarding "the construction equipment [the developers would] use at the site in order to refine the estimate of how much pollutant the site's construction equipment will actually emit." *Id.* at 732. Although it was contended that the rule at issue was "directed at . . . equipment and not the . . . site itself," "[e]missions from any indirect source come from the direct sources located there; that is precisely what makes an indirect source indirect." *Id.* at 736.

        b)    Application

---

[8]  The EPA recognized that an ISR "could be preempted if the rule in practice as applied acts to compel the manufacturer or user of a nonroad engine or vehicle to change the emission control design of the engine or vehicle" or if "it creates incentives so onerous as to be in effect a purchase mandate." 76 Fed. Reg. 26609, 26611 (May 9, 2011). However, to the extent this statement is inconsistent with *NAHB*, the Ninth Circuit's holding is binding here.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
| --- | --- | --- | --- |
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

(1)   <u>"Standard"</u>

CTA and A4A cannot meet their burden to show that the Rule is a "standard." The Rule does not command that any businesses only purchase vehicles with particular emission characteristics. Businesses can comply with the Rule by taking actions unrelated to the purchase of ZE and NZE trucks. For this reason, the Rule is not a "command-and-control" regulation and *Engine Mfrs.* is distinguishable. Instead, because the Rule does not directly regulate within the field preempted by Congress, it is only preempted if it indirectly regulates within the preempted field such that it effectively mandates a specific, preempted outcome.

The Rule's purpose and effect must be evaluated to assess whether it meets this test. However, it is determined that neither the purpose nor the effect of the Rule is to compel the purchase of ZE or NZE trucks.

As to purpose, the District has provided evidence that it was motivated by a desire to control emissions from warehouses, including indirect emissions from trucks attracted to those warehouses. The District has also presented evidence, which has not been controverted, that communities within one half mile of warehouses within the Basin had significantly higher exposure to carcinogenic diesel particulate matter and fine particulate matter and higher rates of preexisting health conditions related to pollution. Dkt. 107-3 ¶¶ 90-93.

The administrative record is consistent with this purpose. The official purpose of the rule is "to facilitate local and regional emissions reductions associated with warehouses . . . ." Dkt. 107-3 ¶ 102. Elsewhere, in the Final Staff Report for Proposed Rule 2305, the District stated that the Rule only encourages ZE vehicle use "as one of many options of compliance," which supports the District's position that the Rule is aimed at reducing overall warehouse emissions rather than truck emissions specifically. Dkt. 63-20 at 12. The Final Staff Report also focuses on both emissions from trucks and those from "other emission sources associated with" warehouses. *Id.* Finally, in a draft presentation describing the Rule, the District stated that the Rule would address "localized emissions impacts" and "reduce emissions from the most significant source—trucks." Dkt. 91 ¶ 49; Dkt. 63-19 at 2. CTA and A4A argue that the statements by the District that support its position are self-serving, but that is not a basis to disregard this evidence.

The portions of the administrative record relied on by CTA and A4A do not undermine this conclusion. The Final Environmental Assessment for Proposed Rule 2305 states that the Rule "is intended to accelerate the use of ZE trucks and yard trucks that operate at warehouses" and to "incentivize the purchase and use of NZE and ZE vehicles instead of conventional gasoline and diesel vehicles." Dkt. 91 ¶ 54; Dkt. 81-11 at 3. A similar statement was made in the Final Staff Report. Dkt. 63-20 at 11 (stating the Rule would "support statewide efforts to increase the number of ZE vehicles"). These statements reflect a perceived benefit by increasing the number of ZE and NZE trucks. However, the District is permitted to increase the number of ZE and NZE trucks in use by incentivizing their purchase so long as the District's incentives do not amount to an attempt to compel the purchase of ZE and NZE trucks. Next, the Final Staff Report expresses concern that existing rules do not "turn over enough vehicles to meet air quality standards" and "do[] not require any certain number of trucks to be sold . . . ." Dkt. 91 ¶¶ 55, 58. However, statements about other rules are not persuasive evidence of the District's purpose with respect to the Rule at issue. The Final Staff Report also states that the Rule

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

would "place requirements on warehouse operators in [the District's jurisdiction] that will encourage them to ensure that the potential benefits from statewide regulations [related to electric vehicles] occur" in the District's jurisdiction. Dkt. 63-20 at 11. However, this passage only states that warehouse operators would be required to comply with the Rule and would merely be "encourage[d]" to bring electric vehicles into the District. This passage does not state that warehouse operators would be compelled to purchase electric vehicles.

The design of the Rule supports the District's position. The extent of a warehouse's compliance obligation is dependent on the number of trucks that arrive at the warehouse within a given year. However, the District has proffered evidence that 90% of NOx emissions from warehouses in the District come from truck visits. Dkt. 107-3 ¶ 89. CTA and A4A have offered no contrary evidence. The purpose of the covered warehouses is to ship goods by truck; the amount of non-truck emissions that occur at each warehouse is necessarily related to the number of truck shipments that pass through that warehouse. Neither CTA nor A4A has presented any evidence that the amount of non-truck emissions at a warehouse is not proportional to the amount of emissions from trucks visiting that warehouse.[9] Nor has CTA or A4A presented any evidence that the amount of warehouse emissions from activities other than truck visits could be measured with sufficient accuracy and without undue expense.

Trucks emit pollution wherever they go. If the Rule were intended to penalize warehouse operators for the emissions of their trucks or compel the purchase of ZE and NZE trucks, the District would have every reason to make each warehouse's WPCO proportional to the number of miles driven by trucks associated with that warehouse. However, if the Rule were solely directed at controlling pollution emitted within the vicinity of warehouses, only the number of times trucks visit those warehouses would be relevant. Because a warehouse's obligations under the Rule are dependent on truck trips rather than truck mileage, the structure of the Rule suggests that it was not adopted for the purpose forbidden by Congress.

CTA and A4A also rely on certain statements by various District Governing Board members and staff members about the purpose of the Rule. Several of those statements were made years before the Rule was finalized. These statements do not reflect the purpose of the Rule, because there is no evidence that those who made these statements would have had the same view about the purpose of the Rule that was adopted. Several of the statements cited by CTA and A4A were made by those who opposed the Rule. Presumably, the majority of the District Governing Board members who approved the Rule did not share the concerns of those who dissented, so these statements are not persuasive evidence of the intent of the majority that approved the Rule. Turning to the remaining statements, Rex Richardson, one member of the Board majority that approved the Rule, stated that "[t]he problem is the trucks." Dkt. 107-2 ¶ 19. Dr. Philip Fine, a District staff member, stated that the District eventually wanted to "completely turn over the truck fleet through incentives" and that the Rule could help with this, but this individual stated that the Rule only operated by providing "incentives" and "options" rather than compelling a result. Dkt. 91 ¶ 62. Another staff member, Ian MacMillan, stated that "[t]he primary thing

---

[9] At the hearing on the Motions, CTA argued that some warehouses have more refrigeration equipment, more loading equipment, or more employees commuting to the warehouse, and CTA then argued that these factors could influence warehouse emissions. Dkt. 155 at 31. However, the arguments of counsel are not evidence, and there is no evidence in the record that these factors had a material effect on warehouse emissions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

that warehouse operators can do is purchase or use low emission technologies." *Id.* ¶ 63.[10] These statements reflect that most warehouse emissions come directly from trucks, and that incentivizing the purchase of ZE and NZE trucks would reduce the emissions associated with warehouses. Even if it were determined that some of these statements had the meaning asserted by CTA and A4A, isolated statements in the administrative record would not show that "legislators and interested parties uniformly understood" that warehouse operators would be required to purchase ZE and NZE trucks. *See Fielder*, 475 F.3d at 194.

As to effects, CTA and A4A place primary reliance on the District's Final Socioeconomic Impact Assessment, which estimated the compliance costs of the Rule. In that analysis, the District determined that the cost of complying with the Rule by using or acquiring ZE or NZE trucks varied from negative $0.02 per square foot to $1.04 per square foot and determined that the cost of complying with the Rule by other means varied from $0.70 to $1.21 per square foot. *See* Dkt. 91 ¶¶ 24-29. Assuming these estimates are accurate, the compliance strategies involving the acquisition or use of ZE and NZE trucks are somewhat less expensive than the compliance strategies that do not. However, there is substantial overlap between the costs of these strategies. In addition, the District presented evidence that warehouses would not have to shutter their operations or relocate unless compliance costs exceeded approximately $1.50 per square foot per year. Dkt. 107-3 ¶ 133.[11] That none of the models predicted compliance costs exceeding that amount, suggests that the effects of the Rule were not sufficient to compel warehouse owners to purchase ZE or NZE trucks. Also, for a typical, 500,000 square foot warehouse, the compliance costs would be 0.5% on the low end to 3.2% on the high end of the warehouse's existing annual operating costs. Dkt. 107-3 ¶ 135. These amounts are quite small, and do not show that the District has provided warehouse operators with a demand to purchase ZE or NZE trucks that cannot practically be refused.

As in *Travelers* and *Dillingham*, it is immaterial that the Rule may have "affect[ed] . . . the relative prices" of different choices or "alter[ed] the incentives" faced by warehouse operators. 514 U.S. at 658; 519 U.S. at 333-34. Only if the Rule provides an incentive that is "tantamount to a compulsion" would it be preempted. 519 U.S. at 334. *Metro Taxicab* and *Taxicab Operators* are instructive in this respect. In *Metro Taxicab*, the rule at issue would have cut the regulated entities' profits nearly in half unless they purchased more energy-efficient vehicles and was therefore preempted. In *Taxicab Operators*, the rule at issue only affected the portion of the taxicab fleet that served the regulated location. Although the rule had increased the number of alternative taxicabs, there had been no showing that alternative taxicabs would displace traditional taxicabs at other locations. Here, the record evidence is that the Rule would increase the operating costs of warehouses by less than 3.2%, and that the Rule only considers trucks that transport goods to and from warehouses in the District. *See* Dkt. 91 ¶ 16; Dkt. 107-3 ¶¶ 135-36. Even if the Rule has increased the number of ZE and NZE trucks that visit warehouses in the District, there has been no showing that diesel trucks have been displaced

---

[10] MacMillan also stated that he did not believe warehouse operators would be likely to satisfy their compliance obligation by installing filters but that he would "report back immediately to the Board and recommend any necessary changes" if "it turn[ed] out that this is a common compliance pathway." Dkt. 91 ¶ 63. This is not a material fact. MacMillan was directed to monitor the effects of the Rule. Consequently, it is logical that he would report back to the Board whenever the Rule had unanticipated effects. Contrary to the argument by CTA and A4A, nothing about this communication shows that the District designed the Rule to make onerous the compliance options other than ZE and NZE trucks.

[11] CTA and A4A dispute the accuracy of this conclusion but have presented no contrary evidence.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

elsewhere within the District. In these respects, *Metro Taxicab* is distinguishable, and *Taxicab Operators* is analogous.

CTA and A4A also argue that the preliminary compliance data supports their position. However, in the Initial Site Information Reports, almost 30% of warehouse operators stated that they did not anticipate acquiring or using ZE or NZE trucks or yard trucks to comply with the Rule. Dkt. 107-3 ¶ 159. Also, more than 10% of warehouse operators stated that they anticipated neither acquiring or using ZE or NZE trucks or yard trucks nor paying the mitigation fee. *Id.* ¶ 158. Given that substantial fractions of warehouses and warehouse operators intended to comply with the Rule without purchasing or using ZE or NZE trucks, the preliminary compliance data supports the District's position that the acquisition of ZE and NZE trucks is not compelled by the Rule.

In the first batch of Annual WAIRE Reports, 87.11% of the total points earned were earned by acquiring or using ZE and NZE trucks. This is a substantial fraction of the total points earned, but a meaningful minority of approximately 13% of the total points earned were earned by taking other actions. Dkt. 126 at 6-8. In addition, only 7.95% of the points earned were attributable to the acquisition of ZE and NZE trucks; 79.16% of the total points earned were attributable to the use of ZE and NZE trucks, many of which may have been purchased before the Rule took effect or even before it was adopted. *See id.*[12] In addition, no evidence has been presented as to whether the increased use of ZE and NZE trucks is attributable to the Rule or to the other incentives provided to warehouse operators, such as increased fuel costs, changes in the prices or quality of available ZE and NZE trucks, the Clean Trucks Fund created by the Ports of Los Angeles and Long Beach, and other regulations and incentive programs adopted by the California Air Resources Board.

CTA has offered a declaration from its Senior Vice President of Government Affairs that CTA's members will "expend substantial resources in direct response to the Rule by purchasing and using District-approved trucks in place of their federally-complaint combustion vehicles." Dkt. 63-2 ¶ 8. A4A has made a similar contention in its verified interrogatory responses about the anticipated reactions of its members to the Rule. Dkt. 107-2 ¶ 11. However, there has been no showing that the individuals who made these statements had personal knowledge of the plans of their members or the reasons those plans were made. In addition, to the extent that these statements repeat other statements made by CTA's and A4A's members, they are inadmissible hearsay. Even if these statements were admissible, they are conclusory.

> (2)    "Relating to the Control of Emissions From New Motor Vehicles or New Motor Vehicle Engines"

In the alternative, CTA and A4A cannot meet their burden of showing that the Rule relates to the control of emissions from new motor vehicles or new motor vehicle engines. The Ninth Circuit has held that when a rule is "targeted at a . . . site as a whole, its standard or requirement relates to emissions from an indirect source, not from nonroad vehicles or engines" used at that location. *NAHB*, 627 F.3d at 739. It cannot reasonably be disputed that the regulated warehouses are indirect sources because they are "facilit[ies]" that "attract[], or may attract, mobile sources of pollution." 42 U.S.C. § 7410(a)(5)(C).

---

[12] CTA argues that warehouse operators would have purchased more ZE and NZE trucks, but many believed that the Rule would soon be invalidated in this action. However, CTA has not provided evidence that warehouse operators considered the status of this litigation in making compliance decisions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

CTA and A4A contend that the Rule is not an indirect source rule because indirect source rules require a "facility-by-facility review of indirect sources of air pollution." 42 U.S.C. § 7410(a)(5)(D). However, a rule does involve a "facility-by-facility" review so long as it operates "[b]y measuring emissions by, and requiring emission reductions from, development sites as a whole . . . ." *NAHB*, 627 F.3d at 737 (upholding a rule where "the emissions reductions it requires are site-based rather than engine- or vehicle-based"). Here, the Rule only applies to trucks to the extent they are used at the indirect sources targeted by the Rule. Trucks used at other places are not affected by the Rule. As in *NAHB*, the application of the Rule depends "not on the character of the [trucks] but the character of the site where the [trucks] happen[] to be located." *Id.*

The Ninth Circuit has not required that the amount of emissions from the regulated site be measured precisely. For example, with respect to a regulation of construction site emissions, California Air Districts were permitted to use an "estimate of how much pollutant the site's construction equipment will actually emit." *Id.* at 732. This figure was generated by using a computer model and could then be refined based on information about the specific construction equipment used. *Id.* The Rule at issue in this action has a similar structure. The WPCO of each facility is calculated based on a formula that applies an estimate of the emissions by the warehouse based on the number and type of trucks that visit that warehouse. Dkt. 91 ¶ 19. The District has provided unrebutted evidence that these truck visits comprise 90% of NOx emissions from warehouses in the District. Dkt. 107-3 ¶ 89. In addition, to the extent that a warehouse takes actions to reduce its emissions through some means not within the Rule, the Rule allows that warehouse to receive WAIRE points for those actions by developing and implementing a custom WAIRE Plan with the District. *Id.* ¶ 116. Therefore, the compliance obligation imposed on warehouses is adequately tied to the emissions from that particular facility.

CTA argues that the indirect-source-review provision of the CAA is limited to regulations that affect "new or modified" indirect sources. This does not accurately describe the provision. It states that the set of permissible rules "includ[es]" regulation of new and modified indirect sources. 42 U.S.C. § 7410(a)(5)(D). Nothing in the text, structure, or purpose of the indirect-source-review provision suggests that this phrase limits indirect source reviews to those based on new and modified indirect sources. Generally, "including" is a "term of enlargement, and not of limitation." *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008). The legislative history of this provision is consistent with its plain text and inconsistent with CTA's narrow reading. "An indirect source review program is one which provides for the review of new, existing or modified indirect sources." H.R. Conf. Rep. 95-564, at 126 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1502, 1507.

CTA and A4A also argue that the District has waived any reliance on the indirect-source-review provision. In support of this position, they refer to a letter from the District to A4A stating that the CAA was "irrelevant" to its authority to enact the Rule because that authority is based on California's police power. *See* Dkt. 81-22 at 3. Even if the District could waive its right to rely on the indirect-source-review provision in such a manner, the statement relied on by CTA and A4A was only one about the origin of the District's authority rather than a disclaimer of its right to rely on the indirect-source-review provision.

*                              *                              *

The determinations made in the prior discussion are consistent with the statements made by the parties

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

at the hearing on this matter regarding whether there were triable issues of fact. The following colloquy occurred during the hearing:

> THE COURT: All right. Thank you. Let me ask my final procedural question. I know you each -- I think what I've heard each of you say this morning is that neither side thinks there are facts in dispute that are material to the decision on the merits. Is that what you've said?
> MR. ROBINSON: Yes, Your Honor, if you look at the –
> THE COURT: I understand.
> MR. ROBINSON: -- opposition, or the so-called disputed fact statement, you won't find any facts. You'll see a lot of argument on the defense side.
> THE COURT: All right. And, Mr. Zinn, I think you -- what is your view on this? I know you've just said that you contend the plaintiffs have introduced facts but didn't -- I think you also said that may not be pertinent to the issues.
> MR. ZINN: In the end, it's not, Your Honor, simply because the Salerno standard requires them to prove that it's preempted in all its circumstances, and they've pointed to no evidence that would support that, so.
> **THE COURT: All right. So let me -- just to confirm this then: Do you both -- are you of the -- do you jointly assert that the issues here, in that this case should be resolved on a Motion for Summary Judgment, whichever way it may come out and that there would not be a need for a trial, a bench trial proceeding, to resolve any facts?**
> **MR. ROBINSON: Absolutely, Your Honor.**
> **THE COURT: You agree with that?**
> **MR. ZINN: Yes, Your Honor, for totally different reasons.**
> **MR. RICHICHI: Your Honor, the [A4A] feels exactly the same that this is –**
> THE COURT: All right. That's fine. I mean, there are -- there's a few out -- there are few cases decided under different statutes -- they're not many -- where there were bench trials to resolve issues. For example, I think here we have some potential for competing expert opinions. I don't think I have all of those opinions yet, but if they were competing expert opinions, your views are that that's just part of the resolution of the legal issues and doesn't require a factual matter. Doesn't involve resolving a fact; is that right?
> MR. ROBINSON: Absolutely, Your Honor.
> THE COURT: You agree with that?
> MR. ZINN: Well, Your Honor, for them to prevail, I think they do need to show facts that are impossible to show because of the standard.

Dkt. 155 at 15:23-17:19 (emphasis added).

For these reasons, summary judgment is granted in favor of Defendants on the CAA claim.

      2.    <u>Airline Deregulation Act and Federal Aviation Administration Authorization Act</u>

      a)    Legal Standards

The ADA provides that state and local governments "may not enact or enforce a law, regulation, or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). A similar provision preempts state laws "related to a price, route, or service of an air carrier or carrier affiliated with a direct air carrier through common controlling ownership when such carrier is transporting property by aircraft or by motor vehicle (whether or not such property has had or will have a prior or subsequent air movement)." *Id.* § 41713(b)(4)(A). The statute also provides that state regulations regarding motor vehicle safety, limitations based on motor vehicle size or weight, limitations on the transportation of hazardous cargo, and certain insurance requirements are not preempted. *See id.* § 41713(b)(4)(B).

"Congress's clear and manifest purpose in enacting the ADA was to achieve the economic deregulation of the airline industry" and to "promote maximum reliance on competitive market forces." *Air Transp. Ass'n of Am. v. City & Cnty. of San Francisco*, 266 F.3d 1064, 1070 (9th Cir. 2001) (cleaned up) (quoting *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 230 (1995)). In other words, Congress sought "[t]o prevent states from 'undo[ing] federal deregulation with regulation of their own . . . .'" *Ventress v. Japan Airlines*, 603 F.3d 676, 681 (9th Cir. 2010) (quoting *Morales*, 504 U.S. at 378). Specifically, Congress "sought to avoid . . . a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 372 (2008) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992)).

The Ninth Circuit has held that the same standard applies to the preemptive effect of the ADA and the FAAAA. *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 644 (9th Cir. 2014) ("the analysis from *Morales* and other Airline Deregulation Act cases is instructive for our FAAAA analysis as well;" "[t]he one difference between the Airline Deregulation Act and the FAAAA is that the latter contains the additional phrase 'with respect to the transportation of property,' which is absent from the Airline Deregulation Act"). Acting in a manner that is consistent with this rule, the parties have agreed that their ADA and FAAAA claims should be analyzed together. *See* Dkt. 150.

"The Supreme Court has held that the analytical framework used in ERISA preemption cases is also utilized in assessing the effect of the ADA's preemption provision on a particular state or local law." *Air Transp. Ass'n of Am. v. City & Cnty. of San Francisco*, 266 F.3d 1064, 1070 (9th Cir. 2001). Thus, one asks whether the state law has "[1] a connection with, or [2] reference to" a covered price, route or service. *Id.* at 1070-71. In applying these terms, the Supreme Court has emphasized that the phrase "related to" "does not mean the sky is the limit." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). Nor is it appropriate to apply "an uncritical literalism . . . ." *Travelers*, 514 U.S. at 656. "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course . . . ." *Id.* at 655. Neither "infinite relations" nor "infinite connections" can "be the measure of pre-emption." *Id.* at 656.

In light of these standards, courts have attempted to "draw a line between laws that are significantly related to rates, routes, or services, even indirectly, and thus are preempted, and those that have only a tenuous, remote, or peripheral connection to rates, routes, or services, and thus are not preempted." *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 656 (9th Cir. 2021), *cert. denied sub nom. California Trucking Ass'n, Inc. v. Bonta*, 142 S. Ct. 2903 (2022) (quoting *Dilts*, 769 F.3d at 643).

The Ninth Circuit has "adopted a relatively narrow definition" of the term "service" for purposes of ADA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

preemption. An air carrier's service consists of "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail." *Ventress*, 603 F.3d at 682 (quoting *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1261 (9th Cir. 1988) (en banc)). Similarly, "'[r]ates' indicates price; 'routes' refers to courses of travel." *Charas*, 160 F.3d at 1265.

"A law's general applicability, while not dispositive, 'will likely influence whether the effect on prices, routes, and services is tenuous or significant.' " *Bonta*, 996 F.3d at 656 (quoting *Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 966 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1331 (2019)). However, "[w]hat matters is not solely that the law is generally applicable, but where in the chain of a motor carrier's business it is acting to compel a certain result . . . and what result it is compelling." *Id.* (quoting same). Nevertheless, generally applicable laws may not be "related to a price, route, or service even if they raise the overall cost of doing business, or shift incentives and make it more costly for motor carriers to choose some routes or services relative to others, leading the carriers to reallocate resources or make different business decisions." *Id.* at 657 (cleaned up) (quoting *Dilts*, 769 F.3d at 646-47).

In general, a state law is not deemed related to motor carriers' prices, routes, and services unless "it compels a result at the level of the motor carrier's relationship with its customers or consumers." *Bonta*, 996 F.3d at 658. "When a generally applicable law compels a motor carrier to a certain result in its relationship with consumers, such as requiring a motor carrier 'to offer a system of services that the market does not provide' or that 'would freeze into place services that carriers might prefer to discontinue in the future,' and 'that the market would not otherwise provide,' the law's effect is more likely to be significantly related to rates, routes or services." *Id.* at 656-57 (quoting *Dilts*, 769 F.3d at 645-46). "Such a law may be preempted because it 'directly or indirectly, *binds* the carrier to a particular price, route or service and thereby interferes with the competitive market forces within the industry." *Id.* at 657 (quoting *Dilts*, 769 F.3d at 646).

"Similarly, a state's common law rule may be preempted if it 'otherwise regulate[s]' prices, routes[] and services by impacting the motor carrier's relationship with its customers." *Id.* (quoting *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1025 (9th Cir. 2020)); *see also Morales*, 504 U.S. at 391 (state regulation of airlines' advertisements to consumers was preempted); *Rowe*, 552 U.S. at 372-73 (state law that limited motor carriers' ability to transport tobacco products was preempted); *Miller*, 976 F.3d at 1024 (state law cause of action for negligent selection of a motor carrier was preempted); *Sanchez v. Aerovias De Mexico, S.A. De C.V.*, 590 F.3d 1027, 1030-31 (state law cause of action for failure to refund certain taxes to customer was preempted); *Air Transp. Ass'n of Am. Inc. v. Cuomo*, 520 F.3d 218, 222 (2d Cir. 2008) (state law that required airlines to furnish fresh air, sanitation facilities, water, and food to customers on delayed flights was preempted). Other regulations, which do not interfere with the carrier-customer relationship, are generally not preempted. For example, "laws of general applicability that affect a motor carrier's relationship with its workforce, and compel a certain wage or preclude discrimination in hiring or firing decisions, are not significantly related to rates, routes or services." *Bonta*, 996 F.3d at 657 (state rules regarding classification as employees and independent contractors not preempted); *Su*, 903 F.3d at 957 (same); *Dilts*, 769 F.3d at 640 (state rules regarding meal and rest breaks not preempted). Further, "inputs such as labor, capital, and technology . . . are often the subject of a particular body of law" and "laws that regulate these inputs operate one or more steps away from the moment at which the firm offers its customer a service for a particular price." *S.C. Johnson & Son, Inc. v. Transp. Corp. of America, Inc.*, 697 F.3d 544, 558 (7th Cir. 2012). Thus, "no one thinks that the ADA . . . preempts" "minimum wage laws, worker-safety laws, anti-discrimination laws . .

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

. pension regulations . . . banking laws, securities rules . . . tax laws . . . intellectual property laws," "laws prohibiting bribery, racketeering, embezzlement, industrial espionage, and gambling," and "many comparable state laws." *Id.* Conversely, "[t]he sorts of laws that Congress considered when enacting the FAAAA included barriers to entry, tariffs, price regulations, and laws governing the types of commodities that a carrier could transport." *Dilts*, 769 F.3d at 644.

ADA preemption extends to "[t]he trucking operations of . . . an air carrier." *Fed. Exp.*, 936 F.2d at 1078. Its "trucking operations are not some separate business venture" because "they are part and parcel of the air delivery system." *Id.* Thus, "[e]very truck carries packages that are in interstate commerce by air." *Id.* Also, "[t]he use of the trucks depends on the conditions of air delivery" because "[t]he timing of the trucks is meshed with the schedules of the planes." *Id.* For this reason, states cannot regulate the prices or terms of service by which an air carrier offers trucking services. *Id.* However, this principle allows a "state to act in an area of non-economic regulation [such as] to impose a general rate for the protection of telephone users without carving out an exception for air carriers." *Id.* "In short, despite the very broad and apparently all-inclusive language of the statute, common sense and common practice have forbidden that the statute be taken literally and have restricted its range." *Id.*

Several cases have held that certain environmental regulations are not preempted by the ADA. *See Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 211 (2d Cir. 2011) (two "environmental laws that do not refer to aviation or airports" were not preempted because they only required a permit for the removal of trees near airports); *Pleasant Hill Bayshore Disposal, Inc. v. Chip-It Recycling, Inc.*, 91 Cal. App. 4th 678, 688 (2001), *as modified on denial of reh'g* (Sept. 13, 2001) (the FAAAA is not "an environmental statute" and did not preempt certain rules related to garbage collection and local recycling programs); *Omya, Inc. v. Vermont*, 33 F. App'x 581, 584 (2d Cir. 2002) (a "land use statute" intended to protect environmental resources was not preempted where it limited the number of truck trips that could be taken between a quarry and a processing center).

According to A4A, in *Su* the Ninth Circuit held that there is a presumption in favor of preemption when a state enacts a regulation for efficiency or to advance environmental interests. The holding in *Su* was significantly narrower. It merely stated "the obvious proposition that an 'all or nothing' rule requiring services be performed by certain types of employee drivers and motivated by a State's own efficiency and environmental goals was likely preempted." 903 F.3d at 964. This proposition is inapplicable here because the Rule is not one that is "all or nothing." In addition, the Ninth Circuit has read *Su* narrowly, rejecting the proposition that even "a state law requiring the use of employees would necessarily be 'related to' the prices, routes, or services of motor carriers." *Bonta*, 996 F.3d at 662-63.

     b)   Application

A4A contends that the ADA and FAAAA preempt the Rule because it protects air carriers' system of transportation and necessarily applies to the local regulation of vehicles. According to A4A, the Rule regulates air carrier services by specifying the type of vehicles air carriers must use to transport property to and from the warehouses that serve their operations. A4A also contends that the Rule regulates air carrier routes because the WPCO of a warehouse depends on the number and type of vehicles that travel there. It also contends that the Rule regulates air carrier prices by imposing compliance costs on air carriers, which will necessarily be passed on to consumers. In the alternative, A4A contends that conflict preemption applies. The District contends that the Rule has only a tenuous,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

remote, or peripheral effect on air carrier prices, routes, or services. The District also denies that the Rule compels operators to purchase or use ZE/NZE trucks, and it argues that warehouse operators only count truck trips as a proxy for their facilities' overall emissions.

The Rule contains no express reference to the services, rates, or routes of air carriers. Unless the Rule "significantly affect[s] rates, routes, or services," it is not sufficient that the law "*implicitly* reference[s] . . . rates, routes, or services." *Nationwide Freight Sys., Inc. v. Illinois Com. Comm'n*, 784 F.3d 367, 375 n.4 (7th Cir. 2015). Thus, the Rule is only preempted by the ADA and FAAAA if it has a connection to the services, rates, and routes of an air carrier. The trucking operations of an air carrier are part of the integrated air delivery system. However, for several reasons, A4A has not shown that the effect of the Rule on that system is more than tenuous, remote and peripheral.

*First*, although the general applicability of a law is not dispositive, it is "a relevant consideration" in understanding whether any effect on rates, routes, and services "is tenuous or significant." *Su*, 903 F.3d at 966. The Rule is not limited to warehouses used by air carriers; it applies to all warehouses in the District. The scope of the Rule is more narrow than the state regulations at issue in *Bonta*, *Dilts*, and *Su*. For example, not all businesses own or operate warehouses large enough to be subject to the Rule. However, a wide range of businesses do transport goods through large warehouses, and the Rule is a "broad law applying to hundreds of different industries with no other forbidden connection with prices, routes, and services." *Dilts*, 769 F.3d at 647 (cleaned up) (quoting *Air Transp. Ass'n of Am. v. City of San Francisco*, 266 F.3d 1064, 1072 (9th Cir. 2001)). Thus, the Rule does not impede the Congressional purpose of ensuring that air carriers are not regulated as public utilities. In addition, this factor suggests that any effect of the Rule on the rates, routes, and services of airlines is remote and peripheral rather than significant.

*Second*, it is immaterial that "a motor carrier must take into account a state regulation when planning services," and that the state regulation "shifts incentives and makes it more costly for motor carriers to choose some routes or services" or that carriers "reallocate resources or make different business decisions." *Dilts*, 769 F.3d at 647, 649. For example, "a law increasing motor carriers' employee costs, but not interfering at the point where the motor carrier provides a service to its customers" is not preempted. *Bonta*, 996 F.3d at 661. Rule 2305 may increase air carriers' costs of doing business, either when they pay the mitigation fee, acquire or using ZE and NZE trucks, or comply with Rule 2305 in other ways. However, this evidence is insufficient for A4A to prevail on its ADA claim unless Rule 2305 interferes with the relationship between air carriers and their customers.

*Third*, "[l]aws are more likely to be preempted when they operate at the point where carriers provide services to customers at specific prices." *Dilts*, 769 F.3d at 646. The Rule has no such effect. For example, the Rule cannot be characterized as similar to "barriers to entry, tariffs, price regulations, [or a law] governing the types of commodities that a carrier could transport." *Id.* at 644. Instead, the Rule "operate[s] one or more steps away from the moment at which the firm offers its customer a service for a particular price." *Johnson*, 697 F.3d at 558. Rather than affecting a motor carrier's relationship with its customers, the Rule regulates the motor carriers' trucks, which are among the economic "inputs" used by those businesses. *Id.* Thus, even accepting A4A's contention that the Rule compels the purchase of ZE and NZE vehicles, its effect on any air carrier's rates is tenuous, remote and peripheral. The Rule does not require that an air carrier offer specific prices to consumers, and does not have an effect that is different than what arises from any regulation that affects an air carrier's costs of compliance.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

Similarly, the Rule does not affect any air carrier's routes because it treats all truck visits the same, no matter which course of travel the air carrier chooses for their trucks. The Rule also does not bind an air carrier to offer particular services for much the same reasons. Thus, it does not control the prices, schedules, origins and destinations offered by air carriers to their customers beyond affecting the compliance costs of those air carriers.

*Fourth*, the ADA and FAAAA were enacted to ensure that airlines would be operated as private businesses rather than public utilities. There has been no showing that the Rule would materially alter this plan. The ADA and FAAAA are not environmental statutes, and A4A has offered no basis to support an inference that these statutes disrupt the balance of federal and state authority over pollution control that was established in the CAA and other statutes. These factors weigh against a finding of preemption. A4A also contends that, even if the express preemption clauses of the ADA and FAAAA do not apply, the Rule has a significant and adverse impact on the   preemption-related objectives of these statutes. However, as noted, the Rule is consistent with the purposes of the ADA and FAAAA.

For each of the foregoing reasons, summary judgment is granted in favor of Defendants on the ADA and FAAAA claims.

3.    <u>The Dormant Commerce Clause and Major Questions Doctrine</u>

In support of the CTA Motion, CTA argues that the Rule violates the Dormant Commerce Clause. However, CTA's Complaint makes no allegations as to the Dormant Commerce Clause; it only contends that the Rule is preempted by the CTA and FAAAA and violates certain provisions of California law. CTA cannot rely on a constitutional claim stated in a single sentence which was not stated in its Complaint.

CTA makes a similar argument as to the major questions doctrine, claiming that it compels the invalidation of the Rule. This doctrine recognizes that Congress does not "typically use oblique or elliptical language" when providing an "[e]xtraordinary grant[] of regulatory authority . . . ." *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022). Consequently, courts presume that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (quoting *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017)). Even if this argument has not been waived, the major questions doctrine, as applied by the Supreme Court, applies to the balance of power between Congress and federal agencies, not the balance of power between the federal government and the states. Moreover, the premise for the major questions doctrine suggests that Congress could not effectively preempt the states' traditional authority to regulate indirect sources of air pollution unless it used clear language to that effect.

**V.    <u>Conclusion</u>**

For the reasons stated in this Order, the Motions are **DENIED**. Summary judgment is granted to Defendants with respect to the claims brought under the CAA, ADA and FAAAA. Within 14 days of the issuance of this Order, after meeting and conferring, the parties shall file a joint report stating their collective and/or respective positions as to the scheduling of additional proceedings in this action, including their proposed date for the expert discovery cutoff and the last date to file motions. The joint report shall also include the parties' collective and/or respective positions as to whether supplemental

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV21-06341 JAK (MRWx) | Date | December 14, 2023 |
|---|---|---|---|
| Title | California Trucking Association v. South Coast Air Quality Management District et al. | | |

jurisdiction over Plaintiffs' state-law claims should be retained.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer          tj
_____